**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC KOTY, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. 15 C 2600** |
| | ) | |
| SHERIFF JOHN ZARUBA, | ) | |
| AS SHERIFF OF DUPAGE | ) | |
| COUNTY, and DUPAGE COUNTY, | ) | **Judge Virginia M. Kendall** |
| | ) | |
| **Defendant.** | ) | |

**DEFENDANT'S LOCAL RULE 56.1(a)(3)
STATEMENT OF UNDISPUTED MATERIAL FACTS**

Defendant, DuPage County Sheriff's Office, by its attorney, Robert Berlin, State's Attorney of DuPage County, through his assistant, Gregory Vaci, hereby submits a Local 56.1(a)(3) statement of undisputed material facts to which there is no genuine issue.

1.     Plaintiff, Eric Koty ("Plaintiff"), brings this action under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 ("ADA") (TAB 1, Defendant's Answer to Plaintiff's First Amended Complaint at ¶ I. A.).

2.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) as Plaintiff is a resident of Plainfield Illinois and was employed with Defendant DuPage County Sheriff in the Northern District of Illinois and the events alleged to be in violation of the ADA occurred within this district. (TAB 1, at ¶ II. C., RR).

3. Defendant DuPage County Sheriff is an elected law enforcement officer in the County of DuPage and is the employer of Plaintiff for purposes of the ADA. (TAB 1, ¶ RR).

4. Plaintiff began his employment with the DuPage County Sheriff on or about May 29, 2001. (TAB 2, Deposition of Plaintiff, p. 6, line 19 through p. 7, line 7) Plaintiff was transferred from Corrections to the Law Enforcement Bureau in 2005. (Id.)

5. The deputies in the Court Security Bureau and the Law Enforcement Bureau are members of the same union; the Metropolitan Alliance of Police ("MAP") (TAB 2, p.7, line 17 through p. 8, line 7) The union contract allows transfer back and forth between the Law Enforcement and Court Services Bureau as long as the transfer is not arbitrary or capricious. (Id.)

6. In November of 2011, Plaintiff aggravated an existing hip condition that he believed to be a genetic problem known as mechanical hip impingement. (TAB 2, p.8, line 14 through p. 9, line 15)

7. In this case, Plaintiff alleges only that the Sheriff's Office retaliated against him for submitting a complaint with the EEOC to the Sheriff's Office and not for any other activity taken by him. (TAB 2, p.13, line 13-22)

8. Plaintiff filed EEOC charge number 440-2014-03506 (Amended) on April 28, 2014 alleging retaliation for filing EEOC charge 440-2014-03506. (TAB 10, EEOC charge 440-2014-03506 (Amended) filed April 28, 2014; TAB 2, p. 65, Plaintiff's deposition exhibit no. 5)

9. Plaintiff filed EEOC charge 440-2014-03506 on April 9, 2014 alleging discrimination in violation of the ADA. (TAB 7, EEOC charge 440-2014-03506 filed April 9, 2014; TAB 2, p. 65, Plaintiff's deposition exhibit no. 4)

10. Plaintiff makes no other claims of retaliation other than his transfer to court security, his placement on inactive status in SWAT, his being required to devise a plan to store his weapons, his assignment to court security upon returning to work after his surgery, and being assigned to midnights after being transferred back to patrol. (TAB 2, p.36, lines 3-7)

11. Plaintiff submitted a doctor's note on February 12, 2014, which stated that he was able to resume regular work on that day. (TAB 6, February 12, 2014 Doctor's note; TAB 2, p. 59, Plaintiff's deposition exhibit no. 2) The note further stated that Plaintiff was able to perform all duties of a law enforcement official and that because of a hip condition a squad car with more legroom, like and SUV would be preferable. (Id.)

12. Plaintiff admits that there was nothing contained in the February 12, 2014 letter that would have caused the employer to not allow Plaintiff to drive his current assigned vehicle. (TAB 2, p. 61, line 2-8)

13. On April 7, 2014, Plaintiff submitted a doctor's note dated April 4, 2014 doctor's note along with an unfiled version of EEOC charge 440-2014-03506 to the Sheriff's Office. (TAB 2, p. 65 line 17 through p. 68, line 19; TAB 5; TAB 7) The EEOC charge provided by Plaintiff had not been filed at the EEOC when it was submitted to the Sheriff's Office. (TAB 3, p. 82, lines 2-12) Plaintiff provided the EEOC charge and

3

the doctor's note dated April 4, 2014 to the Sheriff's Office at the same time. (Id. lines 13-17)

14.     When Plaintiff went to the doctor on April 4, 2014 and received a doctor's note saying that he could no longer drive his assigned vehicle, it was apparent to him that it was possible that he would be transferred to court services. (TAB 2, p. 71, line 1-9)

15.     The April 4, 2014 doctor's note obtained by Plaintiff stated that Plaintiff could resume work as of that day and that he could perform all of the duties of a law enforcement official. (TAB 5, April 4, 2014 Doctor's note; TAB 2, p. 61, Plaintiff's deposition exhibit no. 3)  The note also said that because of a hip condition, a squad car with more legroom, like an SUV, is necessary. (Id.)

16.     Plaintiff admitted that the April 4, 2014 doctor's note directed the Sheriff's Office not to allow him to use the vehicle that was currently assigned to him any longer. (TAB 2, p. 83 line 20 through p. 84, line 7)

17.     The April 4, 2014 doctor's note was the only note received from Plaintiff's physician restricting him from driving his assigned vehicle. (TAB 3, p. 87, line 24 through p. 88, line 2)

18.     Prior to the April 4, 2014 doctor's note, Plaintiff's doctor only indicated that it was preferable that he drive a different vehicle. (TAB 3, p. 88, line 3-15)  Plaintiff never provided any follow up letter to the April 4, 2014 doctor's note that was more specific than requiring a squad car with more room, like an SUV. (Id. p. 7-14)

4

19. Plaintiff agreed that continuing to drive his assigned vehicle would have violated the restrictions placed on him by his doctor on April 4, 2014. (TAB 9, Testimony of Plaintiff in Labor Board hearing, p. 105, line 12 through p. 106, line 1)

20. On April 8, 2014, Plaintiff received a letter authored by Chief Angus assigning Plaintiff to court security. (TAB 2, p. 76 lines 4-10; TAB 8, Angus temporary transfer memo of April 8, 2014; TAB 2, p. 76, Plaintiff's deposition exhibit no. 6) Angus' letter stated that the April 4, 2014 doctor's note prevented Plaintiff from working in his current vehicle and that the employer had no vehicles conducive to the recommendation of his doctor. (TAB 8) Plaintiff was temporarily transferred to the court house pending the receipt of additional requested information regarding this matter. (TAB 8)

21. The April 8, 2014 letter indicated that the transfer of Plaintiff to the courthouse was temporary and in fact the transfer was a temporary one. (TAB 2, p. 84, line 8-20; p. 52 line 9 through p. 53, line 7)

22. Plaintiff admitted that by transferring him to the courthouse, the Sheriff's Office had complied with his doctor's note, even though it was not the solution that he preferred. (TAB 2, p. 85, line 8-20) Plaintiff further admitted that his transfer to the courthouse was one of several accommodations that satisfied the restriction placed on him by the April 4, 2016 doctor's note. (TAB 2, p. 88, line 19 through p. 89, line 16)

23. The decision to temporarily transfer Plaintiff to Court Services arrived at during a meeting between Chief Kruse, Chief Angus and Assistant State's Attorney Bruckner. (TAB 3, Deposition of James Kruse, p. 12, line 18 through p. 13, line 4)

24.     The meeting was convened either the day of, or the day after, Plaintiff submitted a doctor's note to the Sheriff's Office and was convened for the purpose of discussing that note. (TAB 3, p. 13, line 9-22)

25.     During the meeting, it was contemplated that since the only restriction that was placed on Plaintiff by his doctor was that he could not operate his assigned vehicle, the options were either to transfer Plaintiff to the courthouse or send him home. (TAB 3, p. 14, line 14-20)

26.     During the meeting, Chief Kruse consulted with ASA Bruckner, who had the idea of having Plaintiff work in the courthouse because he could do everything that a deputy could do except operate a specific vehicle. (TAB 3, p. 34, line 13-22)  Chief Angus decided that the appropriate thing to do was to transfer Plaintiff to the courthouse so that he could continue working and because there was a need for more manpower in the courthouse. (TAB 3, p. 34, line 23 through p. 35, line 5)

27.     In January 2014, Chief Kruse contacted Patrick Genovese to do an assessment of the vehicles involved. (TAB 3, p. 73, lines 4-24) Genovese was contacted to determine which vehicle had the most leg room. (TAB 3, p. 74, lines 10-14)

28.     Based on the measurements of the vehicles taken by Mr. Genovese and received by Kruse through an email in January of 2014, it was the understanding of Chief Kruse that the Crown Victoria had more leg room than the Ford Explorer. (TAB 3, p. 83, line 13 through p. 85, line 1)  The leg room for the Crown Victoria was 42.5 inches (Length of seat pan added to Front edge of seat to pedals) and the leg room for the Ford Explorer was 42.25 inches (TAB 13, Squad Car evaluation Bates stamped 537)

29.    Subsequent to the assessment regarding the leg room of both vehicles Chief Kruse considered it irrelevant whether there were available Explorers since the vehicles had the same amount of leg room. (TAB 3, p. 85, lines 2-20)  Chiefs Angus and Kruse were aware of those measurements when the decision was made to transfer Plaintiff to court services. (Id.)  The fact that the employer had no vehicles conducive to the doctor's recommendation for more leg room was memorialized in the transfer letter to Plaintiff on April 8, 2014. (TAB 3, p. 86, line 12 through p. 87, line 12)

30.    According to Chief Kruse, on April 7, 2014, the only options with respect to Plaintiff was to transfer him to the courthouse or tell him to stay home because he was unable to drive the vehicle that was assigned to him. (TAB 3, p. 87, line 13-23)

31.    Alan Angus was involved in the decision-making process regarding Plaintiff's transfer to court services and in fact authored a memo temporarily transferring Plaintiff to a court house assignment until he was medically able to return to patrol. (TAB 4, p. 36, lines 6-23)

32.    Angus' opinion regarding Plaintiff's transfer was that he preferred to keep Plaintiff working somewhere in the office being productive rather than sitting at home because he could not drive his vehicle.  (TAB 4, p.42, lines 4-10)  Since there was no vehicle available that had more leg room than his current vehicle, a temporary transfer to court services kept Plaintiff productive and working. (TAB 4, p. 42, lines 12-22)

33.    Giving Plaintiff the SUV used by the Sheriff's Office was not an option because it had less leg room and his doctor's note indicated that he needed more leg room. (TAB 4, p.43, lines 13-21)

7

34.     On April 8, 2014, Angus was in possession of a doctor's note submitted by Plaintiff dated April 4, 2014, which indicated that Plaintiff needed a vehicle with more leg room.  (TAB 4, p. 82, line 7 through p. 83, line 22) He was not aware of any other medical notes provided by Plaintiff giving any other medical direction other than he needed more leg room. (Id.)

35.     The Sheriff has final say all transfers between bureaus. (TAB 4, Deposition of Alan Angus, p. 18, lines 16-23)

36.     Plaintiff's transfer was approved by the Sheriff after it was recommended by Kruse and Angus. (TAB 4, p. 87, line 19 through p. 88, line 23)

37.     Plaintiff provides no evidence that would indicate that his transfer to the courthouse was in retaliation for submitting the EEOC charge on April 7, 2014, other than that the transfer took place the next day. (TAB 2, p.38, line 16-21; p. 39, line16-22; p. 41, lines 12-19)

38.     Plaintiff claims that he was removed from the Special Operations unit ("SWAT") in retaliation for filing the same EEOC charge. (TAB 2, p.20, line 17-19) He alleges that he was not given a reason why he was placed on inactive status with SWAT on April 9, 2014. (TAB 2, p.21, line 5 through p. 22, line 17)  Plaintiff was placed back on SWAT active status in September or October of 2014. (TAB 2, p.23, line 6-12)

39.     Plaintiff was unaware of who made the decisions to transfer him to Court Services and place him on inactive status in SWAT.(TAB 2, p.24, line 13 through p. 25, line 11)

40.     Plaintiff also claims that he was required to have a security plan with respect to storing his weapons while he was at the courthouse working in retaliation for submitting the EEOC charge. (TAB 2, p.25, line 12 through p. 26, line 13)

41.     On August 14, 2014, Plaintiff received a memo from Chief Kruse wherein he requested from Plaintiff a proposal on how Plaintiff would store his weapons and equipment related to his assignment to the Special Operations unit. (TAB 2, p. 94 line 17 through p. 95, line 22)

42.     Plaintiff responded in writing that he would be storing his weapons and gear in his personal vehicle and using that vehicle if he was called out. (TAB 2, p. 96, line 9-16)

43.     The issue was resolved by Plaintiff coming up with a plan to store his weapons in his personal vehicle and parking in the sally port of the courthouse. (TAB 2, p.26, line 14 through p. 27, line 7)

44.     On September 22, 2014, Chief Kruse responded with a memo wherein he outlined where Plaintiff would park and indicated that Plaintiff's weapons should be stored in his trunk or in a locked case concealed from view if his vehicle did not have a trunk. (TAB 2, p. 97, line 5-22)  This was one of four options provided by Plaintiff that was selected. (TAB 2, p. 98, line 3-14)

45.     Between the dates of February 19, 2015 and March 23, 2015, Plaintiff was unable to return to work due to the fact that he had restrictions that prevented him from being able to work full-duty as a deputy. (TAB 2, p. 102, line 1 through p. 103, line 7)

46. On March 23, 2015, Plaintiff returned to work in court services. (TAB 2, p. 105, line 8-14)

47. On March 24, 2015, Plaintiff received a memo from Chief Kruse indicating that Plaintiff was being transferred to the Law Enforcement Bureau. (TAB 2, p. 106, line 8-22; TAB 11, Transfer memo dated March 24, 2014; TAB 2, p. 106, Plaintiff's deposition exhibit no. 13)  The transfer became effective a week after Plaintiff had been released for full duty. (Id.)

48. Plaintiff was told that he was assigned back to court services after he returned to work from medical leave because he was in court services when he went on leave so he had to return there and had to be on a transfer list to go to patrol.  (TAB 2, p. 46, line 8-22) After Plaintiff put in a transfer request he was transferred to patrol a week later. (TAB 2, p. 47, line 1-3)

49. When Plaintiff returned to the Law Enforcement Bureau, he was initially assigned to the midnight shift on patrol.  (TAB 2, p. 107, lines 1-10)  Plaintiff was assigned to the day watch one month after his transfer back to the Law Enforcement Bureau. (TAB 2, p. 107, line 20 through p. 108,  line 14)

50. Plaintiff testified that normally, if you are on any type of medical leave, you are not allowed to bid on a shift and are assigned to wherever there is an open slot. (TAB 2, p.48, line 19-22)

51. Plaintiff suffered no loss of pay when he was assigned to the midnight shift. (TAB 2, p.50, line 12-15)

52.     Plaintiff was not assigned to court services long enough to affect his certification as a patrol officer. (TAB 2, p. 113, line 12 through p. 114, line 10) Plaintiff was unaware of any patrol officer training that he missed as a result of being temporarily assigned to court services. (TAB 2, p. 114, line 11-18)

53.     Plaintiff admits that he has no proof that Sheriff Zaruba was personally involved in any of the decisions that Plaintiff claims were retaliatory actions taken by the employer. (TAB 2, p. 152, line 22 through p. 153, line 7; p. 156, line 21 through p. 157, line 11)

54.     Chris Johnson was employed by the Sheriff in the position of Quartermaster in the Spring of 2014 sometime after February 26, 2014. (TAB 12, Deposition of Chris Johnson, p. 32, lines 9-22)

55.     Johnson recalls a conversation with the Sheriff wherein the Sheriff told him not to give Plaintiff an SUV but has no recollection as to the date of that conversation.  (TAB 12, p. 42, line 18 through p. 43, line 15)

BY:     S/Gregory Vaci
#6204697
Assistant State's Attorney
503 N. County Farm Rd.
Wheaton, Illinois 60187
(630) 407-8221