UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

ERIC KOTY,                                          )
                                                    )
                    Plaintiff,                      )
                                                    )
v.                                                  )        Case No. 15 C 2600
                                                    )
SHERIFF JOHN ZARUBA,                                )        Judge Virginia M. Kendall
IN HIS OFFICIAL CAPACITY                            )
AS SHERIFF OF DUPAGE                                )
COUNTY, and DUPAGE COUNTY,                          )
                                                    )
                    Defendants.                     )


# TAB 2

# Excerpts from the deposition of Plaintiff

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ERIC KOTY,                          )
                                    )
              Plaintiff,            )
                                    )
     vs.                            ) No. 15-C-2600
                                    )
SHERIFF JOHN ZARUBA,                )
Individually and in his             )
Official Capacity as Sheriff        )
of DuPage County, and               )
COUNTY OF DU PAGE,

              Defendants.


THE DISCOVERY DEPOSITION OF
ERIC KOTY
August 9, 2016
10:00 A.M.


          Called as a witness by the Defendant
herein, pursuant to the provisions of the Federal Rules
of Civil Procedure pertaining to the taking of
depositions for the purpose of discovery, before GLORIA
APOSTOLOS, C.S.R., License #084-001205, qualified and
commissioned for the State of Illinois.

Eric Koty
August 9, 2016

2

PRESENT:

        MR. JEFFREY M. JACOBSON

        430 West Roosevelt Road

        Wheaton, IL   60187

          appeared on behalf of the Plaintiff.


        DU PAGE COUNTY STATE'S ATTORNEY'S OFFICE,

        by

        MR. GREGORY VACI

        503 North County Farm Road

        Wheaton, IL   60187

          appeared on behalf of the Defendant.

Eric Koty
August 9, 2016

4

MR. VACI:  Will you swear him in, please?

THE COURT REPORTER:  Raise your right hand please.

(The oath was thereupon duly

administered to the witness

by the Notary.)

MR. VACI:  For the record, we are here for the deposition of deputy Eric Koty in the case of Eric Koty versus Sheriff John Zaruba in his official capacity as the Sheriff of DuPage County, case number 15-C-2600 in front of Judge Virginia Kendall in Federal Court.

ERIC                KOTY,

Called as a witness by the Defendant herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

By:  Mr. Vaci

Q    Deputy Koty, have you been deposed before?

A    **Yes, I have.**

Q    In what type of cases?

A    **A civil case.**

Q    And you've testified in court as well?

A    **That's correct.**

Eric Koty
August 9, 2016

5

Q    You understand that this is essentially the same as testifying in court?  You're under oath.  It's just obviously no Judge in the room to rule on things.  Do you understand that?

A    **Yes.**

Q    Have you taken any medication or are under the influence of anything that would cause you not to be able to tell the truth today?

A    **No.**

Q    Anything that would cause you not to be able to understand the questions I'm asking you?

A    **No.**

Q    Okay.  So you're familiar with the fact I'm going to be asking you questions, correct?

A    **Yes.**

Q    And then you're going to give me an answer, right?

A    **Yes.**

Q    And those answers have to be in a verbal capacity, okay?

A    **Correct.**

Q    You can't shake your head.  You can shake

Eric Koty
August 9, 2016

6

your head as much as you want, but you've got to give me an answer too.

A    Yes.

Q    And she's taking down everything, so wait for me to finish the question before you give an answer, okay?  Because we want a nice, clean record.

If you don't understand a question, feel free to tell me and I will rephrase it.  Your attorney may object from time to time, so if he objects, he may tell you not to answer the question, or he may tell you to go ahead and answer.  Okay?

A    Yes.

Q    If you want to take a break, go to the bathroom, get a drink, whatever, just let me know and we'll take a break.  Okay?  The only thing is, if there's a question pending, I'm going to ask you to finish the question first.  All right?

A    Yes.

Q    When did you start with the Sheriff's Office, working?

A    **May 29th, 2001, I believe was the date.**

Q    Did you start in the jail, or did you start

Eric Koty
August 9, 2016

in the law enforcement building?

A    I started in the jail.

Q    How long were you in the jail for?

A    That time until February of 2005.

Q    In 2005 what happened?

A    I was transferred to the law enforcement bureau patrol.

Q    And when you transferred to law enforcement, is that something that you have to put in for?

A    Yes, it is, a request.

Q    And you did that?

A    Yes, I did.

Q    So you have been in the patrol law enforcement bureau since 2005?

A    Except for a break when I was assigned to court security.

Q    The deputies that are in court security in that bureau and in the Law Enforcement Bureau are in the same union; is that correct?

A    That's correct.

Q    And that would be the Metropolitan Alliance of Police?

Eric Koty
August 9, 2016

8

A    That's correct.

Q    Is there anything regarding the union membership of those deputies in administration and in law enforcement that would prevent transfer back and forth between those bureaus, as far as you know?

A    According to the contract, as long as the transfer is not arbitrary or capricious.

Q    Did you at some point develop a medical condition regarding your hip?

A    Yes.

Q    When was that?

A    When I first experienced the problems was back in November of 2011.

Q    And was there an incident that caused an injury to your hip, or was it a condition like a degenerative condition?

A    There was one incident where the next day I had let's say notice of a severe reaction to it.  So that date I would say that something happened.

Q    In November of 2011?

A    That's correct.

Q    Do you not know what actually occurred to

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

9

cause your condition?

A    I know what the condition is and I know that I would say that that day's what I did aggravated the condition.

Q    What was the condition as far as you were aware?

A    At that time I wasn't aware.  I didn't know what the problem was.

Q    You later found out what the condition was?

A    Right.

Q    And what did you find out?  What did you find it to be?

A    The genetic problem is I have mechanical hip impingement.  That's a genetic defect that I have in my hips.

Q    And specifically how does that affect you, that condition, how did it affect you?

A    That affects me because the impingement occurs when I am in a sitting position.  So in other words, the bones rub on each other when my hip is in a 90-degree or greater position.

Q    And has that condition been resolved?

Eric Koty
August 9, 2016

10

A     I've had one surgery, but it did not resolve the condition.

Q     How long ago was the surgery?

A     In December 23rd of '14.

Q     So from November of 2011, that was the first time that this genetic condition, that you noticed that it was affecting your work?

A     Yes.

Q     In what way?

MR. JACOBSON:  I just want to say, 12/13/14 is when you said you had a surgery?

THE WITNESS:  Yes.

MR. JACOBSON:  It wasn't '15?

THE WITNESS:  No.  I was in the courthouse '14.

MR. JACOBSON:  Sorry about that.  I just want to make sure we got the right dates.

MR. VACI:  Yes, that's fine.

BY MR. VACI:

Q     In November of 2011, was that the first time you noticed that your medical condition with your hip was affecting your work?

A     I had lower back pain prior to that.  I had

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

11

saw a chiropractor for a couple times. And then in November, I had numbness occurring in my leg, and that definitely affected my work.

Q    In what way?

A    It's my right leg, so in order to drive the vehicle, if the right leg goes numb, I can't work. It was partially numb for a long time. One day it went all the way down my foot and I had to leave early and go home.

Q    Was there any other aspect of your job as a deputy that was affected by your hip condition during that time?

A    No. I could still do everything else I needed to do.

Q    After November of 2011, do you recall instances where you notified your employer that you were having a problem driving a vehicle?

A    During November and December I spoke with my employer and let them know that I was having trouble or problems driving the vehicle.

Q    In 2011?

A    Yes.

Eric Koty
August 9, 2016

12

Q    Who did you speak to?

A    I spoke with Sergeant Moore and Lieutenant Mendrick.

Q    These were oral conversations?

A    Correct.

Q    And what did you tell them regarding your condition?

A    I told them that I had pain in my back, I had pain in my hip, and that my right leg was partially numb.  I told them that I believe I needed to get the seat moved further back in my current squad car to get more room to try to alleviate the problem.

Q    And what if anything occurred as the result of those conversations?

A    January 3rd of 2012 after I spoke with Sergeant Moore again over the phone, he called me into the office and told me to put in a to/from to Chief Bilodeau explaining what the problem was, and I did that.

Q    Did you do that?

A    Yes, I did that.

Q    And when did you do that?

Eric Koty
August 9, 2016

13

A    January 3rd I believe was the date, of 2012.

Q    At that time in January of 2012 were you unable to drive your vehicle that you were assigned?

A    I could still drive it.  I mean physically, could I still drive it?  Yes.

Q    All right.  And at that time had any physician, any of your doctors indicated that you could not use the vehicle that you were assigned to up until that point?

A    Could not?  No.

I explained to them what the problem was. I told them what I thought would help, and they agreed.

Q    The case that you filed here in Federal Court that you're being deposed on, you're alleging that the Sheriff's Office retaliated against you for taking certain actions; is that correct?

A    That's correct.

Q    What actions, specifically, are you alleging that the Sheriff retaliated against you for doing?

A    For filing a Complaint with the EEOC.

Q    Anything else?

A    In the retaliation, no.

Eric Koty
August 9, 2016

14

Q    And the EEOC charge that you filed, do you remember when you filed it?

**A    The first week of April, I believe.**

Q    2014?

**A    Correct.**

Q    And what did you do when you filed that -- strike that.

Did you go to the EEOC offices?

**A    No.  My attorney filed the Complaint for me.**

Q    Okay.  And did you see the document before it was filed?

**A    Yes.**

Q    The EEOC charge that was filed, did you personally give it to anybody in the Sheriff's Office?

**A    I gave a copy of it.  I turned it in April 7th in the morning when I started my shift, along with another doctor's note.**

Q    And that was a doctor's note that was provided to you by your physician; is that correct?

**A    Yes, Dr. Thangamane.**

Q    And you gave that doctor's note and the EEOC charge to whom at the Sheriff's Office?

Eric Koty
August 9, 2016

15

     A     Sergeant -- I can't remember his name because I don't work for him any more.

     Q     Was it Ruff?

     A     Yes.  It was Ruff.  Thank you.

     Q     And did you hand it to him?

     A     I didn't hand it directly to him.  I put it on -- I said I need to give this to Lieutenant Mendrick.  He said go ahead and put it into his in box.  So essentially, he was there.  He didn't seem like he wanted to take it from me, so I just said hey, I need to hand this stuff in, and I did so.

     Q     What was the next thing you recall occurring after you handed those two documents to where you turned them in?

     A     Correct.  I was contacted over the phone by Lieutenant Mendrick.

     Q     The same day?

     A     Yes, the same day, later on in the morning.  He told me that Sergeant Ruff had given the documents to Colonel Sternberg.

     Q     And that was Mendrick?

     A     Correct.

Eric Koty
August 9, 2016

18

you know, I've sat it in and I know that it fits me better.

Q    Was that the extent of the conversation at that point?

A    No.  Before he left I told him that this was retaliation.

Q    Before you left that meeting?

A    Before he left the room.  He left first.

Q    And what did you say?  You said it was retaliation?

A    Correct.

Q    And what did you say it was retaliation for?

A    I just said it was retaliation.

Q    And you were referring to your transfer to the courthouse being retaliation; is that correct?

A    That's correct.

Q    Why did you believe that was retaliation?  Or strike that.  What did you believe at that time that it was retaliation for?

A    For turning in the EEOC Complaint.

Q    You had turned in the EEOC the previous day, correct?

Eric Koty
August 9, 2016

19

**A     Correct.  And then during the meeting he handed it back to me.**

Q     Did he hand that back to you with the other document as well, or just --

**A     The doctor's note?  No.  He handed back the EEOC charge and said that this was between me and my doctor.  I think I made a comment like, "Don't you know what this is?"**

Q     What did he say?

**A     He didn't respond.**

Q     And what did you mean by, "Don't you know what this is?"

**A     This is an EEOC Complaint against the employer.  Why would you make a statement that this is between me and my doctor?**

Q     Did you say that to him, or was that something you just thought?

**A     That's what I thought.**

Q     Were you transferred then to the courthouse at that point?

**A     Yes, I was.**

Q     Did you start working at the courthouse that

Eric Koty
August 9, 2016

20

day?

A    That day, no.

Q    Was it the next day?

A    My next day that they needed to make up days off for payroll to be correct, so I started that Friday.

Q    Other than the transfer to the courthouse, is there anything else that you believe, any other actions taken by the employer, the Sheriff's Office, that you believe were retaliatory for filing the EEOC charge?

A    The removal from special operations.

Q    What are special operations?

A    Special operation unit is what is commonly referred to as SWAT.

Q    And is that a unit that you were in at the time?

A    Yes, it was.

Q    That was in April of 2014?

A    That's correct.

Q    How long had you been in special operations?

A    I had been in special operations since about July of 2008, and then there was a break of about a

Eric Koty
August 9, 2016

21

year, year and-a-half where I was moved from special operations, and then I was put back on the special operations after a ULP hearing, Unfair Labor Practice hearing.

Q    At what point were you removed from the Special Operations Unit?

A    In this incident?

Q    Yes.

A    I received a letter at my home on the 9th, I believe was the date.

Q    Of?

A    April.

Q    2014?

A    Correct.

Q    And what did the letter say, to the best of your recollection?

A    Per the advice of the State's Attorney, I was suspended from the Special Operations Unit.

Q    The Special Operations Unit, is that an assignment that you would do something with every day that you would work?

A    You were basically on call every other month

Eric Koty
August 9, 2016

22

at that point in time. You were trained once or twice a month. And if an incident arose where they activated the unit, that you would be called out.

Q    And is there extra compensation for the Special Operations Unit?

A    There's a pager stipend that you get for the months that you are on call.

Q    And what is that? What's the stipend?

A    I believe it's $25.00 a week for the week you're on call.

Q    And during the time that you were suspended from or on inactive status with the Special Ops, did you receive that $25.00?

A    No.

Q    Were you given a reason why you were placed on inactive status with the Special Ops Unit?

A    No.

Q    What is your understanding of why you were placed on inactive status?

A    My opinion is that it was further retaliation. It was an opportunity to further retaliate against me.

Eric Koty
August 9, 2016

23

Q    Are there any criteria or requirements in the General Orders that you're aware of that would have prevented you from being taken off of Special Ops for a period of time?

A    No.

Q    Do you recall as you sit there how long you were off of the Special Ops?

A    **From April 9th until I believe the end of September.  I think I got back the end of September or October.**

Q    Of the same year, 2014?

A    **Correct.**

Q    Do you know why you were placed back into active duty in Special Ops in September or October of 2014?

A    **No.**

Q    Were you given a reason why you were placed back inactive status in September or October of 2014?

A    **I received a to/from from Chief Kruse stating that he had a medical clearance.  That's it.**

Q    And did you at that time when you were told that, had you received a medical clearance?

Eric Koty
August 9, 2016

24

A    I received a medical clearance on May 27th.

Q    Of 2014?

A    Correct.

Q    So prior to May 27th of 2014, were you not medically cleared by your doctor to work in Special Ops?

A    No, I was not.  There was no restrictions placed on me from a doctor stating no, you can't do special operations, no, you can't do functions of a police officer.  Administration, Chief Kruse, no one ever asked me for a doctor's note stating that I was cleared to perform the duties of special operations.

Q    Are you aware of who made the decision to transfer you to the Court services?

A    According to the letter that I received from Al Angus, Chief Al Angus, it sounded like the State's Attorney's Office made that decision.

Q    And are you aware of who made the decision to place you on inactive status with Special Ops?

A    Again, according to the letter, the State's Attorney's Office made that decision.

Q    Well, somebody with the Sheriff's Office

Eric Koty
August 9, 2016

25

would have to actually transfer you and take you off of Special Ops, correct?

A    I would assume so.  It's Chief Al Angus who signed the letter.

Q    Would it be correct that you don't specifically know who in the Sheriff's Office made the decision?

A    No, I do not.

Q    You weren't privy to any of those discussions?

A    Conversations, no.

Q    Other than being transferred to court services and being placed on inactive status with Special Ops for approximately five months, five to six months, are there any other acts that were taken by the Sheriff's Office that you believe were retaliatory for filing the EEOC claim?

A    Well, when I was put -- after the letter in August of 2014 when he said he had received the letter from -- or my doctor's note from May 27th, I --

Q    Wait.  Who said that?

A    Chief Kruse.

Eric Koty
August 9, 2016

26

Q    Okay.

A    There was the whole issue of where I would store my SWAT gear and my weapon while I was working at the courthouse, which has never been an issue with anyone else.

Q    Is that while you were on inactive status or --

A    Correct.  Before I could be put back on active status, and I'm sure it's in the document, it was brought up that they would need to know, I would have to have a security plan where I would store my gear and my weapon while I was at the courthouse working.

Q    And how was that resolved?

A    That was resolved after several communications, and a month and-a-half later they put me back on the team.

Q    Was there a plan put in place regarding where you would store your weapons?

A    Yes.

Q    Where was that?

A    They were stored in my vehicle, and I was

Eric Koty
August 9, 2016

27

parking down in the sally port of the courthouse, which was available the whole time I was there.

Q    In your personal vehicle, correct?

A    Correct.

Q    And the plan that you came up with, that was acceptable to the Sheriff's Office?

A    That was acceptable to the Sheriff's Office.

Q    So we're clear, what part of that do you believe was retaliatory?

A    That I had to come up with a security plan of where I would store my gear or my weapon while I was working at the courthouse.  And the reason for that is that numerous other members on SWAT drive unmarked SUV's, and they have all their gear and their weapons stored in the back of their SUV's, and those SUV's have no better security to them than I do, and they are parked out in public places all the time.

Q    How do you know that?

A    Because when I go to SWAT I see them open up the back of their SUV.  I know their stuff is in there.  And there is no cages or locked anything to prevent someone from breaking a window or taking them, which

Eric Koty
August 9, 2016

28

was their whole issue as to me storing my gear in my personal vehicle.

Q    And do you have information or knowledge that someone within the Sheriff's Office knows that those deputies store their weapons in that way?

A    They know that those vehicles are not equipped with cages or with the security lockers. Those vehicles are issued to them by the Sheriff's Office, so they know the condition of the vehicles. They know that while the deputies are at work, their vehicles are not always parked in a secure location. In fact, they are not parked anywhere in a secure location ever.

Q    How many deputies are you talking about?

A    The commander of the unit at the time, Sergeant Harris, he has an SUV that has no cages in it. He has weapons and gear in there. All the members that were on SR22 all drive SUV's. They had no cages in them. That's three members right there. So that's at least four right there that all drive SUV's that had no additional security to secure their gear or their weapons, the same condition that I would be in driving

Eric Koty
August 9, 2016

29

my personal vehicle.

Q    And it's your understanding that Chief Kruse was aware that those weapons were stored in those vehicles in the manner you described?

A    Yes.

Q    How do you know that?

A    I think I put that in an email to him.

Q    An email informing him that that was the case?

A    Yes.

Q    Do you remember when you did that?

A    Probably after his request for -- it was after his note about where I was going to store my gear. And maybe I didn't send it to him; maybe it was sent through Joe Mazzone, who is the Union's attorney, to ASA Bruckner.

Q    Were you copied on this email or message?

A    I think I've seen it, yes, because we were discussing how and why I needed to come up with a security plan to where I was going to store my gear and weapons.

Q    Was it responded to?

Eric Koty
August 9, 2016

34

the Sheriff there, and then received the letter.  And then that next Monday, I went back to patrol.

Q     And your belief is that the fact that you were initially placed back at work in court services was in retaliation for the EEOC charge?

A     Well, if I was never in court services to begin with, then I wouldn't have to worry about getting transferred back into patrol.

Q     Okay.  Other than those things that you've already mentioned, is there anything else that you believe, any other actions that you believe were taken in retaliation for filing the EEOC charge?

A     Well, when I was put back into patrol, I was put on midnights.

Q     Where did you want to go?

A     Well, I had already been on the 2015 patrol roster for days, which is what I had been on before I was removed from patrol, was days, because I had enough seniority to be on days.

Q     You had enough seniority to be on days?

A     Correct.

Q     Is it the case that when somebody goes

Eric Koty
August 9, 2016

35

back -- strike that.

How often is there a bidding process for shifts?

A    Once a year.  We shift bid once a year.

So I had shift bid for 2015 patrol.  I was put on the 2015 patrol roster on days on the same team that I had been on before.  And then when I returned back to patrol at the end of March, I was put on midnights.

Q    And when were you able to bid for the shift you wanted?

A    I had to file a grievance.  And after I filed a grievance, they put me on days.

Q    Is there an office-wide bidding once a year?

A    Correct.

Q    And were you put back on days before that office-wide bidding?

A    Yes.

Q    Do you know who made the decision to put you on midnights when you came back to patrol?

A    The assignment letter that I got came from Chief Kruse.

Eric Koty
August 9, 2016

36

Q     Do you know if he made the decision?

A     I don't know.

Q     So other than now those five things that you've said, are there any other acts that you claim were retaliatory by the employer for filing that EEOC charge?

A     No.

Q     When you were transferred to court services after you filed the EEOC charge, what can you point to, or why is it your belief that that transfer was caused by, motivated by retaliation for you filing that EEOC charge?

A     For one thing, when I discussed getting a vehicle with my Supervisors, Sergeant Moore and Lieutenant Mendrick, I told them that I was concerned that if they didn't give me a different vehicle which I needed, that they would transfer me to the courthouse.

Q     When did you have that concern?

A     The whole time leading up to my transfer to the courthouse; the whole time I was asking for a different vehicle.

Q     Was that prior to your filing the EEOC

Eric Koty
August 9, 2016

37

charge?

A    That's correct.

Q    And you had that conversation with Lieutenant Mendrick prior to filing the EEOC charge?

A    Correct.

Q    You told him that you thought that they would transfer you to the courthouse?

A    Yes.

Q    And so when you received that notice or that physician's note saying that it was necessary for you to have a different vehicle or that you could no longer -- strike that.

        The physician's note said you could no longer use your assigned vehicle, correct?

A    That's what it said.

Q    So when you got that, you knew that the Sheriff's Office could no longer have you in that vehicle because it would have been against your doctor's recommendations, correct?

A    No.

Q    What effect did you think the April 4th, 2014 doctor's note saying that you could no longer use your

Eric Koty
August 9, 2016

38

assigned vehicle, what effect did you think that was going to have?

MR. JACOBSON: Object as to speculation.

BY MR. VACI:

Q    You can answer.

A    **I was worried, I was concerned that I could be transferred to the courthouse. I also thought that maybe they would understand, or at least try to work with me to get the issue resolved.**

Q    So when you received that doctor's note on April 4th, 2014, did you receive it before or after you went and got an EEOC charge to fill out?

A    **I don't recall what day it was. I don't recall what day I spoke with my attorney. I knew that I was going back to the doctor.**

Q    So my original question was, what do you believe or why do you believe the transfer to the courthouse was in retaliation for the EEOC charge?

A    **Because it happened the next day.**

Q    Anything else?

A    **The timing of it seems pretty clear.**

Q    Anything other than timing?

Eric Koty
August 9, 2016

39

A    Well, I provided them with numerous doctor's notes over several years and I was never transferred to the courthouse.

Q    Would I be correct that that doctor's note that you gave them on April 4th of 2014 was the first doctor's note that said you could no longer drive in that vehicle?  Would that be accurate?

A    That was required.

Q    Required?

A    Correct.

Q    Every doctor's note prior to that said it was preferable that you have a different vehicle?

A    I think the term was recommended.

Q    Recommended?

A    Yes.

Q    So anything other than timing with respect to why you believe the transfer to court services was in retaliation for the EEOC charge?

A    The timing.  If they were so concerned about following the doctor's note for my medical condition, I worked in that vehicle the whole day after I turned in the note first thing at 6:00 A.M. in the morning.  I

Eric Koty
August 9, 2016

40

was still driving it the next morning. So if they were that concerned about following the doctor's orders, then they would have pulled me out right away. They would have had me come to the station as soon as they read it and said Koty, you can't work in this vehicle any more because you're going to violate the doctor's note; we could further injure you.

Q    How long did you work in the vehicle after you were transferred to the courthouse?

A    Can you rephrase that? I'm not sure I understand it.

Q    Yes. Just so I have the time line correct, you brought the note from the doctor and the EEOC charge, turned that in, correct?

A    Correct.

Q    You were called down to the office the next day?

A    The next day.

Q    And you had a conversation with Mendrick, Kruse and who was it?

A    Sergeant Moore.

Q    Sergeant Moore. You were still using that

Eric Koty
August 9, 2016

41

vehicle up to that point, correct?

A    Correct.

Q    After you were told that you were going to be transferred to the courthouse, did you use the vehicle after that?

A    Yes.

Q    For how long?

A    **Not at that point in time.**

Q    So after they told you you were transferred, then you were done using the vehicle?

A    Yes.

Q    Other than the timing and what you stated, is there any other thing that you could point to that indicates to you that the transfer to the courthouse was motivated by retaliation for the EEOC charge?

A    **By handing in that Complaint, that EEOC charge?**

Q    Right.

A    No.

Q    I'm going to ask you similar questions regarding your being placed on inactivity for Special Ops.  Other than -- strike that.

Eric Koty
August 9, 2016

42

You said the timing with respect to the transfer to the court services was timing, something you were pointing to to indicate that you believe that your placement on Special Ops or inactive on Special Ops was in retaliation for the EEOC charge?

**A      That's correct.**

Q      Anything other than timing?

**A      That leads me to believe that it's retaliation?**

Q      Right.

**A      Well, on the day that I was removed, or on the day that -- so on the 8th after my conversation with Kruse, Mendrick and Moore, I spoke with Sergeant Harris over the phone, who was the commander of the SWAT unit at that time. I told him, "Hey, they just took me out of the car and they put me into court security. Is there any reason why I can't still be on SWAT?" He said no. Because the guys, we have a multi-jurisdictional unit, and the members they have from other police departments within the county drive their personal vehicles for driving and to respond to calls the whole time.**

Eric Koty
August 9, 2016

43

**So there is no reason; just because I didn't have a vehicle, I couldn't be on SWAT.**

Q    And there's nothing about being in court services that would prevent you from being on SWAT?

A    Yes.

Q    So I don't why I said SWAT in said of Special Ops.  Let me go back to Special Ops.

Is there anything that would prevent you from being on Special Ops related to being in the courthouse as an assignment?

A    **No, because obviously, I was still in the courthouse when they put me back on Special Ops.**

Q    Okay.  With respect to when you had to come up with a security plan for your weapons, why is it you believe that was in retaliation for filing the EEOC charge?

A    **Why would I have to come up with a security plan when four other members store their gear in the exact same way that I would have been and they parked it out in public spaces the same way I would have been doing?  Why would I have to do that?**

Q    So your belief that coming up with a security

Eric Koty
August 9, 2016

44

plan was retaliatory is because you believe that other people did not have security plans?

A    **They did not have a security plan.  They were not required to provide a security plan.**

Q    Is there anything specifically you can point to to indicate or to support your belief that the Sheriff's Office, specifically Chiefs Angus and Kruse, knew that other people had weapons that were not secure?

MR. JACOBSON:  Objection.  Besides what he's already testified to?

MR. VACI:  Right.

BY MR. VACI:

Q    If you've testified to something to indicate that, anything in addition to what you've already testified to?

A    **No.  I don't think I can say anything else on that.**

Q    Any other reasons why you believe -- other than that, any other reasons you believe that coming up with a security plan for your weapons was a retaliatory act for filing the EEOC charge?

Eric Koty
August 9, 2016

45

A    The way I looked at it was okay, we're going to put him back on Special Ops because the EEOC is breathing down our neck, and this doesn't look good because we don't really have a reason, but we're going to come up with this requirement of a security plan so we can drag it out as long as we can.

When Chief Kruse gave me that to/from about the security plan, I responded to it I believe within the 72 hours.  He testified in the EOP hearing that he didn't get a response for nine months.

Q    The letters regarding coming up with a security plan were approximately five months after the EEOC charge?  Would that be accurate?

A    The EEOC charge was April, and he didn't respond to the doctor's note until August.  But obviously it was received in May.  So why was there a lag between May 27th and August?

Q    The transfer back to court services instead of going directly into patrol after your surgery, why is it you believe that was in retaliation for your EEOC charge?

A    Because according to them, the only reason I

Eric Koty
August 9, 2016

46

was in court services was because I had a medical restriction. So when I come back and I don't have a medical restriction, I didn't see the need for me to be in court security any more if that was the only reason why I was in court security was because of my medical condition.

Q    Is that what you were told?  Strike that.

What was the reason you were told that you had to go back into court services rather than go directly into patrol, if any?

A    They told me that because I was in court services, I was going back to court services, and I had to be on the transfer list.

When I talked to Chief Kruse about it in either February or March, he asked me well, did you put in the transfer letter to go back to patrol, and I said no, I didn't think I needed to, because I didn't request to be in court services, so why would I need to request to be back in patrol?  This was a decision they made.

Q    Did you then put in a transfer request?

A    Yes, because he instructed me to.

Eric Koty
August 9, 2016

47

Q    And then you were transferred a week later?

A    I was transferred a week later.  I put in the request before I returned from the surgery.

Q    So when --

A    I don't recall what date I requested I put that letter in to go back to patrol.

Q    Did you put the letter in, the request for transferring before he told you that's what you needed to do?

A    No.  I put it in after he told me that's what I needed to do.

Q    And once you did that, you were transferred to patrol?

A    No.  But I came back in court security.

Q    When you went into patrol on the midnight shift, what is it that you can point to to support your belief that that was related to you filing an EEOC charge, or in retaliation for filing an EEOC charge?

A    There was open positions on day watch, so I could have very easily been put back in day watch.

     Pretty much when you're put on midnights and you normally work days, that would be considered

Eric Koty
August 9, 2016

48

retaliation for most deputies or any cop.

Q    Were there other deputies that you were aware of who came back to patrol for any reason and were given the shift of their preference?

A    Yes.

Q    Who was that?

A    Kristin Rossi.

Q    And is that a deputy?

A    Yes.

Q    And what were the circumstances?

A    She was out on leave for -- she was out for an extended leave for a pregnancy.  Before she even returned to work or had a return date, she was put -- she came in, she was able to shift bid, and she was put onto a patrol schedule in I believe fall of 2014, and she didn't return to work until -- or no.  I'm sorry. I think that was the year prior, 2013, and she didn't return back to work until late spring of 2014.

Normally, if you're on any type of medical leave, you're now allowed to shift bid.  When you come back from leave, they will put you where they have a spot.  She was allowed to do that.

Eric Koty
August 9, 2016

49

Q    So you're saying the normal procedure is to do what they did with you, correct, put you in an open position instead of --

A    **They put me on one of several positions. That wasn't the only open position.**

Q    What was the other open position?

A    **There was open positions on day watch where people had left the shift, so there were open positions.**

Q    How do you know that?

A    **Because I know who was working on those shifts and I know that they had either retired or they were out injured for a year and weren't coming back.**

Q    And what's your basis of your knowledge regarding Kristin Rossi, her situation, how do you know this?

A    **How do I --**

Q    How do you know that she shift bid when she was on medical leave?

A    **Because when the schedule came out in 2014 for that year, she was already on it, and she had not returned to work yet, and she still was not going to**

Eric Koty
August 9, 2016

50

return to work yet.

Q    And what shift did she return into?

A    Day watch.

Q    Do you know what shifts were open at that time?

A    There was people off on just about every shift.  So there was holes in every shift.  There was holes on days.  There was holes on midnights.  There was probably holes in afternoons.  There was a lot of people out injured at that time.  And we were also having a lot of people retire at that same time.

Q    Other than it was not a shift that you preferred to go back in on, what other -- was there any loss of pay for you going into the midnight shift?

A    No loss of pay.

Q    Other than it wasn't the shift that you preferred to go into, was there any other negative aspect going to midnights?

A    Sure.  It's a lot harder on your family when you're used to working days.

Q    And that's the reason why you did prefer it, but I mean as far as the job itself, is there any

Eric Koty
August 9, 2016

51

negative aspect to working midnights?

A.   Sure.   There's a whole list of negative aspects that I think have been medically documented.

Q    What are those, as far as you're aware?

A    Loss of sleep, stress, weight gain, probably high blood pressure.

Q    And how long were you on midnights before you got transferred to days?

A    A month.

Q    During that month, did you suffer any of those things that you --

A    Loss of sleep, yes.   When you're not used to working midnights, you can't fall asleep during the day.   It takes a while just to get used to be able to fall asleep during the day.

Q    Would I be correct that you weren't on the midnight shift long enough to get used to those things?  Is that accurate?

A    Correct.

Q    What are the negative aspects to being transferred to court services?

A    For me personally?

Eric Koty
August 9, 2016

52

Q   Yes.

A   For one thing, it's not the job that I wanted to do when I got into law enforcement.  So it wasn't the career path that I wanted to be on.  If I had to remain in court services, I would never get to do law enforcement work any more.  I would never have any chance of advancement into detectives or anything along those lines.

Q   Were you aware that it was a temporary situation, a temporary assignment, as long as you had that restriction regarding driving your assigned vehicle?

A   Initially that's the way it was presented.

Q   Do you have any reason to believe you wouldn't be put back into patrol once you were cleared to do so?

A   When they transferred me in November when I got letters saying that I was now transferred to court security, not temporarily transferred to court security.

Q   How long were you in court security?

A   How long was I assigned there?

Eric Koty
August 9, 2016

53

Q    Right.

A    It was almost exactly a year.

Q    And then you did go back to patrol, correct?

A    Correct.

Q    So it turned out it was a temporary assignment, correct?

A    Correct.

Q    Any other negatives regarding court services, other than what you've testified to?

A    For me personally, it increased the amount of money I had to spend for child care, since in patrol we work 12-hour shifts, which means that you're only working seven out of 14 days.  In court security you're working five Monday through Fridays, so now you're working ten days out of every two weeks.  So of course if it's not a weekend and it's a weekday, you would normally be off on the weekday.  Now you have to pay more child care.

So you're doubling your child care costs, because normally on patrol, you would only work five weekdays, five days of weekdays in that two-week period.  Now you're working ten.  So if you have young

Eric Koty
August 9, 2016

54

children that aren't in school yet and you have to provide child care for them, then you have to pay more in child care.

Q    Anything else?

A    I had to put more miles on my personal vehicle to come to work.

Q    Why is that?

A    Well, patrol, I park my assigned unit or my assigned squad at Naperville PD.  I live in Plainfield.  So when I go to work, I drive to Naperville from Plainfield, pick up my squad and I start my day.  Now I'm driving from Plainfield to Wheaton five days a week rather than driving to Naperville PD seven days out of 14.

Q    Anything else?

A    In order to get back into patrol, I had to take time off to have the surgery done, which was all my time since County decided to deny my workmen's comp claim.  So in order to get that medical clearance, I went and had a surgery done to try to get back into patrol.

Q    The Workers' Comp claim, the Sheriff's Office

Eric Koty
August 9, 2016

55

made decisions regarding how the Workers' Comp claim is handled, as far as you're aware?

A     Well, the Sheriff's Office denies me ever reporting it to them.

Q     Say it again?

A     The Sheriff's Office denies me ever reporting that I was having a problem driving the car, or I was having pain driving the car.

And the to/from that I put in was 47 days after the initial incident, so they are stating that because it wasn't within the 45 days, that they are denying the fact that I reported it.

Q     You do have a Workers' Compensation claim pending though; is that correct?

A     That's correct.

Q     And it's related to your hip injury, correct?

A     Correct.

Q     Regarding your being placed on inactive status with Special Ops for a period of approximately five to six months, what were the negatives regarding that?

First let me ask you, financially, how did

Eric Koty
August 9, 2016

56

it impact you?

A    I wouldn't consider the $25.00 a week pager stipend a huge financial impact, but it's a loss of income.  Is it the end of the world?  No, it's not.

Q    For non-economic purposes, how did it affect you negatively?

A    Well, since this was the second time I was removed from the team, it's more loss of training, more loss of status on the team, which means that as you spend more time on the team and you have more seniority, you should move up as to your roles and responsibilities of the team.  And usually when you move up, then you go to additional training which is outside your office which is another opportunity which you don't get if you're just doing the same thing over and over again.

First of all, they feel like they can't rely on you because you're getting removed from the team.  And then you also by not going through the training, you are out of practice in the skills that you need to perform.

Q    Anything else with respect to negative

Eric Koty
August 9, 2016

57

aspects of not being on Special Ops?

A    **For me personally, no.**

MR. VACI:   Anybody need a break?   This would be a natural break time.

MR. JACOBSON:   Yes.

(There was a break taken, after which the deposition was resumed as follows:)

MR. VACI:   Mark this, please.

(The document was so marked by the court reporter.)

BY MR. VACI:

Q    I'm going to show you what's been marked as Deposition Exhibit No. 1.   Do you recognize that document?

A    **That's a to/from to Chief Angus from January of 2014.**

Q    And other than what looks to be a line in there, is it in substantially the same condition when you created it?   When I say the line, it looks like certain things were underlined or highlighted?

A    **Something like that, yes, correct.**

Eric Koty
August 9, 2016

58

Q    And it states that, "I am requesting to be assigned a vehicle that has more legroom than my current one, Squad 59.  I am experiencing discomfort due to the fact that I can't straighten out my leg while driving.  I have sat in the Ford Pursuit SUV and the vehicle has enough legroom to alleviate this discomfort I am experiencing.  I am fit for full duty and I am not injured.  I am requesting a reaonable accommodation to a vehicle of a similar size to present the current discomfort from turning into a medical condition."  Did I read that correctly?

A    **Yes, you did.**

Q    Now, you specifically stated there that you have discomfort from driving in your current vehicle, your assigned vehicle, and you wanted to prevent it from turning into a medical condition, correct?

A    **That's correct.**

Q    And who did you give this to, Chief Angus via the chain of command?

A    **Correct.**

Q    Anyone else that you're aware of?

A    **That saw it?**

Eric Koty
August 9, 2016

59

Q    Yes.

A    Besides my chain of command which would have been Sergeant Moore and Lieutenant Mendrick who was the one who told me to write this after I spoke with him about getting the vehicle.

MR. VACI:  Mark this, please.

(The document was so marked by the court reporter.)

BY MR. VACI:

Q    Take a look at Exhibit No. 2, please.  Do you recognize that?

A    That's a doctor's note submitted on February 12th.

Q    And that's your doctor --

A    Thangamani.

Q    Thangamani.  And that's signed by him or her?

A    Him, yes.

Q    And this is dated February 12th, 2014?

A    That's correct.

Q    And it states that, "Resume regular work as of today, February 12th, 2014.

"Additional comments:  Patient can drive,

Eric Koty
August 9, 2016

60

discharge a firearm, and otherwise perform all duties of an active full duty law enforcement official. However, if available, because of a hip condition, a squad car with more legroom, like an SUV, would be preferable." Correct?

A    Correct.

MR. JACOBSON: I'll just agree that's what the document says.

BY MR. VACI:

Q    Yes. I mean I read that correctly, correct?

A    Yes.

Q    Now, this particular physician's note doesn't -- it says, would be more preferable to have a squad car with more legroom, correct?

A    That's the way it's termed.

Q    There was nothing -- would you agree that there was nothing about this letter that would cause the employer to not allow you to drive your assigned vehicle at the time?

MR. JACOBSON: Object to speculative. You can go ahead and answer.

THE WITNESS: Was there anything --

Eric Koty
August 9, 2016

61

BY MR. VACI:

Q    In your opinion, is there anything about this physician's note that would cause the employer to not allow you to drive your current vehicle, your assigned vehicle?

MR. JACOBSON:  I'll continue my objection.  You can answer.

THE WITNESS:  No.

BY MR. VACI:

Q    And in fact, they didn't take you out of that vehicle and transfer you to the courthouse or do anything else as a result of this, correct?

A    Correct.

Q    You just continued to work as a deputy in your assigned vehicle?

A    Correct.

MR. VACI:  Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    I'll show you what is marked Defendant's 3. Do you recognize that?

Eric Koty
August 9, 2016

62

A    That's the doctor's note dated April 4th.

Q    2014, correct?

A    Correct.

Q    And so this was a little more than a month after your last doctor's note, Exhibit 2?

A    Almost two months.

Q    And this one states that you, "May resume regular work as of today, 4/4/2014.

"Additional comments:  Patient can drive, discharge a firearm, and otherwise perform all duties of an active, full duty law enforcement official. However, because of a hip condition, a squad car with more legroom, like an SUV, is necessary."  Correct? Did I read that correctly?

A    You read that correctly.

Q    So this one, would it be accurate to say that this physician's note is different than the February physician's note because now your doctor is saying you can no longer drive in your assigned vehicle?  Would that be accurate?

MR. JACOBSON:  I'll stipulate that they are both different.

Eric Koty
August 9, 2016

63

MR. VACI: No, I think that's okay. I mean he can answer the question.

BY MR. VACI:

Q    That's the difference, correct?

A    **That three words, or one and two words, that's the difference.**

Q    Were you aware on April 4th, 2014, when you saw that physician, were you aware that he was going to make that change?

A    **When I talked to him in February, the first time I talked to him, he said that if things don't get better, you're doing more damage to your hip. He wasn't -- we had an MRI image to look at at that point in time and he wasn't -- he wanted me to do the surgery as soon as I could.**

Q    Okay. Did he ever provide any documentation to your employer that if you didn't get a different vehicle that was approved by him, that you would be doing more damage to your hip?

A    **I would say that that would be, the several doctor's notes that I've seen would indicate that there was an issue, and they never decided to talk to me**

Eric Koty
August 9, 2016

64

about the issue. They never asked me to explain what was going on. They never sat me down and talked to me. They just received the notes and either made a decision based off the note, or did not make a decision based off the note, took no action.

Q  But did your doctor ever provide anything to you to give to your employer telling your employer that to continue driving in your assigned vehicle would cause you further hip damage?

A  These are the documents that he provided.

Q  Is that a no?

A  That's a no.

I believe the note also states, "Please call if you have further questions."

Q  They all say that, correct?

A  They all say that. And to the best of my knowledge, they never contacted the physician for a further explanation.

Q  On April 4th, 2014, you knew that your physician was going to put the words, "is necessary" on here, correct?

A  Before I walked in the office?

Eric Koty
August 9, 2016

65

Q    Well, not before you walked in the office, but before you left the office?

A    **Before I left the office, obviously, I had the note when I left the office.**

Q    And this is the note that you provided for your employer on April 4th, 2014, as well?

A    **That's the note that I provided to him on April 7th.**

Q    April 7th?

A    **Correct.**

MR. VACI:  Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    Take a look at that.  Do you recognize that document?

A    **That is the Charge of Discrimination, EEOC.**

Q    This is the first EEOC Charge that you ended up filing, correct?

A    **That is the first one, correct.**

Q    It's dated April 4th, 2014.  Is that accurate?

Eric Koty
August 9, 2016

66

A        That's correct.

Q        Did you have this document in your hand when you went to your doctor on April 4th, 2014, if you recall?

MR. JACOBSON:  Do you mean when he received the EEOC, or --

BY MR. VACI:

Q        Well, it's dated April 4th, 2014, correct?

MR. JACOBSON:  That's the date he signed it.  When you say dated, there's two dates on it.

BY MR. VACI:

Q        So that was the date that you first got it from the EEOC, and that's when it's sworn to with a Notary signature, correct?

A        I didn't get it from the EEOC.

Q        How did you get it?

A        They didn't send me the form; I sent them the form.

Q        You sent them?  Who's them?  When you say them --

A        The EEOC.

Q        Did you mail it to them?

Eric Koty
August 9, 2016

67

A    I didn't mail it to them.

Q    Did you fill it out?  Strike that.

Who is it that filled out the narrative portion?

A    My attorney.

Q    And who filled out all of the name, phone number and all that?

MR. JACOBSON:  So I filled out the form and I transmitted it to EEOC.

MR. VACI:  I'm not deposing you; I'm just asking him.

MR. JACOBSON:  I'm just trying to cut to the chase.

MR. VACI:  No, I know.  I'm just trying to get the timeline here.

BY MR. VACI:

Q    So on April 4th -- I'm going to go back to my original question.  When you went to the doctor on April 4th, 2014, had you done anything with respect to the EEOC charge?

A    No.

Q    Okay.  So that would follow that on April

Eric Koty
August 9, 2016

68

4th, 2014, after you got this physician note saying that you could no longer be in your assigned vehicle, you could no longer work in your assigned vehicle, you went to the EEOC to file a charge?

A    **As I said before, I didn't go to the EEOC.**

Q    Okay.  Well, tell me, what steps did you take once you got out of the doctor's office on April 4th, 2014, with respect to filing a Charge of Discrimination.

A    **I spoke with my attorney and then met with him in his office.**

Q    What did you do after that?

A    **We had the form, signed it.  And then --**

Q    When you say the form, you're referring to Defendant's 4?

A    **Correct.**

Q    Okay.  And what did you do with that?

A    **A copy of it I turned in with the doctor's note.**

Q    That was on April 7th?

A    **Correct, April 7th.**

Q    And then did you mail it or send it somehow

Eric Koty
August 9, 2016

69

to the EEOC where they received it on April 9th?

MR. JACOBSON:  Asked and answered.

BY MR. VACI:

Q    If you know?

A    **I did not personally.**

Q    Why was it important for you to go to the EEOC -- strike that.  To provide this Charge to your employer along with this note from the doctor on April 4th of 2014?

A    **On April 7th?**

Q    That's when you gave it to your employer, correct?

A    **Correct.**

Q    So both are dated April 4th, 2014?

A    **Right.**

Q    And just for clarification, you gave both of them to your employer at the same time on April 7th, 2014, correct?

A    **Correct.**

Q    And why was it important for you to go get the Charge and provide it to your employer along with this note?

Eric Koty
August 9, 2016

70

A    Why was it important?

Q    Right.  Why did you do that?

A    Why was I notifying them?  I was notifying them that I was filing a Complaint with the EEOC.

Q    Right.  Why did you get the EEOC Charge filled out on the same day that you got your doctor's note saying that you could no longer work in that vehicle?

A    It was a day off I had.

Q    I'm sorry?

A    I was off that day, so I had time to do it.  You know.

Q    Why was it important, or why did you feel you had to turn them in together?

A    I didn't have to turn them in together, but like I said, I got them, I might as well turn them in both together.

Q    I think you testified earlier that it was your belief prior to going to the doctor's office, you had conversations with Lieutenant Mendrick.  Is that accurate?

A    Yes.

Eric Koty
August 9, 2016

71

Q    And you were concerned that they were going to transfer you to the court services, correct?

A    That's correct.

Q    So when you went to the doctor on April 4th, 2014, and you were given this note saying you could no longer drive in that vehicle, it was apparent to you that it was still a possibility you were going to be transferred to court services, correct?

A    That's correct.

Q    So you went and got a Charge of Discrimination filled out so you could give that to your employer with this note, correct?

A    I gave it to him with the note.

Q    And your intent was to have protection from them sending you to court services, correct?

A    My intention was to notify them that they were not paying attention to me, they were ignoring me, and I was letting them know that I was filing a complaint with the EEOC.

Q    You were aware that if you gave them this Charge of Discrimination along with the note, then if they transferred you to court services, you would be

Eric Koty
August 9, 2016

72

able to claim that there was retaliation for doing that?

A    I didn't know they were going to transfer me to court services.  I didn't know what they were going to do.

I was informing them on that date that yes, I had filed a Complaint with the EEOC because I felt like they had violated my rights under ADAA.

Q    But you said you were concerned with, you thought that was a possibility and you were concerned that they were going to transfer you to court services. You had that concern prior to going to the doctor on April 4th of 2014, correct?

A    I've had that concern since 2011.

Q    And your intent in giving them both of these documents, giving the Sheriff's Office both of these documents on April 7th, 2014, was to protect yourself from being transferred to court services?  Is that accurate?

MR. JACOBSON:  I'll object as to asked and answered.  You can answer it if you have anything new to add, any new information.

Eric Koty
August 9, 2016

73

THE WITNESS: Was it my intent that it was protection?

BY MR. VACI:

Q     Yes.

A     **Obviously it wasn't protection; it was information. I was informing them that they were violating ADAA, and I was letting them know that I was filing an EEOC about it.**

Q     And as soon as you provided these documents, the EEOC Charge and your April 4th, 2014 doctor's note, you did get transferred to court services, correct?

A     **I did get transferred to court services.**

Q     You informed Chief Kruse and Lieutenant Mendrick that that was retaliation at that meeting, correct?

A     **I did say that.**

Q     So it's your testimony that it essentially is just a coincidence that you filed a Charge of Discrimination the same day that you knew that you could no longer -- that your doctor was telling the Sheriff's Office you could no longer drive in the assigned vehicle?

Eric Koty
August 9, 2016

74

MR. JACOBSON: Objection. You asked him why he did it on the same day. He already answered that he did it on the same day. You can answer.

THE WITNESS: That's what I testified. I've already answered the question.

BY MR. VACI:

Q    Was it a coincidence?

**A    Was it a coincidence? I told you; it was things that I got done on that day and I turned them in together.**

Q    And no other reason why, correct?

**A    Correct.**

MR. VACI: Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    If you would take a look at that document? Do you recognize what that is?

**A    It's a second Charge of Discrimination with the EEOC.**

Q    In this Charge you've checked the box for retaliation?

Eric Koty
August 9, 2016

75

A    That's correct.

Q    And you state that, "The employer retaliated against me when it found out I filed a Charge by putting me in a substantially worse job assignment and other terms of employment."  Did I read that correctly?

A    Yes, you did.

Q    And you filled that out on April 23rd and filed it, and it was received by the EEOC, according to this, on April 28th, 2014, correct?

A    That's correct.

Q    And when you state here that the employer retaliated against me when it found out I filed a charge, you're referring to Defendant's No. 4, the original Charge and filed on April -- or that you gave to the Sheriff's Office on April 7th?

A    Yes.

Q    And the substantially worse job assignment and other terms of employment are all the terms that we had discussed earlier, correct?

A    That's correct.

MR. VACI:  Mark this, please.

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

76

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    Take a look at that, Defendant's No. 6.   Do you recognize that?

A    **That is the letter from Chief Angus from the 8th regarding my assignment to court security.**

Q    And do you recall receiving this on or about April 8th, 2014?

A    **Yes.**

Q    And it states that, "Please be advised that I am in receipt of your paperwork that you hand-delivered to Sergeant Ruff on April 7th, 2014."  And that is the EEOC Charge and the doctor's note?

A    **Those are the two.**

Q    And it states further that, "In that your doctor indicated that because of a hip condition a squad car with more legroom, like an SUV, is necessary.

        "This note prevents you from working in the current vehicle supplied by the employer, and we have no vehicles conducive to the recommendation of your doctor."

Eric Koty
August 9, 2016

77

"Subsequently, Chief Kruse met with the State's Attorney's Office and their recommendation is to temporarily transfer your work assignment to the courthouse. The work assignment will be reevaluated after you supply the additional information requested regarding this matter.

"Please meet with Major Romanelli regarding your duties at the courthouse."

Did I read that correctly?

A    That's what it states.

Q    Was it the case that -- I mean you agree with the portion that says, "This note prevents you from working in the current vehicle supplied by the employer?" When I say this note, I'm referring to the doctor's note of April 4th, 2014.

A    That's what it states.

Q    Is that accurate?

A    That's what it states.

Q    In your view, was that accurate that that note was his statement that the note, meaning your doctor's note of April 4th, 2014, prevented you from working in your current vehicle supplied by the

Eric Koty
August 9, 2016

78

employer?

A    That's what it states.

Q    That's what this states, but would you agree with that statement that based on that doctor's note, the Sheriff's Office could no longer have you driving that vehicle?

A    No, because I drove it the whole day before after they had the doctor's note, and I had been driving it for how many years, even though they knew I was having a problem.

Q    But that doctor's note in Exhibit 3 I believe it is, yes, 3.  You can look at it if you need to.

A    I don't need to look at it.

Q    Okay.  It says that, "Because of a hip condition, a squad car with more legroom, like an SUV, is necessary."

Is it your position that the Sheriff's Office -- strike that.  Is it your position that that doctor's note didn't require the Sheriff's Office to prevent you from driving that vehicle any further, your assigned vehicle?

A    It's up to them what they do.  They can

Eric Koty
August 9, 2016

79

either follow the advice of a doctor, they can send me to their own doctor to have an evaluation done, which is part of our General Orders, but they didn't do any of that. They didn't call the doctor for further explanation. They did nothing. They decided to look at this one doctor's note and use it as an opportunity and disregard all the rest.

Q    But that doctor's note is different than previous doctors' notes that you got, correct?

A    By one word, "necessary."

Q    Right. And is it your opinion that the Sheriff's Office could have ignored that physician's note?

A    Sure. They could have ignored that note just like they ignored all the rest of them.

Q    So you don't believe that that note prevented you from working in your current vehicle? Do you agree with that or disagree with that?

A    I'm telling you that they make their decision on what they are going to follow and what they are not going to follow. So it's up to them what they do.

Q    But I'm asking you, do you agree with the

Eric Koty
August 9, 2016

80

statement in Chief Angus's April 8th, 2014, --

A     Did he accurately quote the doctor's note? Yes, he did.

Q     No, forget about the quote.  Where he says that this note prevents you from working in the current vehicle supplied by the employer, is that a statement you agree with or disagree with?

A     That's what the doctor's note says.

Q     No, the doctor's note says, "Because of the hip condition, a squad car with more legroom, like an SUV, is necessary," right?  That's what the doctor's note says?

A     Right.

Q     And then Chief Angus says that, "This note prevents you from working in the current vehicle supplied by the employer."  Is that a statement you agree with or not?

A     No.

Q     You disagree with that?

A     Yes.

Q     Okay.  So the employer could have just left you in that vehicle even though the doctor was saying a

Eric Koty
August 9, 2016

81

different vehicle was necessary?

A    **Yes, because they ignored all the other notes that said the same thing, except for one word.**

Q    Right.  And that one word is that it was necessary to take you out of that vehicle, correct?

MR. JACOBSON:  I'll object to this whole thing as being speculative as to what the employer could or could not do.  You're asking for a number of variations.  But go ahead and answer the question.

MR. VACI:  No, I'm not.

BY MR. VACI:

Q    I'm asking you if the word, the change from preferable to necessary, is that something that changes the meaning of the note, in your opinion?

A    **In my opinion?**

Q    Yes.

A    **In my opinion, yes, it changes the meaning of the note.**

Q    And it changed it from it would be a good thing to something that you had to do, correct?  When you say necessary, that means that a change had to be made?  Would that be accurate?

Eric Koty
August 9, 2016

82

MR. JACOBSON:  Well, object, because, you can answer it, but you're asking him to speculate as to what the Sheriff can do.  He's been answering that the Sheriff can do whatever they want.

BY MR. VACI:

Q     Do you understand the question?

**A     I understand the question.**

Q     Okay.  The notes in Defendant's 2, the note from your doctor says, "A squad car with more legroom, like an SUV, would be preferable," correct?

**A     That's correct.**

Q     And then April 4th, 2014, you got a note from your physician that says, "A squad car with more legroom, like an SUV, is necessary," correct?

**A     That's correct.  That's what it says.**

Q     In your view, is that a significant difference?

**A     In my view, no.**

Q     Okay.  Does it take it from, in the first note, the first doctor's note where it says that a squad car with more legroom would be preferable, right, and you could continue using that vehicle, correct?

Eric Koty
August 9, 2016

83

A    Correct.

Q    To the doctor's note on April 4th, 2014 that states that a squad car with more legroom is necessary, so you can't use that vehicle any more.  Would that be correct?

A    If that's the interpretation, yes.

Q    Is that your interpretation?

A    No.

Q    So what was your understanding of why the doctor used that language?

A    My understanding is that he wanted to get the point across that he's having a problem and that it is a work-related problem and you've obviously ignored how many other doctors' notes that this guy has submitted to you, so now I'm telling you that this is a problem; you need to address it.

Q    And addressing it would include having you not use that vehicle, correct?

A    That was their decision.

Q    Right.  But is your understanding that as a result -- is it your understanding that as a result of that note from the doctor April 4th, 2014, that you

Eric Koty
August 9, 2016

84

were not to use that vehicle any more, the assigned vehicle?

A    If they decide to follow the doctor's note.

Q    But you would agree the doctor was telling the Sheriff's Office not to have you use that car any more?

A    I would agree to that.

Q    With respect to Exhibit No. 6, this is the actual document on April 8th transferring you to the courthouse, correct?

A    That's correct.

Q    And would you agree that this, it says temporarily transfer you, is that right?

A    That's correct.

Q    So you had an understanding that this was a temporary transfer, you were being told, correct?

A    That's what I was being told.

Q    And it turned out it was a temporary transfer, correct?

A    That's correct.

Q    This transfer to the courthouse solved the problem of you not having to work in that assigned

Eric Koty
August 9, 2016

85

vehicle, correct?

MR. JACOBSON:  Objection.  You mean all the time, or at the moment?  Because he was assigned back to the vehicle.

MR. VACI:  Well, let me strike.  I'll rephrase that.

BY MR. VACI:

Q    By transferring you to the courthouse temporarily, that complied with your doctor's note, correct, that you could not be in that vehicle, you could not drive in that vehicle?

MR. JACOBSON:  Objection.  What timeframe?

BY MR. VACI:

Q    At this time on April 8th, 2014, when you were transferred?  Do you understand the question?

**A    Yes, I understand the question.  That was one possible solution, sure.**

Q    And it wasn't a solution that you preferred, correct?

**A    Obviously not.**

Q    And you preferred getting a different vehicle and staying in your current assignment of patrol,

Eric Koty
August 9, 2016

86

correct?

A      That's correct.

Q      Defendant's 6 also states that, according to Chief Angus, "We have no vehicles conducive to the recommendation of your doctor," correct?

A      That's correct.

Q      Transferring you to the courthouse, while not what you preferred, you agree was something that accommodated that doctor's note, correct?

A      No, I think it was not accommodating the doctor's note, because he said that I didn't need to be on light duty or change my work condition.

Q      Well, going to the courthouse is not light duty, correct?  That's just another assignment for a deputy, correct?

A      Correct.

Q      And as you testified, there are occasions when people are transferred from court services to law enforcement and back.  Would that be accurate?

A      That they are transferred?

Q      Are deputies ever transferred from court services to law enforcement for whatever reason?

Eric Koty
August 9, 2016

87

**A** Generally, no. I can't remember the last time, unless it was the only time that they have been transferred from court services to law enforcement is when they were already in law enforcement and got transferred into court services as punishment.

Q And they request a transfer back to law enforcement, correct?

**A** Correct.

Q And on occasion people are transferred from law enforcement to court services, correct, for whatever reason?

**A** Yes.

Q And there's nothing that prevents the transfer back and forth?

**A** I think we've already discussed that, arbitrary and capricious.

Q So I think the question I asked you was the transfer, when you were transferred on April 28th, 2014, into court services, that satisfied the condition, the restriction placed on you by your physician, correct?

**A** According to the employer.

Eric Koty
August 9, 2016

88

Q      It did satisfy it though, correct?

A      **According to the employer, yes.**

Q      When you say according to the employer, what do you mean?

A      **That was the decision they made independently on their own.  That was their decision.  Under ADAA they are required to sit down and talk with the affected individual to see what can be worked out.  How could they provide something that would accommodate them?  They did not do that.  They made this decision --**

Q      They did not speak to you --

A      **No.**

Q      -- about what accommodation you would prefer, correct?

A      **They didn't speak to me about anything; about what the problem was, what they could do to help me with that problem.**

Q      But at the end of the day, transferring you to the court services, while not what you preferred, was still an accommodation that satisfied your restriction that was placed on you by the doctor?

Eric Koty
August 9, 2016

89

A       So would have been going to Detective.  So would have been going to CRU.  Those are other accommodations that could have been made.

Q       And they are all in a group of accommodations that would have satisfied the restriction that was placed on you, correct?

A       Correct.

Q       So the problem that you have with going to the court services is it wasn't the accommodation that you preferred?

A       It wasn't an accommodation I even asked for.

Q       Right.  But that's the problem you have with it?  It's not that it wasn't something that accommodated the restriction, because it clearly did; it's something that you didn't want to do, correct?

A       Correct.

Q       Now, this took place, the transfer took place right after you filed, or you turned over the EEOC Charge the day before, correct?

A       Correct.

Q       The employer, as a result of the document that you turned in with the EEOC Charge, that doctor's

Eric Koty
August 9, 2016

90

note, it put the employer in a position of having to do something with regard to that doctor's note, right?

**A      That's correct.**

Q      And what they decided to do was to transfer you to the courthouse instead of some other possible accommodations?

**A      Some other possible accommodation, correct.**

MR. VACI:   Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q      Have you seen that?

**A      That is from May 27th, 2014.   That is a doctor's note from Dr. Shahbandar.**

Q      Just as an aside, there's no Bates stamp on this document.   This is one of the documents that was provided to me today by you.   It is dated May 27th, 2014?

**A      Correct.**

Q      And it states, from Dr. Shahbandar "The patient is cleared to work as required for the Special Operations Unit with no restrictions."   And it says,

Eric Koty
August 9, 2016

91

"Please call with questions," correct?

A    Correct.

Q    Did I read that correctly?

A    That's what it states.

Q    Why was this provided to you so that you could provide it to the Sheriff's Office?

A    Because Joe Mazzone told me to get it.

Q    And did he tell you why?

A    Because he was going to try to get me back on the Special Operations Unit.

MR. VACI:    Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    This is Exhibit No. 8.  Do you recognize that?

A    It's from the General Orders LEB 7-47 regarding the Special Operations Unit.

Q    And is this the General Order, as far as you're aware, that the effective date is 7/1/2011.  Is it still in effect, and was it in effect -- strike that.  Was it in effect in 2014?

Eric Koty
August 9, 2016

92

A    As far as I know, this is the same, unless they've updated.  As far as I know, this is the same thing.

Q    If you look on Bates stamp Page 450 which is Page 2 of this document, it states that under Criteria For Selection to the Unit, it states under C, "Physical condition:  Due to the rigorous nature of the activities and the demanding tasks to be performed, each applicant shall be in excellent physical condition."  Did I read that correctly?

A    Yes.

Q    Is it your understanding that while you're in the Special Ops Unit, you have to be in excellent physical condition?

A    It's my understanding that the selection for the criteria is that you have to be in excellent physical condition.

Q    Is it your position then that if you have a medical issue that would affect your ability to be in Special Ops, that you would still remain as an active member of Special Ops?

A    Yes.

Eric Koty
August 9, 2016

93

Q      What do you base that on?

A      Well, I've been off before because of an injury. When I came back they didn't retest me to see if I was still in excellent physical condition.

We have members that still operate hurt all the time. They have to be off because maybe they have an injury, and when they come back, they don't retest them to make sure they are in excellent physical condition.

And in fact, after you make it on the team, after you pass the physical agility test the first time, you're not required to pass it again to stay on the team.

And if they wanted to, they could have tested me and said either you passed the test, or you failed. If you fail the test right now, then no, you can't be on it. But they didn't do that.

Q      Is there a tests that's required?

A      Yes.

Q      That's in the General Order?

A      I don't know if it's in the General Order or not. Yes, it's testing Section I on Page 3.

Eric Koty
August 9, 2016

94

Q    Page 3?

A    Correct.  Page 3 under I.

Q    And this is a test to get into the unit?

A    That's correct.  And I have not taken this test probably for six or seven years now.

Q    Has anybody been tested after they have been admitted to the unit?

A    No.

Q    But it's your position that regardless of what your medical condition was, it would have been no basis to put you on an inactive status?

A    That's correct.

MR. VACI:  Mark this, please.

                    (The document was so marked
                    by the court reporter.)

BY MR. VACI:

Q    I'll ask you if you recognize what that is?

A    That would be the to/from that I received from James Kruse.  It's dated August 14th, 2014.

Q    Okay.  And that relates to specifically the Special Operations Unit, right?

A    That's correct.

Eric Koty
August 9, 2016

95

Q    And it refers to a note from your medical care provider.  Is that the note that was Defendant's Exhibit 7, as far as you're aware?

**A    As far as I'm aware, yes.**

Q    Were there ever any other notes other than that one?

**A    No.**

Q    It states, "Please be advised that I am in receipt of note from your medical care provider, indicating you are able to perform the duties necessary with the Office Special Operations Unit.  While you have been medically cleared by your medical care provider, there are some logistical issues which need to be addressed, specifically regarding the security of your SOU weapons and equipment, and your ability to respond to a call-out while temporarily assigned to the courthouse.  Accordingly, please submit to me, in writing, a proposal as to how you will provide for the safe keeping of your SOU weapons and equipment while at the courthouse, and how you will be able to respond to a call-out if needed.  Once I receive your plan, it will be reviewed for appropriateness."

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

96

Did I read that correctly?

A     Yes, you did.

Q     When you received this memo from Chief Kruse, what did you do?

A     I responded to it.  Well, that was the 14th is the date that it's dated.  I don't think I got it until like the 17th, so I think I responded to it either that night or the next day.

Q     And what was your response, generally?

A     My response was that I would be restoring the weapons and gear in my personal vehicle, and when I got a call-out, I would be responding in my personal vehicle.

Q     And you provided that to Chief Kruse in writing?

A     Yes.

Q     Directly or through the chain of command, if you recall?

A     I can't remember.  I don't recall if I did a to/from to him, or if I sent him an email, but I know I responded to him directly.  I don't recall sending it through the chain of command.  I could have, though.

Eric Koty
August 9, 2016

97

MR. VACI:  Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    I'll show you this document.  Do you know what that is?

A    That would be from Chief Kruse, September 22nd, 2014, Security of Special Operations Weapons and Equipment.

"Be advised that your proposals for providing for the security of your Special Operations weapons and equipment while working at the courthouse have been reviewed.  It has been determined the best solution at this time is for you to park your vehicle in the courthouse secured parking area on the north side of the courthouse.  If your vehicle does not have a trunk, please ensure all weapons are locked in a case and all items are concealed from view.  Major Romanelli will arrange to have your key card updated to allow access to this area.  Also, contact Special Operations Commander Harris for further information regarding your assignment."

Eric Koty
August 9, 2016

98

Q    You read that correctly.

A    **Thank you.**

Q    And what is in this note, is that the proposal that you provided, essentially?

A    **We gave them like four options that we had come up with.  And I had spoken to Major Romanelli about possibilities of how we would accomplish this, and that was the one that they selected.**

**Since it was in a secure sally port, I couldn't just park there; I had to have, obviously, permission.**

Q    And this note was accepting that particular proposal, correct?

A    **Correct.**

MR. VACI:  Mark this, please.

(The document was so marked by the court reporter.)

BY MR. VACI:

Q    That's Defendant's 11.  Do you recognize that document?

A    **It is a to/from Chief James Kruse to me dated the 29th of October, 2014.**

Eric Koty
August 9, 2016

99

Q    And it states that, "One of your doctor's notes returns you to full duty, without restrictions, relative to the Special Operations Unit."  Again, is that the May 27th, 2014, letter?

A    **That's the May 27th, 2014 letter that it's referring to.**

Q    And then it says you have been reactivated to the unit, referring to the Special Ops Unit; is that correct?

A    **That's correct.**

Q    "Another of your doctor's notes restricts you from working in your assigned office vehicle.  Your current assignment allows you to work full duty within the restriction specified by your doctor."

Is it your understanding that that doctor's note that he's referring to was the -- is still the April 4th, 2014, note?

A    **That's correct.**

Q    After April 4th of 2014 and through October 29th of 2014, you had never received another doctor's note saying you could drive in that vehicle, correct?

A    **No, but he had approached me about trying**

Eric Koty
August 9, 2016

100

some type of orthopedic pillow in that vehicle.

Q      Who did?

A      Chief Kruse.

Q      Okay.  When did that occur?

A      May or June, I believe.

Q      2014?

A      Correct.

Q      And you say he approached you?

A      Yes.

Q      Tell me what occurred.

A      I don't recall whether he -- he either spoke to me directly, or he asked Major Romanelli to talk to me about it.  And then I contacted my attorney and he said yeah, go ahead and give it a shot, but it never materialized.  I tried to get back in touch with him again to see if we were going to try doing that, and it never happened.

Q      What do you mean you tried to get in touch with him?

A      Well, I would call him and he wouldn't answer the phone; he wouldn't return the phone calls.  So then I tried to go through Major Romanelli to see if he

Eric Koty
August 9, 2016

101

could talk to him about it, and he never got a response from him either.

Q    Did you ever speak to your doctor about any solution that would have included using some type of pillow?

A    No, because it never happened.

Q    Did you ever have any discussions with your doctor about anything else other than a different vehicle, using a different vehicle?

A    We talked about physical therapy, which I had already been through three or four times.  We talked about doing more injections in my back and my hip.  The issue was that it was causing more damage.

MR. VACI:  Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    Do you recognize that document that's Defendant's Exhibit 12?

A    That is correct.  February 18th, 2015, it's a note from --

MR. JACOBSON:  He just asked you if you recognize

Eric Koty
August 9, 2016

102

it.

THE WITNESS:  Yes.

BY MR. VACI:

Q    And how do you recognize it?  Is it something that you received?

A    Yes.

Q    Did you receive it on the date that's on there, February 18th, 2015?

A    Yes.

Q    It's from Dr. Thangamani?

A    Correct.

Q    And it states that, "Patient can work with the following limitations from 2/19/2015 until 3/23/2015 (if employment is unavailable with the criteria listed below, the patient must remain off work completely.)

"Lifting restrictions - maximum 20 pounds. No hazardous or fast moving machinery.  Ground level work only.  Minimal bending or stooping.  No kneeling.

"He can return to full activity without restrictions on 3/23/2015."

Did I read that correctly?

Eric Koty
August 9, 2016

103

A    Yes.

Q    Now, with these restrictions, would it be correct that you were unable to return to work between February 19th, 2015 and March 23rd, 2015?

A    Full duty?

Q    Right.

A    Full duty, yes.

Q    And that's because with those restrictions, you would not be able to do the job of a deputy; is that correct?

A    I don't know if every one of those is something that you do on a regular basis, but --

Q    So after you received this note, what did you do?

A    I provided it to Chief Kruse.

Q    And did you have any conversations with Chief Kruse or anyone else in the Sheriff's Office regarding this?

A    I gave him the note and I asked for a light duty position.

Q    Okay.  Did you do that in writing?

A    Yes.

Eric Koty
August 9, 2016

104

Q     So your intention was to work light duty between the dates of 2/19 and 3/23?

A     Yes.

Q     And what was the reaction or response?

A     I didn't get a response from Chief Kruse. The only way you found out that they denied the light duty position was that I was contacted by IMRF, because I had to apply for short-term disability, and they told me that they had spoken with Chief Kruse and he told them that there was no light duty.

Q     So what occurred between February 19th, 2015, and March 23rd, 2015, as far as your compensation?

A     I was not being compensated because I had run out of time.

Q     Run out of what kind of time?

A     Sick time and vacation time.  I had burned it all already.

Q     And you could not take short-term disability?

A     No, I did take short-term disability through my pension.

Q     Through IMRF?

A     Correct.

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

105

Q    And what did you receive during that approximate one month?

A    **50 percent.**

Q    50?

A    **50 percent of my pay.**

Q    And that's not taxed, correct?

A    **I don't think so.**

Q    You returned to full activity, full work -- I'm sorry.  You returned to full activity without restrictions on March 23rd, 2015, correct?

A    **Correct.**

Q    And at that point, is that when you went back into court services?

A    **Correct.**

Q    When you went back into court services, is that when you asked why you're not going directly into law enforcement?

A    **When I was notified that I wasn't going into law enforcement, that's when I asked.**

Q    Who did you speak to?

A    **I believe I -- I think I recall that I had sent an email to Chief Kruse when I found out that I**

Eric Koty
August 9, 2016

106

was not going back into patrol right away and I was

being returned to court security, and I don't recall

getting a response from him.

MR. VACI:  Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    Do you recognize what Defendant's 13 is?

A    Yes, I do.

Q    And was it a document that you received on or

about March 24rd, 2015?

A    That's correct.

Q    And this is the document indicating you were

being transferred to the Law Enforcement Bureau?

A    Correct.

Q    And that was approximately -- so the transfer

was the day after?  The transfer order was the day

after you returned to work, correct?

A    Correct.

Q    And it became effective a week after you were

released for full duty, correct?

A    That's correct.

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

107

Q    It states, "Effective March 30th, 2015, you will be transferred to the Law Enforcement Bureau. Please meet with Lieutenant Hilgenbrink before 1800 hours this date regarding details of the assignment.  You will be placed on this team due to a vacancy that exists."

A    **That's correct.**

Q    And you were placed into midnight shift; is that correct?

A    **That's correct.**

Q    Did you have any discussions with anybody at the Sheriff's Office regarding why it took a week to be effective from March 24th to March 30th?

A    **No.**

Q    Did you inquire?

A    **No.**

Q    Did you work in court services during that week, March 24th through March 30th?

A    **Yes.**

Q    And how long did it take for you to bid into a daytime slot as far as your shift?

A    **That wasn't the result of a bid; that was the**

Eric Koty
August 9, 2016

108

result of me filing a Grievance.

Q    And when did you file that Grievance?

A    Probably two weeks after I started back in patrol, after I had spoke with Major Romanelli several times about it, I told him that they had people in training.  They had open positions on day watch.  I told him that if this is where you need me right now, that's fine, but I expect to be transferred to day watch as soon as possible, because that's where I should have been; that's where I was assigned per the patrol schedule for that year.

Q    How long did it take you to get transferred to day shift?

A    A month.

MR. VACI:  Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    Do you recognize that document?

A    Yes.

Q    It's the Answer to the First Amended Complaint that was filed in this, correct?

Eric Koty
August 9, 2016

109

A    Correct.

Q    So it's got the Sheriffs Office's responses to the allegations that you are making in this case. Is that your understanding?

A    That's my understanding.

Q    If you go to, I guess if you look up here to this page, go to Page 8 of 13.  Paragraph Y, it states, "On April 7th, 2014, plaintiff tendered his Charge of Discrimination to Chief James Kruse, (Chief Kruse)." That is not accurate, correct?

A    I turned in the sheet on April 7th, 2014.

Q    But you didn't specifically give it to Chief James Kruse, did you?

A    I turned it in.

Q    You turned it into the Sheriff's Office?

A    Correct.

Q    And how did you turn it in?

A    Through the chain of command.

Q    Do you have any recollection specifically on April 7th, 2014 handing the Charge of Discrimination to Chief Kruse?

A    Do I have any recollection?

Eric Koty
August 9, 2016

110

Q    Right.

A    **I turned it in.**

Q    But the question is, did you specifically give it to Chief Kruse?

A    **Did I specifically give it to him?  No.  But that's who ended up with it.**

Q    And you know that because on the following day in paragraph Z it says Chief Kruse returned the Charge of Discrimination to you?

A    **That's correct.**

Q    Meaning he handed it to you?

A    **He handed it back to me, so he ended up with it.**

Q    On the next page where it says, paragraph DD, "The transfer to the courthouse causes plaintiff to lose his holiday pay, ability to find other patrolman positions, miss training related to patrolman positions, has worse work hours, eliminates the ability to do police work and other benefits."  Do you see where I'm reading?

A    **Yes.**

Q    Regarding the transfer to the courthouse, are

Eric Koty
August 9, 2016

111

there any other negative issues relating to that

transfer, other than what's in that paragraph?

MR. JACOBSON: And what he testified to?

BY MR. VACI:

Q    And what you've already testified to?

**A    And what I testified to.**

Q    How did the transfer to the courthouse cause

you to lose your holiday pay?

**A    So deputies that work in court security don't**

**work, they don't get holiday pay because they are**

**already off the holidays. When you're on patrol you**

**get 56 hours of holiday pay every six months. So it's**

**split up half the year and half the year.**

**So basically when I was transferred over**

**there, I didn't get holiday pay for those holidays that**

**I was in the courthouse for.**

Q    Do you actually have to work those holidays

then?

**A    No.**

Q    If you're in patrol, just so I have an

understanding of this, if you're in patrol, you're

getting holiday pay and you're working the holiday, or

Eric Koty
August 9, 2016

112

you're not working the holiday?

A    Correct.  It's not like you would get double time because you worked the holiday; you just get 56 hours of holiday pay twice a year.

Q    And if you're working in the courthouse, you get the holiday off, correct?

A    Correct.

Q    And you're being paid for that day, correct?

A    You're being paid your regular salary.

Q    Right.  So you're saying that the 56 hours is over and above your regular salary?

A    Yes.  It's up and above your regular salary.

Q    Did you have the ability to work overtime in the courthouse?

A    No.

Q    You didn't have the ability, or you never got any?

A    I didn't have the ability.

Q    Why is that?

A    Well, when I got there originally, they gave me one day of training.  And I wasn't trained or certified to use the screening machines, the X-ray

Eric Koty
August 9, 2016

113

machines, and in order to work overtime, you had to be able to do that function. Or to work in a courtroom you had to have been trained in a courtroom, and I wasn't trained in a courtroom either.

Q    And what was the reason you weren't getting the training; do you know?

A    Because it was supposed to be a temporary assignment.

Q    You did air quotes there. But it turned out it was a temporary assignment, correct?

A    That's correct, a year later.

Q    Now, you also said it caused you to lose the ability to find other patrolman positions. Are you talking about in other agencies?

A    If I would have stayed in the courthouse, court security officers are different than patrol.

Q    Okay. But how would that have affected you in the sense that you would not have the ability to find other patrolman positions?

A    If you stay there long enough, you lose your certification.

Q    How long would you have to stay to lose your

Eric Koty
August 9, 2016

114

certification?

A    I don't know what the State Statutes are.

Q    Did you lose your certification?

A    I wasn't there that long.  This was back in --

Q    So this may have been an issue again, but it turned out it wasn't an issue?

A    Correct.

Q    Is that correct, what I just said?

A    Yes.

Q    Did you miss training related to patrolman positions?

A    If there was any training that occurred during those nine months, or actually a year, then I would not have attended it.

Q    As you sit here today, do you know if you missed any of that patrolman-related training?

A    I don't know.

Q    Now, you state, "Has worse work hours in the courthouse."  In what sense do you mean that?

A    I think I explained that when I talked about my child care.

Eric Koty
August 9, 2016

115

Q    Okay.  So that was specifically, when you say worse work hours, you mean for you personally?

A    **For me personally, yes.**

Q    Taking the child care issue out of it, are there worse work hours in the courthouse?

A    **I think that's a very individual question. Everybody would answer that question differently; some people yes, some people no.  Obviously the people that want to work there like the hours.**

Q    But the hours are, generally speaking, what being at the courthouse?

A    **Generally speaking?**

Q    If you're working at the courthouse, generally speaking, are they 8:00 to 5:00, that kind of thing?

A    **8:00 to 5:00, 7:00 to 3:00.  There are a couple of different starting times.**

Q    Are there any other shifts other than the day shift?

A    **There's afternoons.  I think they start at 10:00 or 11:00.**

Q    And they go to when?

Eric Koty
August 9, 2016

116

A    It's an eight-hour shift, so 10:00 to 6:00 or 11:00 to 7:00.

Q    Did you ever work those hours?

A    No.

Q    You only worked the day hours?

A    Yes.

Q    So outside of the fact that you had to do something with child care, it would not have been an issue with those hours, because those are essentially the same hours you were working in patrol, right, the 12-hour shift?

A    But double the amount of time during the work week.

My wife works full-time, so when I have to be there 7:00 to 3:00 five days a week, that of course affects her work schedule negatively.  She has to drive from Plainfield to Rosemont every day.

On the days that I was not working when I was on patrol, she would car pool.  She couldn't do that any more.  Now she has to stay home every day until 8:30 to get the kid on the bus.

Q    Do you know if the Sheriff's Office or

Eric Koty
August 9, 2016

150

back to patrol.

Q    So what's the implication there?  What do you believe that showed?

A    That he had direct involvement, because nothing happens at this office that fast, nothing.  Not when I've been told --

Q    So he had direct involvement in transferring you back to patrol?

A    Correct.  And putting me on midnights.

Q    And you were on --

A    Days.

Q    Okay.  Other than the fact that the Sheriff came into the office at that time when you were with -- you were with who, Chief Kruse?

A    Romanelli.

Q    Romanelli?

A    Yes.

Q    And how long was he in the office for?

A    How long was he privy to the conversation?  I don't know, because the door was open and he was standing outside the door.

Q    Other than the fact that you saw him standing

Eric Koty
August 9, 2016

151

outside the door, do you have any basis to believe that he made the decision to put you on midnights on patrol?

A    **I just told you, nothing happens in our office that fast.  When you've been told that now you're on the transfer list to go back to patrol, people sit on that transfer list for years around here.**

Q    Other than that, you have no other evidence to believe --

A    **I have no evidence, no.**

Q    What about all the other decisions prior to being put on midnights as far as being transferred to the courthouse and all of the other things that you say were retaliatory?

A    **Yes.**

Q    Do you have any --

A    **Proof?**

Q    -- basis to believe that the Sheriff was personally involved in those decisions?

A    **Do I have proof?**

Q    Yes.

A    **I do not have proof.  But ultimately, he's responsible for any decision made by his subordinates,**

Eric Koty
August 9, 2016

152

**his Chiefs; he's responsible for those decisions.**

Q    But there's a difference between being responsible and being personally involved, correct?

**A    No.  If we're talking about violating a federal law like ADAA, you would make sure that if your intention is not to do that, then you would make sure that your Chiefs have the correct training on the policy and the law, and also that they were not violating it, so that way you would not end up with five Deputies suing you in Federal Court.**

Q    Okay.  So now you've answered this question, but now you've continued your answer too, so let me ask you again.  Do you have any evidence that the Sheriff personally made the decision or was involved in the decision-making process of any of the actions that you claim to be retaliatory?

MR. JACOBSON:  Objection.  Besides what he's already testified to?  You've asked this a couple times.

MR. VACI:  No, it's a new question.

BY MR. VACI:

Q    So do you have any evidence that the Sheriff

Eric Koty
August 9, 2016

153

personally made the decisions or was involved in the decisions of any of the actions that you claim to be retaliatory, other than being transferred to midnights when you testified because he was there for a conversation, any of the other decisions?

**A    Do I have any evidence?  No, I do not have any evidence.**

Q    And do you know regarding any of those decisions, do you know who the decision-maker was?

**A    It is unclear to me, because I have pieces of paper with someone's name on them, but I'm getting them handed to me by another Chief, so I don't know.  I don't know who made those decisions.  They are made and then they are given to me.**

MR. VACI:  That's all.

MR. JACOBSON:  I've got a couple.

MR. VACI:  Go ahead.

RE-EXAMINATION

By:  Mr. Jacobson

Q    So these words get bantered around a lot at depositions and I'm not sure people know.

So you were asked about proof.  Do you

Eric Koty
August 9, 2016

154

have any proof?  And what is your definition -- do you know what proof means, actually?

A    **Proof would be something that is either tangible, like a bloody knife in a murder case, something like that.  A document from one individual that showed that that person made that decision.**

Q    Okay.  So it would be actually something you saw?

A    **Something I saw.**

Q    Okay.  And then you were also asked about do you have evidence.  What is your definition -- do you think circumstantial evidence?  When you answered that question, were you thinking about circumstantial evidence, or were you thinking about the bloody knife?

A    **I can tell you, circumstantial, no.  I have circumstantial, but I don't have evidence such as a document, an email, something like that.**

Q    So when you were asked about do you have any evidence if Sheriff Zaruba was involved in this, are you saying that you have circumstantial evidence, but not direct evidence?

A    **Correct.**

Eric Koty
August 9, 2016

155

Q    So is it fair to say you may not be well-versed in the legal definition of evidence, the word evidence?

A    **Apparently not.**

Q    Okay.

MR. JACOBSON:  I have nothing further.

MR. VACI:  Okay.  Well, let's be real clear then.

RE-EXAMINATION

By:  Mr. Vaci

Q    Circumstantial evidence is evidence, right? So what is your circumstantial evidence?  Are you saying there's circumstantial evidence that the Sheriff was personally involved in any of these decisions?

MR. JACOBSON:  I'll object as we're asking him to define a legal term.  If you want to ask if he has any facts to come to his conclusion?  But you can answer if you understand.

THE WITNESS:  What I have it based off of is probably what would be considered hearsay.

BY MR. VACI:

Q    Okay.  Well, what is your -- what I'm talking about now is any of the decisions that you were

Eric Koty
August 9, 2016

156

claiming were retaliatory?

A    Yes.

Q    Okay.  That's the transfer to the courthouse, the inactive status for Special Ops, the midnights on patrol?

A    **Which I think I've established that.**

Q    The being transferred back to court services and not directly to patrol after surgery, right?

A    Yes.

Q    Those four, and I think there was one more, the coming up with the security plan.  So those five things, do you have a basis to believe the Sheriff was personally involved in any of them?

MR. JACOBSON:  And I'll object.  He also included the failure of the Sheriff to act as evidence that he has no policies and procedures.

BY MR. VACI:

Q    But those five things are what you testified were retaliatory acts?

A    **Correct.**

Q    Do you have any basis to believe that the Sheriff was personally involved in making decisions

Eric Koty
August 9, 2016

157

regarding any of those five?

A    I know from past experiences that he is involved in making decisions that involve personnel transfers, day-to-day basic administrative decisions.

Q    Do you know specifically if he was involved in any of those decisions related to you?

A    In these five?

Q    Yes.

A    No, I don't know regarding these five decisions.  I couldn't sit there and show you a piece of paper or tell you that someone told me that.

MR. VACI:  Okay.  That's all.


AND FURTHER DEPONENT SAITH NOT

Eric Koty
August 9, 2016

158

STATE OF ILLINOIS )

) SS.

COUNTY OF DU PAGE )

I, GLORIA APOSTOLOS SIOLIDIS, C.S.R., in and for the State of Illinois do hereby certify that ERIC KOTY was first duly sworn by me to testify the truth; that the above deposition was recorded in shorthand and reduced to typewriting by me; that the deposition is a true, correct and complete transcript of the entire testimony given by the said witness at the time and place hereinabove set forth.

I further certify that I am not counsel for, nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

In witness hereof, I have hereunto set my hand and affixed my Notarial Seal this 16th day of August, A.D., 2016.

GLORIA APOSTOLOS SIOLIDIS
CSR License #084-0001205