UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

ERIC KOTY,                                  )
                                            )
                Plaintiff,                  )
                                            )
v.                                          )        Case No. 15 C 2600
                                            )
SHERIFF JOHN ZARUBA,                        )        Judge Virginia M. Kendall
IN HIS OFFICIAL CAPACITY                    )
AS SHERIFF OF DUPAGE                         )
COUNTY, and DUPAGE COUNTY,                  )
                                            )
                Defendants.                 )

# TAB 3

# Excerpts from the deposition of James Kruse

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ERIC KOTY,                              )
                                        )
            Plaintiff,                  )
                                        )
        vs.                             ) 15 C 2600
                                        )
SHERIFF JOHN ZARUBA, Individually,      )
and in his official capacity as         )
Sheriff of DuPage County, and           )
DU PAGE COUNTY.                         )
                                        )
            Defendants.                 )

DISCOVERY DEPOSITION OF
JAMES KRUSE

September 29, 2016
9:30 a.m.

Called as a witness by the Plaintiff herein, pursuant to the provisions of the Federal Rules of Civil Procedure pertaining to the taking of depositions for the purpose of discovery, before LINDA M. CIOSEK, C.S.R. No. 084-002892, a Notary Public qualified and commissioned for the State of Illinois, taken at 430 W. Roosevelt Road, Wheaton, Illinois.

James Kruse
September 29, 2016

PRESENT:

    JEFFREY M. JACOBSON LAW OFFICE, by

    MR. JEFFREY M. JACOBSON

    430 W. Roosevelt Road

    Wheaton, Illinois  60187


        Appeared on behalf of the Plaintiff.


    OFFICE OF ROBERT B. BERLIN, DuPage County State's

    Attorney, by

    MR. GREGORY VACI

    503 N. County Farm Road

    Wheaton, Illinois  60187


        Appeared on behalf of the Defendants.

ALSO PRESENT:

    MR. ERIC KOTY

James Kruse
September 29, 2016

4

MR. JACOBSON: Would you swear in the witness, please.

THE COURT REPORTER: Would you raise your right hand, please.

(Whereupon, the oath was duly administered by the Notary.)

J A M E S      K R U S E,

Called as a witness by the Plaintiff herein, pursuant to the provisions of the Federal Rules of Procedure and the Rules of the Supreme Court thereof pertaining hereto, having been first duly sworn, was examined and testified as follows:

EXAMINATION

By: Mr. Jacobson

Q.      Can you state your name for the record?

**A.      James Kruse.  Last name is K-r-u-s-e.**

Q.      Again, Mr. Kruse, this is taken pursuant to United States Supreme Court Rules and local rules, your deposition.  As I mentioned to you earlier, if you need to take a break for whatever reason, go ahead.  The only thing is if I've already put a question forward, you have to answer that before you take a break, but I do understand there's a possible emergent matter.

James Kruse
September 29, 2016

10

Q.    Does the sheriff get communication on all transfers?  Let me ask you:  On any transfers that you've been involved in, has the sheriff received communication that that's what these bureau chiefs want to do?

A.    **Sometimes.**

Q.    Okay.  And do you know why he would get communication what the bureau chiefs wanted to do?

A.    **Because he's the agency head.**

Q.    Do you know why he would not get communication of what the bureau chiefs wanted?

MR. VACI:  I'm going to object to the form of the question.

BY MR. JACOBSON:

Q.    Do you know why he would not get communication of bureau chiefs deciding to transfer someone?

A.    **He allows us, empowers us to make those decisions.**

Q.    So do you know ahead of time then if he's empowering you to make a decision?  How do you find out?

A.    **Normally he gets involved if there is matters of significant discipline being contemplated, but day-to-day operations, he pretty much leaves that authority to us.**

Q.    You keep using the word "pretty much".  How do you know if it's okay from the sheriff or not?  How would

James Kruse
September 29, 2016

11

you find out?

MR. VACI: Object to the form of the question.

BY MR. JACOBSON:

Q. You can go ahead and answer.

A. **Normally the response that we receive, if we're communicating with the sheriff, is go with the advice what the State's Attorney's Office says.**

Q. And who is it at the State's Attorney that would give you the advice typically?

A. **His name is Paul Bruckner.**

Q. So is it fair to say Paul Bruckner was giving you advice on personnel issues?

A. **Yes. I engage him quite frequently on personnel issues.**

Q. And when you engage with him on the personnel issues, does he tell you where someone should be transferred, or when they should be transferred?

A. **He can offer that advice.**

Q. Okay. And do you follow his advice?

MR. VACI: Object to the form of the question.

BY MR. JACOBSON:

Q. So when he offers that advice, do you follow that advice?

MR. VACI: Same objection.

James Kruse
September 29, 2016

12

BY MR. JACOBSON:

Q. You can answer.

**A. Yes, frequently.**

Q. Does he give you any other -- so is this advice, or is he telling you what you need to do?

MR. VACI: Objection, form of the question.

BY MR. JACOBSON:

Q. When you've contacted Mr. Bruckner about a transfer or assignment, does he tell you what to do, or does he give you advice?

MR. VACI: Objection.

THE WITNESS: We normally actually have a meeting and discuss the particular circumstances relating to different matters of personnel, because it's important for us that we do things properly and legally, and he is our counsel in that regard.

BY MR. JACOBSON:

Q. Okay. Are you familiar with the transfer of Deputy Koty to the court security?

**A. Yes.**

Q. Do you know on the transfer of him from Law Enforcement Bureau to court security why Sheriff Zaruba's name wasn't on the court transfer form?

**A. Because that decision was made with Chief**

James Kruse
September 29, 2016

13

Angus, myself, and Assistant State's Attorney Bruckner.

Q.      During that, I assume you had a meeting with the three of you?

A.      Yes.

Q.      Do you remember when that was?

A.      Not specifically the date.

Q.      Do you know about the month, the year?  Was it 2014?

A.      I can tell you we convened the meeting either the day or the day following a doctor's note submitted by Deputy Koty.

Q.      And who was present at this meeting?  Was it just you, Angus and Bruckner?

A.      Yes.

Q.      And do you remember where the meeting was?

A.      My office.

Q.      And do you remember why you called that meeting?  I'm assuming you called it.  Who called the meeting?

A.      I don't remember specifically who called the meeting; however, we did reach out to Mr. Bruckner to discuss a medical note that was received by the office.

Q.      Now, why -- who contacted Mr. Bruckner to be at that meeting?

James Kruse
September 29, 2016

14

A.      I don't remember.

Q.      Do you know why he was contacted?

A.      Yes.

Q.      Why was that?

A.      Because the medical note indicated from the doctor that a vehicle -- I believe the words was "like an SUV was necessary".

Q.      And so why did you feel you needed to contact the state's attorney on that?

A.      Well, two reasons:  First, being we did not have a vehicle available, and we consulted with the state's attorney about what potential options we had with Deputy Koty.

Q.      Okay.  And what were the options that you had with Deputy Koty?

A.      During that discussion, the options that were contemplated were either transfer him to the courthouse, because the only limitation that we were provided was that he couldn't operate the vehicle he was currently assigned, or to be sent home.

Q.      Did anyone talk -- at that meeting, was it decided what to do with Mr. Koty, or was there subsequent meetings?

A.      No, it was decided at that meeting.

James Kruse
September 29, 2016

15

Q.    Okay.  Do you have any EEOC training with disability?

A.    I have been to a class in EEOC, along with other legal matters.  That was just a component of a broader seminar that was -- I'm trying to think of who put that on.  I believe it was Baird, the Baird Law Firm.

Q.    Do you remember when that was?

A.    About two years ago.

Q.    So about 2014?

A.    Yes.  It was more focused toward labor law, but EEOC was mentioned, I believe.

Q.    Do you know how much time was spent on EEOC issues?

A.    I don't remember specifically.

Q.    Do you remember anything about what was talked about at that meeting or seminar, whatever it was?

A.    Not really.

Q.    Any other training or education you had on EEOC?

A.    Not that I can think of.

Q.    What's the employer's policy on EEOC when someone says they've got a disability?  What's the employer's policy on that?

A.    I would have to reference the office's

James Kruse
September 29, 2016

16

general orders.

Q.     As you sit here today, you don't recall?

A.     **Not specifically.**

Q.     So when Mr. Koty gave you that doctor's note, what was the first thing you did?

A.     **We contacted ASA Bruckner.**

Q.     Do you have an EEOC officer liaison at the Sheriff's Office?

A.     **Specifically at the Sheriff's Office, Mr. Bruckner would be that point of contact.  He's across the courtyard.**

Q.     So it's your belief that ASA Bruckner was an EEOC officer?

A.     **He would be our point of contact who we consult with having anything to do with EEOC matters.**

Q.     And after that meeting, did you and Mr. Angus decide what to do with Mr. Koty as far as the doctor's note?

A.     **The decision was made by Mr. Angus.**

Q.     Okay.  What did you say at the meeting, and what did Mr. Angus say at that meeting?

A.     **Well, I mean I don't remember specific words.**

Q.     Do you remember in general?

A.     **In general is we have this doctor's note submitted to us saying that it was necessary for us to put**

James Kruse
September 29, 2016

32

Q.     Do you remember where that information came from?

A.     It was -- I'm trying to think of where I went to -- I believe it was the Department of Labor website, I think.

Q.     Illinois?

A.     Federal.

Q.     Do you remember what you read there?

A.     What the definition of major life skills were.

Q.     Okay.

A.     And what constituted a disability.

Q.     Anything else that you read prior to that meeting with Mr. Koty -- or over Mr. Koty with Chief Angus, yourself, and ASA Bruckner?

A.     Not that I remember.

Q.     When you got that note, did you ever inquire as to what the medical condition was?

A.     I don't understand.

Q.     So you got a note saying that -- I'm going to show you what's marked as Exhibit No. 1.

                              (Whereupon, Exhibit 1 was

                              marked for identification.)

BY MR. JACOBSON:

Q.     Is that the note you received?

James Kruse
September 29, 2016

33

A. Yes.

Q. And what's the note say the vehicle that Mr. Koty should have?

A. "A squad car with more leg room, like an SUV, is necessary."

Q. Did you ever talk to the doctor concerning this?

A. No.

Q. Do you know if anyone talked to the doctor concerning this?

A. No.

Q. Did you ever determine what the problem was and why the doctor recommended an SUV?

A. He did not -- the issue is, is that he, in the note, the doctor indicated that a car with more leg room like an SUV was necessary, not recommended. Before it was recommended.

Q. So, the issue is that he's saying it's necessary, it's absolute?

A. Correct.

Q. Did you ask why an SUV was necessary of anyone outside of this letter?

A. No.

MR. VACI: Object to the form of the question.

James Kruse
September 29, 2016

34

THE WITNESS: To me it was very clear. It's a doctor's statement. I rely upon -- he's a medical professional. I'm not -- I'm going to rely upon what he indicated in his memo.

BY MR. JACOBSON:

Q. So on the date that you saw this memo, it would have been your opinion that the doctor said an SUV is necessary, that would be -- there wouldn't be any question whether an SUV was necessary or not for him, as far as vehicles to be driven in?

A. That was -- this letter was the triggering event to the entire discussion of what do we do.

Q. After that meeting, was it -- during that meeting, was it determined what to do?

A. That was when we consulted with ASA Bruckner. And knowing that we did not have a vehicle that we can provide to Deputy Koty, as I said before, we arrived at we send him home and he sits at home, and then actually it was Mr. Bruckner's idea of having him work in the courthouse, because he could do everything according to this that a deputy could do except operate a specific vehicle, and we did not have another vehicle to provide him.

Q. So, at that meeting then, what I'm trying to get to is was it decided then? I don't know the process.

County Court Reporters, Inc.
630.653.1622

James Kruse
September 29, 2016

35

A.      Yes, Chief Angus decided that would be the appropriate thing to do was to transfer him to courthouse so that he could continue working, and that was also an advantage for the courthouse, because at the time we were in need of manpower.

Q.      And were you overseeing the courthouse at that time, too?

A.      Yes.

Q.      Do you know how many more deputies you needed at the courthouse, or manpower?

A.      Like 500.  I'm kidding.

Q.      But it was a lot?

A.      I'll take any more positions that I could get right now.

Q.      And when you say right now, you mean from 2014 to current?

A.      It's still continuing, yes.

Q.      Do you know why you're short in the courthouse?

A.      Yes, because the County Board has been reducing our head count over the last four or five years.

Q.      Is law enforcement low in head count, too?

A.      Everyone is down.

Q.      And you mean everyone, you mean --

James Kruse
September 29, 2016

36

A.    All bureaus.

Q.    How many bureaus are there?

A.    **Three**.

Q.    Do you know if when you left the meeting was -- was there a formal process then to transfer from Law Enforcement Bureau to Court Security Bureau?

A.    **Chief Angus had to offer a letter notifying Deputy Koty that he was being temporarily transferred.**

Q.    Did you ever have a subsequent meeting with Chief Angus on transferring Deputy Koty from law enforcement to court security?

A.    **No**.

Q.    Now, would you have been involved because you oversaw court security if Chief Angus said, oh, hold on, I'm changing my mind, or I want to rethink this?

A.    **If Chief Angus wanted to rethink it, then that would have been his entitlement, because at the time Deputy Koty was subordinate to Chief Angus.**

Q.    But would you be involved in that process because of your position?

A.    **He may have said hold on, let me think about it as informational, but really the decision lies with him.**

Q.    So whatever he decided then, you would have signed off on it?

James Kruse
September 29, 2016

37

A.    Correct.

Q.    So, why do you think you were in that meeting then?

A.    Well, because part of my responsibilities is personnel, and when we have personnel issues, it normally is not one of us sitting isolated.  We discuss among ourselves.

Q.    So I'm trying to find out is it possible that after your meeting, Chief Angus met with a different chief to discuss what's going to happen with Deputy Koty?

A.    He may have.  I don't have direct knowledge whether he did or not.

Q.    If Chief Angus said he wanted to move Deputy Koty somewhere else, could you have said no?

A.    I would have had input, but I felt that being that we were so limited because of the doctor's note, and speaking with the state's attorney, that having him temporarily transferred to the courthouse was a way to allow him to continue working.  So I would have agreed with that.

Q.    If there was an SUV available that you didn't know about, would that have been your first -- would you have assigned him a different vehicle?

A.    If there was one available, yes.

Q.    And would that seem to you the most reasonable accommodation for him?

James Kruse
September 29, 2016

71

**A.      They have to be secured.  When I was on special operations, I brought my weapons into my home.  I did not leave them in the vehicle.**

Q.      Okay.  Is it fair to say there really isn't -- in 2014 and 2015 and 2016, there really isn't any safe place to keep weapons?

MR. VACI:  Objection, form of the question.

THE WITNESS:  The safest place to keep your weapons is home.

BY MR. JACOBSON:

Q.      Do people break into homes and steal weapons?

**A.      Yes.**

Q.      Have law enforcement people had their weapons stolen from their home that you're aware of?

**A.      Yes.**

Q.      So there is no absolute secure place for weapons as far as you know?

**A.      No absolute place, no.**

MR. JACOBSON:  Few minute break.

                              (Whereupon, a recess was

                              taken.)

BY MR. JACOBSON:

Q.      It looks like Mr. Genovese took measurements in January for the vehicle, which would have been way before

James Kruse
September 29, 2016

72

Exhibit No. 1's letter of April; correct?

A.    Correct.

Q.    Do you know why -- so does that change your testimony as to what happened relating to the measurement of the vehicle?

MR. VACI:  Objection to the form of the question.

THE WITNESS:  The vehicle with the most leg room was the Crown Victoria.

BY MR. JACOBSON:

Q.    I'm going to show you what we've marked as Exhibit No. 2.

(Whereupon, the document was marked Exhibit 2 for identification.)

BY MR. JACOBSON:

Q.    Do you recall that letter?

A.    Yes.

Q.    What did you do after you received Exhibit No. 2?

A.    This might have been -- no, I don't remember.

Q.    Let me show you Exhibit No. 3.

(Whereupon, the document was marked Exhibit 3 for identification.)

James Kruse
September 29, 2016

73

BY MR. JACOBSON:

Q.      Do you recall that?

A.      No.

Q.      I'm going to show you Exhibit No. 4.

                    (Whereupon, the document was

                    marked Exhibit 4 for

                    identification.)

BY MR. JACOBSON:

Q.      Dated January 22nd.  Do you recall that?

A.      Yes.

Q.      Do you know if you contacted Mr. Genovese related to Exhibit 2, 3, or 4?

A.      I don't remember.

Q.      Okay.  Do you know if you contacted Mr. Genovese in January to do the measurements?

A.      I believe it is January.

Q.      Okay.  Do you know what occurred concerning your contact with Mr. Genovese in January?

A.      I don't understand.

Q.      So, you contacted -- how did you contact him?

A.      I called him.

Q.      And why did you call him?

A.      I asked him to do an assessment of the vehicles.

James Kruse
September 29, 2016

74

Q.     Did you meet with any chiefs or anyone else to make that determination?

A.     **No, I believe -- like I said, I recalled the State's Attorney's Office using him for another matter, and that gave me the idea to reach out to Mr. Genovese to come do the assessment.**

Q.     Did you believe at the time that an SUV would have alleviated Mr. Koty's problems?

A.     **No.**

Q.     And so why did you call him -- why did you call Mr. Genovese to measure the two vehicles?

A.     **Because I wanted, as I had indicated, I was trying to be diligent and determine which vehicle had the most leg room.**

Q.     In January did you -- January, February and March, did you have an SUV to assign to Mr. Koty?

A.     **No.**

Q.     And how would you know whether in January, February or March you had an SUV to assign to Mr. Koty?

A.     **Because Chief Angus had indicated that we did not have any vehicles available.**

Q.     Did you talk to Chief Angus after you received one of those exhibits?

When did you talk to Chief Angus on the

James Kruse
September 29, 2016

75

inventory of SUV's?

A.     It was -- I can't give you an exact date, I just recall him saying to me that we did not have a vehicle for him.

Q.     Did he say why?

A.     We did not have one available.

Q.     Now, how would I know or how would you know after January 22nd the next SUV that gets assigned out?

A.     I would receive an email from the Quarter Master assigning a vehicle.

Q.     Would you receive anything from the Quarter Master when SUV's are shipped from the manufacturer or delivered to the sheriff?

Let me back.  It's my understanding the County gets the SUV's?

A.     Correct.

Q.     They then make them -- they put the sirens, the lights and everything on and then they transfer --

A.     They send out for that.

Q.     Right, and then they transfer them to the Sheriff's department after all that equipment is put on, or does the sheriff take them before the equipment is put on?

A.     They're titled to the County, and then they go from -- they go from the garage -- well, when the money is

James Kruse
September 29, 2016

76

available to upfit.  They're sent out, upfitted, and then come into the pool of available vehicles at the Sheriff's Office.

Q.    And then the sheriff has control on who assigns them?

A.    Correct.

Q.    Is there any log of when these SUV's come into the pool?

A.    **The garage may have documents on when the deliveries occurred.**

Q.    The deliveries from being upgraded with the sirens and stuff?

A.    **Oh, no, just when the -- because they're not police cars until they're upfitted.**

Q.    So who gets a list of when these become police cars?

A.    **That would be our budget coordinator, because that would be when the invoice would be sent.**

Q.    And when you say ours, do you mean the sheriff's?

A.    Yes.

Q.    So that would be the document that would say when it became first available to the sheriff to assign?

A.    Yes.

James Kruse
September 29, 2016

80

to the sheriff's policies, procedures, rules?

A.      **These would be brought to the State's Attorney's Office.**

Q.      And do you know if there is -- when -- sorry, it wasn't a clear question.

When a deputy has one of those, do you know if there's policies, procedures, rules, general orders on what they're supposed to do with that?

A.      **I don't know.**

Q.      Okay.  Do you know if they're supposed to give it to an EEOC officer?

A.      **No.  I don't think it's specific.  We don't necessarily have an EEOC officer clearly defined as a position at the office.**

Q.      Okay.  So when a deputy in 2014, when a deputy has that -- did Deputy Koty go through, as far as you know, the right procedures on who he handed that to?

A.      **I believe he started, from what I recall, I believe he started with Sergeant Ruff.**

Q.      Which was his sergeant?

A.      **Yes, well, may have been.  I don't know what team he was assigned to, but he's a sergeant.  From there to coming upstairs, I don't know how it was handled.**

Q.      Okay.  Was it, as far as you know, the

James Kruse
September 29, 2016

81

appropriate procedure to give it to Sergeant Ruff?

MR. VACI:  Objection, form of the question.

THE WITNESS:  I don't see it being unreasonable.

MR. JACOBSON:  I'm just trying to find out if there's a policy or procedure that he didn't follow in giving this to someone.

I don't think I have anything further.

MR. VACI:  Okay.


EXAMINATION

By:  Mr. Vaci

Q.    Let me ask you since this is the last thing counsel asked you about.  Had you ever been handed an EEOC charge by any other employee under your command that you can recall?

A.    Yes.

Q.    How long ago?

A.    Two years.

Q.    And who was that?

A.    That was Deputy Jones.

Q.    Okay.  And is that person still working for the Sheriff's Office?

A.    No.

Q.    Did he retire?

James Kruse
September 29, 2016

82

A.    Yes.

Q.    Was this -- had this been filed at the EEOC at the time that you received it from Deputy Koty?

A.    No.

Q.    In fact, it was filed on April 9th; correct?

A.    Yes.

Q.    Typically does the sheriff received EEOC charges after they've been filed, and then the EEOC mails them or sends them in some way to the Sheriff's Office?

A.    Yes.

Q.    That didn't happen in this case; correct?

A.    Correct.

Q.    Now you said you got the EEOC charge that's Exhibit 5 and Exhibit 1 at the same time; is that accurate?

A.    Yes.

Q.    Both on April 7th, is that accurate?

A.    **They were provided at the same time.**

Q.    Okay.  As far as you're aware, were those two documents kept together at least until the decision was made regarding transferring Deputy Koty?

A.    Yes.

Q.    Now, counsel asked you some questions about Exhibits 2, 3 and 4.  I think those are here.  Take a look at those.

James Kruse
September 29, 2016

83

Exhibit 2 talks about, the doctor's note, talks about requiring increased leg room in the vehicle to allow his hip to heal. Is that accurate?

A.      Yes.

Q.      And then Exhibits 3 and 4 don't mention anything about leg room; correct?

A.      **Exhibit 3 does not, and Exhibit 4 returns him with no restrictions.**

Q.      Now, I think you testified that the evaluation of the squad car, as far as the leg room, that was done in January of 2014?

A.      Yes.

Q.      Have you ever seen this document which is Bates stamped 537, Exhibit 1 for Mr. Genovese's deposition?

A.      **Yes.  This is what I recalled about replacing the seat.**

                    **(Whereupon, Exhibit Bates**

                    **stamped 537 was identified.)**

BY MR. VACI:

Q.      Okay.  And how did you receive it from him?

A.      **Email.**

Q.      Is the date that appears on there, January 22nd, 2014, is that correct when you received it, as far as you recall?

James Kruse
September 29, 2016

84

A.    Yes.

Q.    And that was the day after the January 21st note, January 21st, 2014 indicating that Deputy Koty required increased leg room in the vehicle; is that accurate?

A.    Yes.

Q.    I think you testified you didn't have a recollection of receiving this document, the January 21st, 2014?

A.    Correct.

Q.    Other than this document, were you aware of a requirement for increased leg room for Deputy Koty?

A.    No.

Q.    The measurements that were done, was that only done one time as far as you were aware?

A.    Yes.

Q.    And that was in January of 2014?

A.    Yes.

Q.    And based on that, what was your understanding of the comparable leg room for the Crown Victoria and the Ford Explorer?

A.    **Based on this, the Crown Victoria had more leg room.**

Q.    And you were aware of that in January of 2014?

James Kruse
September 29, 2016

85

A.    Yes.

Q.    After January -- after you had that assessment made, was there any relevance in your mind as to whether there were any of those types of SUV's that were measured available that could be given to Deputy Koty?

A.    They were not.

Q.    And my question is, is the issue after that, was it relevant at all in your mind as to whether there were any available, given the fact that they had the same leg room?

A.    No, it would not have been relevant.

Q.    And when you met with ASA Bruckner and Chief, at that time, Chief Angus after you received the April 4 Exhibit 1, and the EEOC charge Exhibit 5, at that point would it be accurate that you had already known for three months of those measurements?

A.    Yes.

Q.    And when the decision was made by Chief Angus, the letter was sent to Deputy Koty; is that correct?

A.    Yes.

Q.    And that's Bate stamped 14.

(Whereupon, Exhibit Bates stamp 14 was identified.)

MR. JACOBSON:  Do you want me to make copies of it?

County Court Reporters, Inc.
630.653.1622

James Kruse
September 29, 2016

86

MR. VACI: I'll just use the Bate stamp for now. It will identify it enough. I'll have him identify the date and everything. You can make copies if you want, but let's move through and then we'll make copies if you want.

BY MR. VACI:

Q. Do you recognize what that is?

A. **Yes.**

Q. And the Bates stamp on the bottom is 14; is that accurate?

A. **14, yes.**

Q. What is it?

A. **It's a memo to Deputy Koty from Chief Alan Angus dated April 8th, 2014 regarding work assignment.**

Q. And the work assignment is what? Is it a transfer?

A. **No.**

Q. What is it?

A. **I'm sorry, I apologize, it is, a temporary transfer of your work assignment to the courthouse.**

Q. And in the body of this letter, does it indicate as to whether the employer, the Sheriff's Office, had a vehicle that Deputy Koty could use that would have satisfied the leg room requirement of his position?

A. **Well, it indicates that this was preventing**

James Kruse
September 29, 2016

87

**him from working in the current vehicle supplied.**

Q.     Okay.

**A.     And we have no vehicles conducive to the recommendation of your doctor.**

Q.     At the time that that letter was sent out on April 8th of 2014, was that an accurate statement?

**A.     Yes.**

Q.     Did the Sheriff's Office have any other vehicles, SUV vehicles or any other type of vehicles, that could be used as a patrol vehicle that had more leg room than the Crown Victoria?

**A.     No.**

Q.     So when you testified that essentially on April 7th, when there were two options, either keeping -- telling Deputy Koty to stay home or transferring him to the courthouse, is that the reason why there were two options?

**A.     Yes.**

Q.     And did you know that on that day?

**A.     Yes.**

Q.     Were you aware of any other effect of Deputy Koty's hip condition other than he was restricted in driving the assigned vehicle that he had, that Crown Victoria?

**A.     No.**

Q.     And the only time he was actually restricted

James Kruse
September 29, 2016

88

from driving it was when you received that April 4th letter?

A.    Correct.

Q.    Prior to that, it was indicated that it would have been preferable that he have a different vehicle; is that right?

A.    Correct.

Q.    Was there ever any, that you're aware of, ever any follow-up letter to that April 4th letter regarding the SUV that was Exhibit 1, any follow-up letters from his doctors?

A.    Are you speaking to the one --

Q.    The April 4th, 2014.  Was there ever another letter from his physician that was more specific than requiring a squad car with more leg room like an SUV?

A.    No.

MR. VACI:  That's it.


                    RE-EXAMINATION

                    By:  Mr. Jacobson

Q.    What is your training in leg room?

A.    I don't have training in leg room.

Q.    Okay.  Why is it you're focusing on the doctor's letter, the word or phrase "leg room", versus SUV?

A.    Because it was saying -- the doctor's note was

James Kruse
September 29, 2016

89

indicating that leg room was -- more leg room was necessary.

Q.    It actually said an SUV is necessary; right?

A.    Like an SUV.

Q.    What's the word after like an SUV?

A.    Is necessary.

Q.    So why is it you're focusing on leg room, and that was all you did?

A.    Because the doctor's letter was saying that he needed more leg room.

(Whereupon, the document was marked Exhibit 6 for identification.)

BY MR. JACOBSON:

Q.    I'm showing you what's marked as Exhibit 6. Do you recall that?

A.    No.

Q.    Do you know what the markings at the bottom are, the CP70?

A.    No.

Q.    Okay.  Do you know if the Sheriff's Office, anyone received this?

A.    This was addressed to Chief Angus.

Q.    Okay.  Does this request a Ford Pursuit SUV?

A.    Yes.

James Kruse
September 29, 2016

90

Q.    And does it say because Mr. Koty sat in it and it alleviated his discomfort?

A.    Yes.

Q.    Would that have been more important than someone giving you measurements of leg room?

MR. VACI:  Objection to the form of the question.

THE WITNESS:  This is -- what we do is base the information of doctor's notes.

BY MR. JACOBSON:

Q.    Okay.  Did you ask for a doctor's note?  Do you know if anyone asked for a doctor's note?

A.    I don't know.

Q.    What would be -- when Mr. Koty gave this to or sent this to Chief Angus ,what's the policies and procedures on what happens next?

MR. VACI:  Objection to the form of the question.

THE WITNESS:  That would be a determination of Chief Angus to see if whether there was a vehicle.

BY MR. JACOBSON:

Q.    Is there any policies and procedures of what happens when a deputy says they're having a problem with their job because of a medical condition?

A.    Not that I can recall specifically.

Q.    And is there policies and procedures on when a

James Kruse
September 29, 2016

94

STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF DU PAGE    )

            I, LINDA M. CIOSEK, C.S.R. No. 084-002892, a Notary Public in and for the County of DuPage, State of Illinois, do hereby certify that at the request of MR. JEFFREY JACOBSON, subject to the usual terms and conditions of County Court Reporters, Inc, that JAMES KRUSE was first duly sworn by me to testify the truth; that the above deposition was recorded stenographically and reduced to typewriting by me; that the deposition is a true, correct and complete transcript of the entire testimony given by the said witness at the time and place hereinabove set forth, and that signature is hereby reserved by said witness.

            I further certify that I am not counsel for, nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

            In Witness Whereof:  I have hereunto set my hand and affixed my Notarial seal this 21st day of October, A.D. 2016.


                        ----------------------------------

                        LINDA CIOSEK, CSR



My Commission expires:

May 5, 2018.

County Court Reporters, Inc.
630.653.1622