UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS,
EASTERN DIVISION

ERIC KOTY,                                      )
                                                )
                    Plaintiff,                  )
                                                )
v.                                              )        Case No. 15 C 2600
                                                )
SHERIFF JOHN ZARUBA,                            )        Judge Virginia M. Kendall
IN HIS OFFICIAL CAPACITY                        )
AS SHERIFF OF DUPAGE                            )
COUNTY, and DUPAGE COUNTY,                      )
                                                )
                    Defendants.                 )

# TAB 4

# Excerpts from the deposition of Alan Angus

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

ERIC KOTY,                              )
                                        )
          Plaintiff,                    )
                                        )
     vs.                                ) 15 C 2600
                                        )
SHERIFF JOHN ZARUBA, Individually,      )
and in his official capacity as         )
Sheriff of DuPage County, and           )
DU PAGE COUNTY.                         )
                                        )
          Defendants.                   )


DISCOVERY DEPOSITION OF
ALAN ANGUS


September 29, 2016
12:20 p.m.


        Called as a witness by the Plaintiff herein, pursuant to the provisions of the Federal Rules of Civil Procedure pertaining to the taking of depositions for the purpose of discovery, before LINDA M. CIOSEK, C.S.R. No. 084-002892, a Notary Public qualified and commissioned for the State of Illinois, taken at 430 W. Roosevelt Road, Wheaton, Illinois.

Alan Angus
September 29, 2016

2

PRESENT:

       JEFFREY M. JACOBSON LAW OFFICE, by

       MR. JEFFREY M. JACOBSON

       430 W. Roosevelt Road

       Wheaton, Illinois   60187

           Appeared on behalf of the Plaintiff.

       OFFICE OF ROBERT B. BERLIN, DuPage County State's

       Attorney, by

       MR. GREGORY VACI

       503 N. County Farm Road

       Wheaton, Illinois   60187

           Appeared on behalf of the Defendants.

ALSO PRESENT:

       MR. ERIC KOTY

Alan Angus
September 29, 2016

4

THE COURT REPORTER:  Would you raise your right hand, please.

(Whereupon, the oath was duly administered by the Notary.)

A L A N    A N G U S,

Called as a witness by the Plaintiff herein, pursuant to the Federal Rules of Procedure and the Rules of the Supreme Court thereof pertaining hereto, having been first duly sworn, was examined and testified as follows:

EXAMINATION

By:  Mr. Jacobson

Q.    Can you state your name for the record.

**A.    Sure.  Alan, A-l-a-n, A-n-g-u-s is my last name, Angus.**

MR. JACOBSON:  This is pursuant to United States Supreme Court and local rules.

BY MR. JACOBSON:

Q.    Mr. Angus, if you need to take a break at any time, just let me know.  You have to wait until you answer a question, though, before you can take a break.  If there's anything you need, let me know.  The court reporter can only take down words, so try to answer with words instead of

Alan Angus
September 29, 2016

16

and discuss it with them because they have much more experience and we seek guidance from them, and the State's Attorney's Office.

Q.      Is there any policies and procedures on what to do when someone makes a disability claim for the sheriff?

A.      I'm not certain.

Q.      Okay.  As you sit here today, do you know any policies or procedures if someone makes a disability claim?

A.      I would have to look through the general orders.  I believe it is addressed in the arbitrated award that they will follow the Federal -- or we will follow the legal standard for that and we will not discriminate.

Q.      What is the arbitrated award?

A.      That's the award that was between the County of DuPage, the Sheriff of DuPage County, and Metropolitan Alliance of Police that covers your client and all of the deputies in the courthouse and patrol.

Q.      And reasonable accommodations, well, when someone gives you a claim of disability, do you believe it's your role at the sheriff to determine what a reasonable accommodation is?

A.      Depends upon the employee that provides it.

Q.      And how do you determine whether it is or isn't?

Alan Angus
September 29, 2016

17

A.      What bureau they fall under.

Q.      And so if they fell under your bureau at the time?

A.      Yes.

Q.      Is there any -- so, you believe it's your responsibility then if they fall under your bureau to determine a reasonable accommodation?

A.      With the assistance of HR, yes.

Q.      And does the sheriff have their own HR department, or is it the HR of Dupage County?

A.      The County HR is who issues the paychecks, who issues the insurance, who does all the benefits.  We have an administrator that facilitates the conversation between the County and the Sheriff's Office.

Q.      Okay.  Who is that?  Who was it in 2014?

A.      I believe it was Elizabeth Angus.

Q.      Did that change in 2015?

A.      Not that I'm aware of.

Q.      Elizabeth Angus?

A.      Yes.

Q.      Is that someone related to you?

A.      Yes.

Q.      Who is she?

A.      My sister-in-law.

Alan Angus
September 29, 2016

18

Q.      And she started after you?

A.      Yes.

Q.      And, I'm sorry, in 2015, 2016 was she still the contact person?

A.      Yes.

Q.      What are the forms of communication you used to communicate with the sheriff?

A.      **Most everything done with the sheriff is orally.  Very few things are done through email.**

Q.      Okay.  Do you know why?

A.      **I don't have the concrete reason.  I can only speculate.  My speculation is that when it's oral communication, there is not a written documentation of it.**

Q.      Okay.  And that's to protect someone?  I'll strike that question.

Is it the sheriff that decides who should be transferred from one department or bureau to another?

A.      **Ultimately it's his decision, yes.**

Q.      Does he get final say on all transfers in 2014, 2015 from one bureau to another?

A.      **Yes.  They have to be authored by him.  He's the only one, by our policy, that's authorized to transfer between bureaus.**

Q.      For Mr. Koty, when he was transferred from law

County Court Reporters, Inc.
630.653.1622

Alan Angus
September 29, 2016

19

enforcement bureau to the security -- is court security a separate bureau?

A. Yes.

Q. In order for that to happen, Sheriff Zaruba ultimately has to approve of that?

A. Yes.

Q. Or he can reject it; correct?

A. Correct.

Q. Do you know why the sheriff's name wasn't on the court transfer for Deputy Koty?

A. I have no idea.

Q. Do you know if the sheriff had decided on his own on someone being transferred from one bureau to another? Do you know if the sheriff said, without anyone else knowing, I want this person to be transferred from this bureau to another?

MR. VACI: Objection, form of the question.

MR. JACOBSON: Unless he tells you you shouldn't answer.

THE WITNESS: The problem that you have with the question, or the problem that I have with the question is that's such an overly broad question because transfers happen on a frequent basis, so to specify one, I can't.

Alan Angus
September 29, 2016

20

BY MR. JACOBSON:

Q.    Are you aware of any examples, or do you recall an example where someone was transferred from one bureau to another solely by the sheriff deciding that?

A.    **Yes.**

Q.    From no input from any chiefs?

A.    **With no input, no.**

Q.    So every transfer that you're aware of from one bureau to another where the sheriff has decided, that was with input from the chiefs?

A.    **Well, there was discussion, yes.**

Q.    And who would that be that you recall the one person?

A.    **The one person that I can think of off the top of my head was Sergeant Williams.**

Q.    Okay.  And where did Sergeant Williams move from to?

A.    **From patrol to court security.  I take that back, another one was Lieutenant Dan Bilodeau.**

Q.    And he moved from patrol to court security, too; right?

A.    **Right.  From Chief of Law Enforcement to court security, yes.**

Q.    Was it chief of -- as far as you can recall,

Alan Angus
September 29, 2016

34

that's where we usually get -- that's where we always get our legal guidance when it comes to personnel issues through the State's Attorney's Office.

Q.     So someone else told you that it's not -- it's not an impact of a daily life activity?

A.     Correct.

Q.     Do you know who it is that told you?

MR. VACI:  Objection, attorney/client privilege.

BY MR. JACOBSON:

Q.     Do you know if it was an attorney that told you that it wasn't a daily life activity?

A.     Yes.

Q.     Okay.  Do you know if the attorney instructed you on what to do with employment?

MR. VACI:  Same objection, attorney/client privilege.

BY MR. JACOBSON:

Q.     Did the attorney give you advice or instruct you what to do?

A.     Yes.

Q.     Which, both?

MR. VACI:  Objection.  My advice is not to answer the question.

BY MR. JACOBSON:

Q.     After you met -- and this is Mr. Bruckner?

Alan Angus
September 29, 2016

35

A.      I'm not 100 percent certain if it was Mr. Bruckner or not.

Q.      Do you know who the pool of attorneys are at the State's Attorney's Office that you would deal with?

A.      Yes.

Q.      In 2014?

A.      Yes.

Q.      Who are those?

A.      Assistant State's Attorney Vaci, Assistant State's Attorney Bruckner, and Assistant State's Attorney Bill Roberts.

Q.      So it could have been any of them?

A.      Yes.

Q.      Do you know if, after you talked to whoever it is you talked to, you had a choice of making an employment decision, or you had to -- you had no choice?  So you talked to someone concerning Mr. Koty; correct?

A.      I talked to Chief Kruse.

Q.      Okay.  I thought you said you talked to some of the state's attorneys?

A.      What I said is we talked, we as the office talked to the state's attorney when it deals with employment decisions.  It says right here in paragraph two of this memo, Exhibit 14, says "subsequently Chief Kruse met with

County Court Reporters, Inc.
630.653.1622

Alan Angus
September 29, 2016

36

the State's Attorney's Office and the recommendation is to temporarily transfer your work assignment to the courthouse."

So that conversation apparently took place between Chief Kruse and the State's Attorney's Office.

Q. Do you recall if you had any conversation with Chief Kruse and the state's attorney?

A. I had some type of conversation because this memo is my memo temporarily assigning, which is Exhibit 14.

MR. VACI: Bates Stamp 14, for the record.

THE WITNESS: This is my memo, and I had to have some type of conversation because I authored this memo temporarily assigning Deputy Koty over to the courthouse.

BY MR. JACOBSON:

Q. Do you know if you were involved in the decision making of what was to happen related to Mr. Koty?

A. Yes.

Q. And what was your involvement in the decision making?

A. Well, the decision was made that we would put Deputy Koty in the courthouse until such time as he was medically able to come back to patrol, as this says, is a temporary assignment.

Q. So I'm asking what your involvement in the

Alan Angus
September 29, 2016

37

decision is, not --

A.      Oh.    The decision was that I agreed with putting him in the courthouse instead of leaving him sit at home because he was a productive member of the office, and it was put him at the courthouse and still have him as a productive member of the office, or let him sit at home because he medically could not drive the car that was assigned to him.

Q.      Okay.   Your decision making, were you -- your involvement in decision making, was it just simply Mr. Kruse -- I'm trying to figure out what your involvement was. Did all three of you get together and meet?  Did Chief Kruse say this is what we're going to do and you said okay, fine? What was your actual -- did you say anything to anyone?  Did anyone say anything to you?

A.      I don't recall.

MR. VACI:  Object to the complex question.

BY MR. JACOBSON:

Q.      So do you recall how you were involved in the decision making except for that --

A.      The intricacies, no.

Q.      Do you recall meeting with anyone, either in person or by phone, concerning this memo?

A.      With this specific incident, no, I don't

Alan Angus
September 29, 2016

38

recall.

Q.    And you were chief at that time; right?

A.    **Yes.**

Q.    And were you Chief of Law Enforcement?

A.    **At that time, yes.**

Q.    And what was Chief Kruse responsible for?

A.    **He was Chief of the Administrative Bureau.**

Q.    And what does the Administrative Bureau oversee?

A.    **The Administrative Bureau oversees personnel, budget, court security, crime lab, radio room, civil division.**

Q.    Okay.  So it sounds like -- am I correct it's everything but law enforcement and prison?

A.    **No.**

Q.    Okay.  There is -- all right.

Do you know why Deputy Koty didn't get an SUV?

MR. VACI:  Object to the form of the question.

BY MR. JACOBSON:

Q.    Do you know why he was transferred to court security instead of receiving an SUV at that time?

A.    **The best recollection that I have is Chief Kruse met with our risk manager and had them conduct**

Alan Angus
September 29, 2016

39

measurements of an SUV and Deputy Koty's squad car, and the results were that the squad car had more leg room than the SUV.

Q.      You said the best that you can recall.  Why do you say that?  Do you not have a good recollection of what happened?

A.      I was not part of the meeting between Chief Kruse and the county risk manager.  I only remember the results of what Chief Kruse told me that those measurements were.

Q.      Except for that memo, are you aware of any other documentation related to the transfer of Mr. Koty from law enforcement to court security?

A.      Yes.

Q.      And what is the other documentation?

A.      The other documentation, I know that I authored another memo to Deputy Koty temporarily placing him inactive on the Special Operations Team.

Q.      Okay.  Any other documents that you recall?

A.      Not that I'm aware of.

Q.      Okay.  Did you -- so you never talked to Mr. Genovese concerning Mr. Koty's medical problem?

A.      No.

Q.      Okay.  Were you involved in the decision

Alan Angus
September 29, 2016

40

making to go talk to Mr. Genovese?

MR. VACI: Object to the form of the question.

BY MR. JACOBSON:

Q. Someone decided to talk to Mr. Genovese; correct?

A. Correct.

Q. Someone had to make that decision?

A. Correct.

Q. Were you involved in that decision to talk to him?

A. I can't recall if I was or not.

Q. Is there anything that would help you refresh your recollection?

A. No.

Q. Do you know of anything else that happened -- so you think that after this letter Mr. Genovese was involved in something; correct?

MR. VACI: Object to the form of the question.

THE WITNESS: I believe that Mr. Genovese was involved prior to this letter.

BY MR. JACOBSON:

Q. Okay. Would --

A. Bates stamped 14.

Q. I'm showing you what's been Bates stamped 537.

Alan Angus
September 29, 2016

41

(Whereupon, Exhibit Bates

stamped 537 was identified.)

BY MR. JACOBSON:

Q.    Does that look familiar to you?

A.    No.

Q.    Did you ever receive any information from Mr. Genovese concerning Mr. Koty's transfer?

A.    No.

Q.    Do you know why Mr. Koty did not get an SUV?

MR. VACI:  Object to the form of the question.

THE WITNESS:  No.

BY MR. JACOBSON:

Q.    In 2014, do you know why Mr. Koty did not receive an SUV?

MR. VACI:  Same objection.

THE WITNESS:  No.

BY MR. JACOBSON:

Q.    You eventually learned that Mr. Koty was getting transferred to the court security; correct? In general, you eventually learned that?

A.    Yes.

Q.    And did you have an opinion on him being transferred to court security?

A.    Yes.

Alan Angus
September 29, 2016

42

Q.     Well, did your opinion matter on the transfer?

A.     No.

Q.     Okay.  What was your opinion?

A.     My opinion was, as I stated before, that instead of having Mr. Koty sitting at home because he couldn't drive the vehicle, I'd rather have him a productive member of the office and work somewhere.  And his doctor's note, I believe, indicated that he was able to do all the functions of a police officer, just it was necessary for him to have a vehicle.

Q.     Okay.

A.     And if we didn't have that vehicle, this was a way to keep him productive.  He was still in the same union, he still had everything -- all the powers that he was granted before his move to court security.

Q.     How did you know they didn't have a vehicle for him?

A.     Through the conversation we had before, as I believe I said before, that Mr. Kruse, or Chief Kruse, said the measurements in the SUV actually showed there was less leg room than the Crown Victoria, which was Mr. Koty's vehicle.

Q.     At that time you were the chief, so did you have any responsibilities as to accommodating Mr. Koty?

Alan Angus
September 29, 2016

43

MR. VACI: Objection to the form of the question.

THE WITNESS: I believe the accommodation was made by keeping him employed and keeping him a productive member of the office.

BY MR. JACOBSON:

Q. I understand that. I'm asking if you had any responsibility. I don't know what your role was, so did you have any responsibilities as chief to accommodate him?

A. Yes.

Q. What were those responsibilities?

A. **To make a reasonable accommodation for the medical condition that he presented us with.**

Q. Now, would another reasonable accommodation be giving him an SUV?

A. **Based on the information that I know, no, it would not have been.**

Q. Why not based on the information you knew?

A. **The information that was provided to me by Chief Kruse, that would have aggravated the situation because it had less leg room, and his doctor said he needed more leg room.**

Q. So help me out. Why is everyone calling the doctor a liar? Why is it when the doctor says an SUV would be necessary, you and the chief, and I don't know who else,

Alan Angus
September 29, 2016

44

is saying the doctor doesn't know what he's talking about?

MR. VACI: Objection to the form of the question.

BY MR. JACOBSON:

Q. Go ahead and answer.

A. Am I calling the doctor a liar? I'm not calling the doctor a liar. I can only deal with facts. The facts were that Mr. Koty's car was measured by our risk manager, and I don't believe it was measured by the doctor. The SUV was measured by Mr. Genovese, and I don't believe it was measured by the doctor, so I would not say he was a liar.

Q. Did you ask the doctor if he measured it?

A. No, because we cannot have a discussion with the doctor.

Q. Why not?

A. We didn't want to violate HIPAA.

Q. Who told you that?

MR. VACI: Objection.

THE WITNESS: State's attorney.

BY MR. JACOBSON:

Q. And are you familiar with HIPAA?

A. Yes.

Q. Were you advised in your learning of HIPAA that transmitting medical information from one chief to

Alan Angus
September 29, 2016

45

another may be a violation of HIPAA?

A.    The medical information that was provided was provided by the doctor.

Q.    Okay.  Did you ever talk to Mr. Koty and ask for permission to talk to the doctor to see what the doctor did?

A.    No, I did not.

Q.    Did you ever talk to Mr. Koty or anyone in the whole world asking why the doctor came to the conclusion that an SUV would solve his problem?

A.    No.

Q.    And do you have any idea of what the experience is of the person that measured the vehicle?

A.    As far as?

Q.    Measuring vehicles.

A.    Measuring vehicles, no, I'm not certain what his qualifications are, so to speak.  He is the County risk manager, so I am under the assumption if he was hired as a risk manager, he has some training in mitigating the County's risk.

Q.    But this is an assumption just based on his title; correct?

A.    Correct.

Q.    And there is no confusion that the doctor

Alan Angus
September 29, 2016

80

deputy.

Q.      Okay.  Do you know if that dog was ever transferred to another deputy?

A.      Yes.

Q.      When was that?

A.      I don't remember the exact date, but it was transferred to Deputy Culver.

Q.      Is there any reason why Deputy Koty could not have used that vehicle, except for the fact that the sheriff decided it should be in Deputy Lee's driveway?  You said it's canine.  To convert the SUV from canine to normal patrol requires what?

A.      Removal of the entire kennel, which the kennel replaces the entire back seat package.  What I believe require -- and this is only speculation, because I can't remember the exact outfitting.  You'd have to talk to our outfitters as far as what the conversion is, but the SUV that he had for the canine had the kennel, which takes the place of the rear seats, has electronic fans mounted in the windows for air flow, doesn't have a partition, because the kennel acts as the partition, and I'm not certain about all of the other extra things that happen with a canine vehicle. So it would be substantial.

Q.      Without taking the cage out and doing the

Alan Angus
September 29, 2016

81

other things, Deputy Koty could actually have been on the street with that vehicle; right?

A. **Could he have driven the vehicle? Yes, he could have driven the vehicle.**

Q. And he couldn't transport prisoners, but you guys have a procedure when prisoners can't be transported; correct? If Deputy Koty pulled over a dozen people, he couldn't fit the dozen in any SUV or Crown Victoria; correct?

A. **Correct.**

Q. In fact, there's a procedure for transporting those people when they don't all fit in the vehicle; correct?

A. **Well, there's a transport procedure, yes.**

Q. So if he couldn't fit two people in his vehicle, or fit any prisoners in his vehicle, there's a system to handle that without converting that SUV, Deputy Lee's SUV; correct?

A. **Yes.**

Q. So, Deputy Koty could have done his job in law enforcement except for transporting prisoners, which he couldn't do if there were more than two anyways with that vehicle; correct?

A. **Sure, yes.**

Alan Angus
September 29, 2016

82

Q.      Okay.

MR. JACOBSON:   I don't think I have anything more. It's all yours.


EXAMINATION

By:  Mr. Vaci

Q.      Take a look at Bates stamp 14 again.   That's dated April 8th, 2014; correct?

A.      Yes.

Q.      You were the chief of the patrol division at the time?

A.      Yes.

Q.      And Deputy Koty was under your demand at that time; correct?

A.      Yes.

Q.      On that day, you were in possession of the doctor's note of April 4th, 2014, which is Exhibit 1.   Do you need to see it?

A.      Yes.

                        **(Whereupon, Exhibit 1 was**

                        **identified.)**

BY MR. VACI:

Q.      And that indicated that Deputy Koty needed more leg room, a vehicle with more leg room; is that

Alan Angus
September 29, 2016

83

correct?

A.     Yes.

Q.     And at that time you were aware through Chief Kruse that there were measurements done and that the Crown Victoria that was Deputy Koty's assigned vehicle had more leg room, according to the measurements, and the Ford Explorer that he used as an Interceptor vehicle; correct?

A.     Yes.

Q.     Are there other SUV's used as patrol cars other than that Ford Interceptor?

A.     Yes.

Q.     Which one?

A.     The Expedition.

Q.     And other than the one that you were just asked questions about, who has Expeditions?

A.     The four watch commanders and three canine handlers; two I think now.

Q.     Other than that note that was given to you and that you observed, were there any other medical -- any other notes that gave you any other type of medical direction other than he needed more leg room?

A.     No.

MR. JACOBSON:  I'll object.  That's not the evidence.

County Court Reporters, Inc.
630.653.1622

Alan Angus
September 29, 2016

84

BY MR. VACI:

Q.    Well, the question is were there any other notes that you were aware of that gave you any medical direction other than he needed a vehicle with more leg room?

A.    No.

Q.    And the date that that decision was made to transfer Deputy Koty to court services, were the options essentially that he either be sent home and not work, not be active on work and have to go on some type of disability, or you reassign him somewhere else?

A.    Yes.

Q.    Those are the two options?

A.    Yes.

Q.    And the courthouse is the most preferable place to reassign him to?

A.    Yes.

Q.    Why was that?

A.    **That kept him working.**

Q.    And was the courthouse in need of people to work in the courthouse, if you know?

A.    **I don't know at that time.**

Q.    You weren't in charge of the courthouse; correct?

A.    **Correct.**

Alan Angus
September 29, 2016

85

Q.    So clarify what was the decision making process regarding transferring him to the courthouse. Essentially somebody had to make a decision; correct?

A.    **Correct.**

Q.    So who made the decision?

A.    **Ultimately the decision was made by the sheriff with input from the State's Attorney's Office and Chief Kruse.**

Q.    Now, did you ever have discussions with the sheriff about Deputy Koty?

A.    **No.**

Q.    Do you know if anyone had discussions with the sheriff about Deputy Koty?

A.    **I don't know.**

Q.    So when you say the ultimate decision is the sheriff, are you referring to the fact that he has to -- I mean a transfer is not effective until he okay's it?

A.    **Bureau transfers and personnel decisions are made by the sheriff.**

Q.    What do you mean by that?

A.    **Bureau transfers by the policy, by our own general orders, can only be made by the sheriff.**

Q.    So does that mean the sheriff has to get involved in the actual decision to make that, or does he

Alan Angus
September 29, 2016

86

just okay what his bureau chiefs determine is the right course of action?

A.    Yes and no.

Q.    Which?

A.    **Yes, being is he involved with every decision when it comes to personnel, yes.  Is it always his recommendation?  It's not always his recommendation, but it can be his recommendation.**

Q.    So in this case, was it the sheriff's recommendation to move Deputy Koty to --

A.    **In this case I believe it was the state's attorney's recommendation to move him to the courthouse.**

Q.    So it was the state's attorney's --

A.    **Guidance.**

Q.    Just so we can define the terms, the state's attorney's opinion gave you legal advice, you and Chief Kruse; correct?

A.    **Well, Chief Kruse.**

Q.    And that legal advice was what?

A.    **That it would be beneficial to -- that we could transfer him to the courthouse.**

Q.    Okay, because that would have been an acceptable accommodation?

A.    **Yes.**

Alan Angus
September 29, 2016

87

Q.      And that's regardless of whether he's actually disabled or not disabled; is that right?

A.      **Correct.**

Q.      So, is it your testimony that the State's Attorney's Office makes a decision that the Sheriff's Office transfer somebody?

A.      **The state's attorney offers their legal opinion, and we follow what the legal opinion is.**

Q.      But the legal opinion is not the actual decision to transfer someone?

A.      **Correct.**

MR. JACOBSON:   Hold on one second.

(Whereupon, a recess was taken.)

BY MR. VACI:

Q.      So there's a difference between getting legal advice and then making a decision; correct?

A.      **Correct.**

Q.      So would I be correct in that only the sheriff's office can transfer somebody from one bureau -- transfer a deputy from one bureau to the other; correct?

A.      **Yes.**

Q.      And is it also true that in order for that to happen, the sheriff himself has to approve it?

Alan Angus
September 29, 2016

88

A.    Yes.

Q.    And you're saying in some cases he recommends a transfer, in other cases he would just approve the transfer?

A.    Yes.

Q.    And I believe your testimony was in this case, he approved the transfer of Deputy Koty.

A.    Yes.

Q.    So, whose recommendation was it to transfer?

A.    **Chief Kruse.**

Q.    And that's based on what?

A.    **Based on the conversations that he had with the state's attorney and with the medical documentation and the lack of being able to find a vehicle.**

Q.    Was Deputy Koty under Chief Kruse's command at that time?

A.    **No.**

Q.    Whose command was he under?

A.    **Mine.**

Q.    Was it your recommendation to transfer Deputy Koty to court services?  Did you agree with the recommendation?

A.    **I agreed with it, yes.**

Q.    Could Chief Kruse transfer him or make a

Alan Angus
September 29, 2016

89

recommendation to transfer him without your approval or agreement?

A.      Yes, he could.

Q.      And would that be taken into account?

A.      Yes.

Q.      So what exactly happened in this case that you recall?  What would be the mechanics of getting this transfer done?  Was it Chief Kruse recommending it to you?  How was the recommendation made so that it eventually ended up to the sheriff approving it?

A.      **The question of the squad car came up.  This was deferred to Chief Kruse, I believe, and this is only speculation, because I believe that he had a meeting with --**

MR. JACOBSON:  Well I'll object to speculation.

THE WITNESS:  -- Deputy Koty where they had a discussion outside of the -- it was downstairs in the patrol conference room.

BY MR. VACI:

Q.      This is at what time, sometime prior to the decision being made?

A.      **Yes.  And Chief Kruse spoke with the State's Attorney's Office, and we were presented with -- we, being myself and Chief Kruse, presented me with the options of, based on this request, we have two options, that we could**

County Court Reporters, Inc.
630.653.1622

Alan Angus
September 29, 2016

90

transfer him to the courthouse, or we could send him home. And, the recommendation was --

Q.      And this is your employee that he's talking about?

A.      Correct.

Q.      And then what happened?

A.      And then the decision I agreed with was to put him in the courthouse.

Q.      So, is it your testimony that the chiefs essentially just recommend something to the sheriff?

A.      Yes.

Q.      And then the sheriff is thumbs up or thumbs down on the recommendation?

A.      In this case, yes.

Q.      So the sheriff, in that sense, is the ultimate decision maker?

A.      Yes.

MR. VACI:  That's all.


                   RE-EXAMINATION

             By:  Mr. Jacobson

Q.      So you were asked what legal advice was given to you.  What was all the legal advice that was given to you about Mr. Koty?

Alan Angus
September 29, 2016

96

STATE OF ILLINOIS    )
                     )  SS.
COUNTY OF DU PAGE    )

            I, LINDA M. CIOSEK, C.S.R. No. 084-002892, a Notary Public in and for the County of DuPage, State of Illinois, do hereby certify that at the request of MR. JEFFREY JACOBSON, subject to the usual terms and conditions of County Court Reporters, Inc, that ALAN ANGUS was first duly sworn by me to testify the truth; that the above deposition was recorded stenographically and reduced to typewriting by me; that the deposition is a true, correct and complete transcript of the entire testimony given by the said witness at the time and place hereinabove set forth, and that signature is hereby reserved by said witness.

            I further certify that I am not counsel for, nor in any way related to any of the parties to this suit, nor am I in any way interested in the outcome thereof.

            In Witness Whereof:  I have hereunto set my hand and affixed my Notarial seal this 21st day of October, A.D. 2016.


           --------------------------------
             LINDA CIOSEK, CSR


My Commission expires:

May 5, 2018.