Daniel Bilodeau
September 19, 2016

4

THE COURT REPORTER:  Please raise your right hand.

(The oath was thereupon duly administered to the witness by the Notary.)

MR. JACOBSON:  Can you state your name for the record?

THE WITNESS:  Daniel Bilodeau, B-i-l-o-d-e-a-u.

MR. JACOBSON:  Mr. Bilodeau, this is the deposition taken pursuant to United States Supreme Court and local rules.  Just some -- have you ever done a deposition before?

THE WITNESS:  A long time ago.

MR. JACOBSON:  Okay.  Just to remind you, you can't say sounds.  You have to use the words; although she'll take down sound anyways.  And if you need a break at any time, just let me know you need to take a break, you know, for whatever.  If you don't understand any of my questions, just let me know.  I'll try to rephrase them.

DANIEL BILODEAU,
called as a witness by the Plaintiff herein, pursuant to the provisions of the Federal Rules of Civil Procedure pertaining hereto, having been first duly sworn, was examined and testified as follows:

Daniel Bilodeau
September 19, 2016

5

EXAMINATION

By:  Mr. Jacobson

Q.    And you mentioned you've had prior depositions.  When were those?

A.    **I had one approximately 2000, 2001 for a traffic crash that I was the reporting officer on.**

Q.    Any other depositions, if you recall?

A.    **For me, no.**

Q.    In relationship to this lawsuit, have you done anything to prepare for this deposition?

A.    **No.**

Q.    Have you talked to any attorneys?

A.    **Only Mr. Vaci.**

Q.    Have often have you talked to him?

A.    **Last week when he called to tell me that I had to do a deposition.  One time.**

Q.    Have you signed any statements or made any statements related to this case?

A.    **No.**

Q.    And do you live in Darien?

A.    **I do.**

Q.    Did you read any transcripts, depositions, or any documents before coming here related to this

Daniel Bilodeau
September 19, 2016

6

deposition?

A. No.

Q. And what is your position currently with the Sheriff's?

A. **Lieutenant.**

Q. And how long have you been lieutenant?

A. **I was promoted to lieutenant on Halloween of 2007.**

Q. And what bureau are you a lieutenant of?

A. **I'm in the law enforcement bureau.**

Q. And prior to October 31st, 2007, what was your title?

A. **Detective sergeant.**

Q. And prior to that?

A. **Patrol sergeant.**

Q. And when was the -- what period of time was that for?

A. **I was promoted approximately March of 2003 to patrol sergeant. I was detective -- appointed to detective sergeant March/April of 2006.**

Q. And when did you start working for the Sheriff's?

A. **July of 1999.**

Q. Did you work prior to that?

Daniel Bilodeau
September 19, 2016

7

A.      Yes.

Q.      Where did you work?

A.      **Village of Brookfield.**

Q.      Did you work with any other officers that are currently at the Sheriff's Department in Brookfield?

A.      **No.**

Q.      How long were you with the Village of Brookfield?

A.      **Approximately two years.**

Q.      And what did you do there?

A.      **Police officer.**

Q.      Highest education?

A.      **Master's.**

Q.      In?

A.      **Public safety administration.**

Q.      You're one of the more educated sheriffs then.

        Any other education or training in the last ten years related to being a sheriff?

A.      **I went to School of Police Staff and Command through Northwestern University in 2006, and just various training courses along the way.**

Q.      And in the Sheriff's Department in the last five years, what forms of communication do you use to

Daniel Bilodeau
September 19, 2016

8

communicate with the Sheriff?

A.    **The Sheriff personally?**

Q.    Yes.

A.    **In the last three years I've spoken with the Sheriff maybe twice, and maybe sent a couple of e-mails.**

Q.    What system do you use for sending the e-mails?

A.    **The Sheriff's Office e-mail.**

Q.    Does the Sheriff communicate with you in the last few years?

A.    **Personally, no.**

Q.    When you say "personally," is there other forms of communication?

A.    **I get group e-mails, like today a thank you e-mail for people who attended Safety Saturday, but there's no personal e-mail or communication between the Sheriff.**

Q.    And are those all through the Sheriff's e-mail system?

A.    **Yes.**

Q.    Have you received any commands from the Sheriff through someone else?

A.    **Not that I'm aware of.**

County Court Reporters, Inc.
630.653.1622

Daniel Bilodeau
September 19, 2016

9

Q. But you'd be aware, right, if the Sheriff wanted to get a message to you, and it came through someone else?

A. **Depending how they deliver it, yes.**

Q. What do you mean by that, "how they deliver it"?

A. **If somebody said, The Sheriff said to do this, then it would be a message from the Sheriff, but I have not received anything of that nature.**

Q. Does the Sheriff decide if someone gets transferred from one bureau to another?

A. **I've not spoken with or worked with the Sheriff directly in years.**

Q. But as far as what happens -- you've been with the Sheriff's Department for a long time.

As far as transfers from bureau to bureau, do you know how that occurs?

A. **Ultimately, the Sheriff is the only person who can authorize a bureau transfer per policy.**

Q. Is transferring from law enforcement to the court system a bureau transfer?

A. **Yes.**

Q. And how do you know he's the only one?

A. **It's in policy.**

Daniel Bilodeau
September 19, 2016

10

Q.   Can that get -- can the policy be waived in certain situations, do you know?

A.   **Not to my knowledge.**

Q.   So, for Mr. Koty to go from law enforcement to the court system, it would ultimately have to be the Sheriff that approves that, as far as you know from the policy?

A.   **Per policy, yes.**

Q.   And for Mr. Koty then to go from the court system back to law enforcement, it would -- pursuant to the policy, the Sheriff would have to approve that?

A.   **Correct.**

Q.   Are you involved in any meetings concerning transfers from one bureau to the other bureau in the last three years?

A.   **No.**

Q.   Do you get involved in any personnel changes?

A.   **Absolutely not.**

Q.   Do you see any correspondence concerning any personnel transfers from bureau to bureau?

A.   **Only if it affects the people that directly work for me.**

Q.   And on those transfers, do you know who they come from?

County Court Reporters, Inc.
630.653.1622

Daniel Bilodeau
September 19, 2016

11

A. Depends on who the top headers from. It'll say who it's from. It'll say -- to use Mr. Koty as an example, it would say: To Deputy Eric Koty from -- whoever was authorizing whatever that change would be.

Q. So, that I understand how the system works, so if you were to get something from someone besides Zaruba, would that person be authorizing the transfer, or just communicating the transfer?

A. The transfer would -- in my experience, a transfer -- a bureau transfer has to come from the Sheriff. Now, in a case of -- like I referred to with Mr. Koty, if he had requested to go to a different shift within the same bureau, his chief could authorize that transfer, and the memo would come from the chief.

Q. And could the Sheriff stop that, change that? Can the Sheriff change shift changes?

A. Sure. He has ultimate control of everything in that office.

Q. Now, were you ever a chief with the Sheriff's?

A. I was.

Q. And that was in 2010?

A. Well, it started at the very end of 2007 through early 2012. I can give you the exact dates if

Daniel Bilodeau
September 19, 2016

12

you'd like.

Q.    Probably won't hurt.

A.    **December 28th of 2007 to February 27th of 2012.**

Q.    And as chief, what did you do?

A.    **I was appointed to run the affairs of the law enforcement bureau.**

Q.    And that's where Mr. Koty is currently. Correct?  As far as you know?

A.    **Currently, yes.**

Q.    And who did you report to as chief?

A.    **The Sheriff.**

Q.    And how many conversations -- personal conversations would you say you had with the Sheriff during that period of time that you were chief?

A.    **Multiple daily.**

Q.    Do you know if there was any conversations related to Mr. Koty?

A.    **None that I recall.**

Q.    Do you know if there was any documents concerning your communications related to Koty back when you were chief?

A.    **I believe when I was chief, Mr. Koty was put on the SWAT team, so there might have been a document**

County Court Reporters, Inc.
630.653.1622

Daniel Bilodeau
September 19, 2016

17

the Sheriff, and five of the seven worked directly for me at the time.

Q. So, was this your decision to request a transfer, or did someone else suggest it?

A. No. It was my decision.

Q. And what was the lawsuit over?

A. Of allegations of Constitutional violations.

Q. Do you know what happened with those lawsuits?

A. I was dismissed with prejudice.

Q. Is it fair to say then that you don't want to go back to the courthouse based on this?

A. I never wanted to go to the courthouse in the first place.

Q. And why is that?

A. That's not the position I applied for when I applied at the DuPage County Sheriff's Office.

Q. Is there any difference between the courthouse and law enforcement?

A. Of course.

Q. And what's the differences, in your mind?

A. Law enforcement is being the police and driving your squad car and responding to calls. The courthouse is monitoring the hallways and courtrooms of

Daniel Bilodeau
September 19, 2016

18

the courthouse.

Q. According to the Sheriff's policy, they're both the same. You know, there's the courthouse is like a mini city that has all sorts of crimes and stuff.

Would it be fair to say you don't agree with that, that being on the street is much different than being in the courthouse?

A. Yes.

Q. Are the benefits different for being on the street versus -- for law enforcement versus court security?

A. Which type of benefits?

Q. I don't know. That's -- I mean, like the hours, when you start with the hours for the courthouse versus law enforcement. Is one better than the other?

A. In my opinion, I prefer the hours on the street, the twelve-hour shifts.

Q. Any other benefits? Vacation? Holiday pay?

A. Holiday pay versus having the holidays off.

Q. Which one?

A. I prefer to have the holiday pay.

Q. Okay. In law enforcement?

A. Law enforcement.

Daniel Bilodeau
September 19, 2016

19

Q.   Any other benefits that's one over the other?

**A.   Only my own personal beliefs.**

Q.   Well, that's what I'm trying to find out.

**A.   My belief is that I applied to be a police officer.  I wanted to be in a police car.  I did not want to be in a building.  I wanted to be responding and helping citizens, not working in a court security division.**

Q.   So, there was one other thing.  I'm drawing a blank now.

Do you know if some people consider going to the courthouse -- has anyone told you going to the courthouse is a punishment, or a negative transfer?

**A.   Yes.**

Q.   Have you ever heard that from the people above you?

**A.   No.**

Q.   Have you ever heard that someone's getting punished by being transferred to the courthouse from law enforcement?

MR. VACI:   Objection to form of the question.  You can answer.

THE WITNESS:   Not in those terms, no.

County Court Reporters, Inc.
630.653.1622

Daniel Bilodeau
September 19, 2016

20

BY MR. JACOBSON:

Q. What kind of terms have you heard it in?

A. **From the people below me, or the people being transferred?**

Q. Anyone. Anyone. Have you ever heard in the Sheriff's Department talking about someone getting punished by being transferred from law enforcement to --

A. **I believe it's a general conception that if you get transferred there without your request, it's a punishment of some sort.**

Q. Oh, I remember. Is training different for courthouse security than law enforcement?

A. **There's a much shorter academy-type training.**

Q. To be in the courthouse security?

A. **Correct.**

Q. While you're -- are you familiar with the SWAT training?

A. **No.**

Q. Did you ever learn during your employment with the Sheriff that Mr. Koty has a disability?

A. **Through gossip circles. Never through anybody specific.**

Q. Were you ever involved in Mr. Koty's car

Daniel Bilodeau
September 19, 2016

21

being modified?

A.   No.

Q.   And you said gossip and stuff.  What have you learned?

A.   I had just heard that Mr. Koty had a problem, and was trying to get a different or bigger vehicle for something to do with, I believe, his back.

Q.   For vehicles, do you know who assigns which deputy gets which vehicle?

A.   It's currently my understanding a civilian named Aaron Jacobs.

Q.   Do you know who he's employed by?  The Sheriff or --

A.   The Sheriff.

Q.   And when did that start?

A.   I don't know.

Q.   Do you know who was doing it before him?

A.   Chris Johnson.  Another civilian, who no longer works with the Office.

Q.   And these are who were assigning vehicles?

A.   They were in charge of the quarter master and the vehicles.

Q.   Okay.  I'm sorry.  They were in charge of the quarter master?

Daniel Bilodeau
September 19, 2016

22

A.   They were in charge of our quarter -- they were called the quarter master.  That was their title.

Q.   Okay.

A.   And they were in charge of the motor pool.

Q.   Do you know how the assignment of vehicles was done?

A.   I do not.

Q.   Do you know if the Sheriff had the ultimate decision on assigning the vehicles?

A.   The Sheriff had the ultimate say in everything that happens at the Sheriff's Office.

Q.   Do you know how involved the Sheriff was on the assignment of vehicles?

A.   Sir, I have not been upstairs in years.  I don't know.

Q.   Have you seen any communication where the Sheriff said, This person is going to get this vehicle, or this person is going to be transferred?

A.   No, sir.

Q.   So, if Sheriff Zaruba wanted Mr. Koty to have a different vehicle, it's your understanding under the policy Sheriff Zaruba could do that?

A.   He could.

Q.   So, as you sit here today, you don't recall

Daniel Bilodeau
September 19, 2016

23

any correspondence relating to Mr. Koty's disability or accommodation for vehicles?

A.    No, sir.

Q.    Do you ever recall getting a State's Attorney's permission to modify Mr. Koty's car?

A.    I had nothing to do with Mr. Koty's car, sir.

Q.    And there is a -- are you familiar with the policy on truthfulness at the Sheriff's Office?

A.    Yes, sir.

Q.    Do you know why it doesn't -- the truthfulness statement seems to imply you're supposed to answer a very narrow question(sic) instead of being forthright.

Do you know why it's written like that?

A.    No, sir.

MR. JACOBSON:  Could I just have two minutes, Greg?

(There was a break taken, after which the deposition was resumed as follows:)

BY MR. JACOBSON:

Q.    I'll mark this as Exhibit No. 1.  Showing you what's been marked as Exhibit No. 1.

If you can read that, and tell me if that

County Court Reporters, Inc.
630.653.1622

Daniel Bilodeau
September 19, 2016

24

helps refresh your memory?

A.    **It's addressed to me, but I don't recall seeing it.**

Q.    Do you recall any adjustments to his vehicle or anything related to that back then?

A.    **No, sir.  This is -- to be perfectly candid with you, this is when things were starting to go south with the sheriff and I.  It was right before my transfer.  I do not recall.**

Q.    Your transfer to court services?

A.    **Yes.**

Q.    Now, when say "south," do you think you were being punished on --

A.    **I just believe that my time as chief was coming to an end.**

Q.    Because I noticed you had contributed to the Sheriff, and there's not been contributions recently.

A.    **Correct.**

Q.    I'd be surprised if he looked at it, but okay.

      So there was -- about what time do you think your relationship with him went south?

A.    **It was starting, in my opinion, November, December of the year prior.**