Patrick Genovese
September 19, 2016

10

there until 2008. Is it possible you were only there until 2007?

A.    **Yes. Yes, it is. Yeah. Give or take a month.**

Q.    And you handle currently the risk management for the Sheriff's Department?

A.    **For DuPage County.**

Q.    And does that mean every entity in DuPage County?

A.    **Correct.**

Q.    And how does your job relate to Mr. Koty?

A.    **From a safety perspective.**

Q.    What does that mean?

A.    **I can recall being requested by Chief Kruse to evaluate Deputy Koty's vehicle. He had a doctor's note, if I'm not mistaken, that indicated his legs hurt due to lack of leg room.**

Q.    Would you say that falls under the category of ergonomics?

A.    **Yes.**

Q.    What is your training in ergonomics?

A.    **Multiple classes in ergonomics.**

Q.    Tell me the last one you went to.

A.    **Last year.**

Patrick Genovese
September 19, 2016

11

Q. And where did you go?

A. **Northern Illinois University.**

Q. What was the class?

A. **On ergonomics.**

Q. Do you know what the title was?

A. **Ergonomics.**

Q. Was there any handouts?

A. **And ergonomics in the workplace.**

Q. Was there any handouts for that?

A. **I can't recall.**

Q. And in 2014, what kind of ergonomic training did you have?

A. **On-line.**

Q. Where was that? Who was that with?

A. **I can't recall the company. Ergopoint, I think.**

Q. Do you know what you were trained?

A. **Office evaluations.**

Q. What does that --

A. **Workstation evaluations.**

Q. What does that mean?

A. **Evaluating a person's workspace for ergonomic issues.**

Q. Would that be similar to a vehicle that they

Patrick Genovese
September 19, 2016

12

work in?

A.    Yes, absolutely, because you have to evaluate the chair that they're sitting in.

Q.    So what are some of the things that you would do to evaluate a chair?

A.    Well, one of the things that I would do is evaluate if the chair was adjustable.  I would evaluate the leg space from the edge of the seat pan to the floor and the wall or any other impediment.

Q.    I'm sorry, the law?

A.    Wall.  I'm sorry, wall.  Or any other impediments to the leg.

Q.    Okay.  So, let's deal with just the vehicle. What are the -- step back.

Is there certifications for people that do ergonomics?

A.    Yes, there are.

Q.    Do you have any of those certifications?

A.    No.  I am not a certified ergonomist.  I'm a certified safety professional.

Q.    All right.  So, as it relates to Mr. Koty, what are the things that -- Do you feel you're qualified to evaluate -- let's step back again -- whether a vehicle meets the ergonomic policies?

Patrick Genovese
September 19, 2016

13

A. As respect to leg room, absolutely.

Q. And what was Mr. Koty's issue with the vehicle?

A. Insufficient leg room.

Q. Where did you get that information from?

A. I believe that was a doctor's note that was forwarded on by Chief Kruse.

Q. So, what is it that you did to determine whether there was a problem with his vehicle or not?

A. He was driving a -- and I forget the year, but a Crown Victoria. So, I evaluated the seat pan distance to the pedals, gas and brake pedals. And I did that by moving the seat pan seat as far back as possible. And then just took a tape measure, and measured from the front of the seat pan -- which is what you're sitting in. It's called a seat pan -- to the pedals in the Crown Victoria. I also did a similar measurement with a Ford Explorer that the Sheriff had recently obtained as a squad car or vehicle.

Q. At any time did you have Mr. Koty get in the vehicles and say which one alleviates pain?

A. No, I did not. He had already indicated the Crown Victoria didn't.

Q. Is that important when the person that you're

County Court Reporters, Inc.
630.653.1622

Patrick Genovese
September 19, 2016

14

trying to take the measurements for tells you that it alleviates the problem?

A.  Frequently when I'm evaluating a scenario, you can't alleviate the problem by just talking about it.  For instance, I had recommended that the front seat of Detective Koty's Crown Victoria squad car be replaced.  It had no -- it had lost its support over the years, and subsequently the thigh was not being supported as he sat in the seat, which would have a direct -- not that I'm a doctor -- have a direct bearing on condition of the legs.

Q.  You bring up an interesting point.

Is it fair to say you have no idea what's causing the medical problem of Officer Koty?

A.  Oh, I have no idea what's causing the medical problem.

Q.  So, if Mr. Koty said he sat in the SUV, and that it alleviated his problem, is there any need to do measurements from an ergonomic point of view?

A.  I was not told that by Mr. Koty -- Deputy Koty.

Q.  You mentioned that he said something about the SUV's?

A.  I took measurements of an SUV the same day

Patrick Genovese
September 19, 2016

15

that I took measurements of the Crown Victoria for a comparison, because the issue that I was told was there was insufficient leg room. And so I took measurements of the Crown Victoria's leg space as well as the SUV's leg space.

Q. And that's -- was there anyone else you communicated to concerning this issue except for Chief Kruse?

A. There was a sergeant that was there at the time. His name escapes me. And Deputy Koty was there as I took the measurements.

Q. For both vehicles?

A. Yes. They were done at the same time, and they were parked adjacent to each other.

Q. Did you ever learn in any of your training that you should have a person sit in the vehicle to determine whether it's a fit or not?

A. No.

Q. I'm showing you what is marked as Exhibit No. 1. Do you want to do 1 or 2?

MR. VACI: I would go 1.

(Whereupon, the document was marked as Deposition Exhibit No. 1 for identification.)

Patrick Genovese
September 19, 2016

16

BY MR. JACOBSON:

Q. Showing what is marked as Exhibit No. 1.

Those are your -- that's your data. Correct?

A. **As I recall, yes.**

Q. Did you take any other data besides that?

A. **No.**

Q. I don't see in here any angle from the front seat to the pedals. Could you -- am I missing something? Is there any angles there?

A. **No. I didn't measure the angles, no.**

Q. But it's fair to say you didn't know medically what the problem was. Correct?

A. **No, no.**

Q. So, if the problem was his legs couldn't be -- his knees couldn't be at 90 degrees or less, you never measured for that?

A. **No. I was not told that.**

Q. Did you ever contact Mr. Koty to ask him to try the vehicles out?

A. **No.**

Q. So, related to the ergonomics of the car, what specific training do you recall that you had?

A. **Over the years it related to the position of**

Patrick Genovese
September 19, 2016

the seating as relates to the computers that are in the cars today, law enforcement vehicles.

Q. Do you know what training there was? Where you took the training and when?

A. I'm sorry, I can't recall.

Q. Do you recall taking any training in the last five years related to ergonomics in vehicles?

A. No. I have not.

Q. Has the science of ergonomics changed in the last ten years?

A. No. Ergonomics is basically the same. Some of the tools that can help an individual in their workstation have changed, and the research. For instance, if you're sitting at a desk, the research now says it's preferable to stand at least 50 percent of the day versus be seated for 50 percent of the day for not only better ergonomics but also your health.

Q. I actually have to stand at the desk.

A. So, that's relatively new.

Q. But we're focussing on automobiles.

A. Correct.

Q. What specific training have you taken that relates to Mr. Koty's injury disability?

A. None. The training related -- the request

Patrick Genovese
September 19, 2016

18

was to evaluate the amount of leg room between a Crown Victoria and a Ford Explorer, and I did.  I measured it.

Q.    Did you believe when you were doing this that Mr. Koty had a disability?

A.    No.  I mean, I had no opinion.

Q.    Did you ask why you were doing it?

A.    No.  I was -- I'm asked regularly to perform ergonomic evaluations with a doctor's note that gives me some -- a lead as to what an issue might be, be it shoulder, be it leg, be it neck, et cetera.

Q.    Do you know what vehicle Mr. Koty is in now?

A.    No, I do not.

Q.    Well, Mr. Koty is an SUV, and he's not having any problems.

Would that impact, what you know now, your opinion back then?

MR. VACI:  Objection.  Form of the question.

BY MR. JACOBSON:

Q.    You can answer.

A.    No.

Q.    Did you have an opinion back then?

MR. VACI:  Objection.  Form of the question.

THE WITNESS:  I don't --

Patrick Genovese
September 19, 2016

19

BY MR. JACOBSON:

Q.   Did you have an opinion as to which vehicle would be better for Mr. Koty?

**A.   No.   I reported the measurements to Chief Kruse, and recommended the seat be replaced because, as I had indicated, it had lost its substantial substance. But no, that was up to the Sheriff.**

Q.   Actually, the seat -- does the seat have anything to do, in your opinion, with the doctor's note?

**A.   It may have, because when you sat in it, you pretty much kind of fell into it.   It didn't give you any support anymore.   So, your thighs weren't supported.**

Q.   What's -- is there density in the type of foam for support?   Do you know what the specifications are on the support?

**A.   No.   I do not.**

Q.   Now, on chairs you have the waterfall chairs. You don't have those in automobiles.   Correct?

**A.   Correct.**

Q.   And do have an opinion on a desk chair, how that should be, the ergonomics of a desk chair in an office?

Patrick Genovese
September 19, 2016

20

MR. VACI: Objection. Form of the question.

BY MR. JACOBS:

Q. If you understand.

A. **With a -- some vehicles allow you to adjust the seat pan forward, which allows you more support for your thighs.**

Q. It allows the seat pan to get deeper?

A. **Correct. And so do office chairs. Some office chairs allow you to do that, to allow support for your thighs.**

Q. So, how far from the edge of the seat pan was it to Mr. Koty's knees?

A. **I don't know if I took those measurements. You'd have to refer to that.**

Q. I'm showing you Exhibit 1.

Do you have any data in there as to Mr. Koty's size?

A. **Size of?**

Q. Well, here -- for example, as you can see the seat pan for me should be coming out a lot farther.

A. **Correct.**

Q. I'm a different size than Mr. Koty.

A. **Correct.**

Q. Mr. Koty's size would be -- would Mr. Koty's

Patrick Genovese
September 19, 2016

21

size be relevant for how deep the seat pan should be?

A.    I honestly don't know.

Q.    And that's -- you don't know because of your training on this type of issue?

A.    I would say the -- whether or not that would have a medical impact, I don't know.

Q.    Okay.  Would you --

A.    I'm not trained medically.

Q.    I'm sorry.  Would you know anything related to Mr. Koty's vehicle on how it relates to his disability?

A.    No.

Q.    And let me phrase it a different way.

Would you know what changes would be needed to alleviate the doctor's note?  Because that's all -- the only communication you got related to Mr. Koty's problem was a doctor's note.  Correct?

A.    (Nonverbal response.)

BY MR. VACI:

Q.    You have to answer.

BY MR. JACOBSON:

Q.    Sorry.  You have to say yes or no.

A.    Oh, sorry.  Yes.

Q.    So, that's the only communication you got,

Patrick Genovese
September 19, 2016

32

computer and call people for -- that are out on warrants, to try to find them.

Q. And that was abolished for a certain period of time though, light duty?

A. Yeah. And light duty depends upon what is open. The -- if I'm not mistaken, the union contract for the Sheriff restricts sheriff's deputies from light duty other than within the Sheriff's Department.

Q. Now, is it your opinion that light duty is different than reasonable accommodations?

A. I look upon it as the same.

Q. And why is that?

A. Well, light duty you're restricted due to medical reasons for whatever. Okay? You can't lift 100 pounds except for "x" amount of time until the doctor releases you to full duty. And an accomodation is you're unable to perform a task due to whatever the reason. So, another job is found that you're able to perform that job, but you not the original one you were hired for.

Q. Wouldn't a reasonable accommodation be that you're able to stay in a job if there's accommodations for those? Reasonable accommodations?

A. If there are reasonable -- yes, you'd be able

Patrick Genovese
September 19, 2016

33

to stay employed.  Whether or not it would be within the same title or job function, I'd have to confirm that with HR.

Q.    Do you make recommendations for accommodations?

A.    I do not.

Q.    Is that HR that does it?

A.    Yes, it is.

Q.    Do you know if the Sheriff does it, or the DuPage County human resources does it?

A.    The Sheriff's Office works with human resources.

Q.    Do you know anything about Mr. Koty's being moved to court security?

A.    No.

Q.    So, help me out here.

Anyone could have taken these measurements.  Correct?

A.    Right.

Q.    Why were you picked?

A.    You'd have to ask Chief Kruse that.

MR. JACOBSON:  Give me a few minutes.

Patrick Genovese
September 19, 2016

34

(There was a break taken, after which the deposition was resumed as follows:)

BY MR. JACOBSON:

Q. Just a couple more questions.

So, Mr. Genovese, when you were talking about the leg room, were you talking from the front seat of the pan to the pedals?

A. Yes.

Q. And that was your determination for the doctor's note that you received?

A. Yes. Insufficient leg room.

Q. I'm showing you what's marked as Exhibit No. 1.

Is that -- you have that distance on that sheet. Correct?

A. Front edge of seat to pedals. Yes.

Q. Which is longer?

A. The Interceptor is 23 inches versus 21.5.

Q. So, which would have longer leg room then?

A. That would be the Interceptor.

Q. The other thing is you have driver height.

What is that?

A. Driver height, that is the height of --

County Court Reporters, Inc.
630.653.1622

Patrick Genovese
September 19, 2016

35

Q. I don't know if this helps. Mr. Koty is the height of the one you have for the Crown Victoria.

**A. Okay. Yes. I do recall asking, yes. I had asked Deputy Koty --**

Q. And did you ask the driver --

**A. -- and I asked the driver of the SUV their height.**

Q. What's the relevance of that data as it relates to what you know about this case?

**A. Probably none.**

Q. Is there -- okay. Is there other stuff on here -- well, okay.

So, based on this report, there is more leg room for the Interceptor than the Crown Victoria. Correct?

**A. Correct.**

MR. JACOBSON: Okay.

MR. VACI: Are you done?

MR. JACOBSON: Yeah.

EXAMINATION

By: Mr. Vaci

Q. So, what is the -- on that same document, Exhibit 1, you have length -- you have it in front of

Patrick Genovese
September 19, 2016

36

you.

A.     Yeah.

Q.     You have length of the seat pan.  Correct?
Length of the seat pan?

A.     Yes.

Q.     21 inches for the Crown Victoria, and
19 inches for the Interceptor.  Correct?

A.     That is correct.

Q.     19 and a quarter inch, I should say; is that
right?

A.     Right.

Q.     And that's a difference of one inch and --

A.     -- three quarters.

Q.     And the length of the seat pan goes from the
back of the seat to the front of the seat; is that
right?  The part that you sit on?

A.     Correct.

Q.     Would that figure into the total leg room, as
far as you're aware, because you have -- strike that.
I'll leave that question.

        Do you understand that question?

A.     Could you repeat it?

Q.     Well, I'll strike that question.

        You have front edge of seat to pedals:

Patrick Genovese
September 19, 2016

37

21.5 Crown Victoria, and 23 for the Interceptor.
Correct?

A.    Correct.

Q.    And that's a difference of one and a half inches?

A.    Correct.

Q.    And that's from the very front of the seat pan.  Correct?

A.    Correct.

Q.    To the pedals?

A.    **To the pedals.**

Q.    And then you have length of the seat pan: 21 inches for the Crown Victoria, and 19.25 for the Interceptor.  Correct?

A.    Correct.

Q.    Wouldn't it be the case that you would include the length of the seat pan along with the front edge of the seat pan to the pedals in order to get the total leg room?

A.    **You could add those if you wanted.**

Q.    Well, I mean you're sitting on the seat pan, and assuming your back is up against the back of the seat, wouldn't your legs be going across the seat pan to the front, and then obviously continuing to the

Patrick Genovese
September 19, 2016

38

pedals?

A.   Correct.

Q.   So, the total -- if you total the length of the seat pan with the front edge of the seat to the peddles for the Crown Victoria it's 42.5.  And if you do the same for the --

MR. KOTY:  It's 42 and a quarter.

MR. VACI:  I'm sorry?

MR. KOTY:  It's 42 and a quarter.

MR. VACI:  42 and a quarter?

MR. KOTY:  It's a quarter-inch difference.

BY MR. VACI:

Q.   42 and a half.  And you're adding the length of the seat pan for the Interceptor:  19 and a quarter, and 23, you got 42 and a quarter.  So, the total for the Interceptor would be 42 and a quarter.  The total for the Crown Victoria would be 42 and a half. Correct?

A.   If your math is correct.

Q.   If my math is correct.  And then in that case, the Crown Victoria's leg room would be a quarter inch longer if you use those measurements.  Would that be accurate?

A.   That would be correct.

Patrick Genovese
September 19, 2016

39

(Whereupon, the document was marked as Deposition Exhibit No. 2 for identification.)

BY MR. VACI:

Q. I'm going to show you what we've marked as Exhibit 2 for your deposition. Can you take a look at that?

Do you recognize what that is?

A. This looks like a return to duty authorization by the doctor.

Q. And is this -- if you recall, is this the doctor's note that you looked at, or that you were given in order to perform your measurements regarding the leg room?

A. I honestly do not recall.

Q. This specific document says: "However, because of a hip condition, a squad car with more leg room like an SUV is a necessary."

Do you see those words there?

A. Yes.

Q. Did I read that correctly?

A. Yes.

Q. If you recall, was that the information you were given in order to do the measurements that you

Patrick Genovese
September 19, 2016

40

eventually did?

A.    I was told he needed leg room.

Q.    Do you remember seeing any --

A.    I don't recall anything about a hip.

Q.    Do you remember receiving -- actually seeing a document talking about leg room, or were you just told that by Chief Kruse?

A.    I was told that by Chief Kruse in the initial -- yeah. I was told that by Chief Kruse.

Q.    You don't know -- you don't specifically remember this document or any document mentioning leg room?

A.    No, I don't.

MR. VACI:  That's all.

RE-EXAMINATION

By: Mr. Jacobson

Q.    Can you keep that document for a minute? You see on the document it says:  "Like an SUV"? Of the two vehicles you mentioned, which is more like an SUV?

A.    The Ford Explorer, I believe it's called, or the Interceptor.

Q.    And if you saw this document, would you do something different on the measurements for your scope?

Patrick Genovese
September 19, 2016

41

A.     I probably would have measured the distance from the door to the -- if there was an armrest or not, and if there wasn't, then to the post that held the laptop computer in the squad cars, which is to the right of the steering wheel, to try and evaluate the hip room.

Q.     So, if you were to see this letter, you -- is it fair to say you would have done something different?

A.     Yes.

Q.     And is it fair to say that the doctor recommended an SUV?

A.     Yes.  It appears that way.

Q.     And would that impact your scope?

A.     No, because I would still have to evaluate it personally.  I have received doctor notes.  Some are very specific, for instance, doing an ergonomic evaluation.  Some are very specific in saying:  Suzy Q. needs a larger screen, computer screen.  Some doctors request a work station evaluation to be conducted. Okay?  So, because what does a larger computer screen mean to me, you know?  Because if you're not sitting properly, you know, and you're still -- stretching your neck, or looking up like this, or looking down, it doesn't mean anything.  And how can a person determine

Patrick Genovese
September 19, 2016

42

that by not looking at the work station?

Q. And a larger screen may also mean they need larger pictures, fonts, and stuff too?

A. It's possible, but in the same breath where you're positioned in your chair versus where the screen is it shouldn't be more than 25 inches away from you because you start to kink your neck going forward.

Q. Now, Exhibit 2, it says more leg room. It doesn't say longer leg room. Right?

A. More leg room.

Q. Would that impact your scope?

A. No, because I believe I took the measurements that identified leg room.

Q. The seat pan, the fact that the seat pan was defective, would that have an impact on your measurements?

A. No, because I did it from the front of the seat pan, not the sponginess, if you will for lack of a term, the cushiness of the seat itself. So, the front of the seat pan is going to remain the same whether it's a brand new seat or an old seat.

Q. But how someone sits in it would be impacted on the seat pan. Correct?

A. Oh, absolutely.