Christopher Johnson
October 25, 2016

6

A      Probably about 2007.

Q      Okay.  And then what was your next position?

A      Information technology.

Q      And when was that?

A      Maybe 2010, '11.

Q      Okay.

A      My timing is probably going to be really off.

Q      That's okay.

A      I know my last position was a quartermaster.

Q      Okay.  And when was that?

A      After the IT position.  So probably sometime in '11, '12 until September 18th, 2015.

Q      Okay.  And what does quartermaster do?

A      So part of my responsibilities were issuing squad cars to deputies, vehicle maintenance, taking in cars that needed scheduled maintenance to the Ford dealership because we had Fords at that time, making sure we had enough supplies that go into the police cars such as flares, cones.  All the necessities that the deputies would use on the street, we had to have a full stock of that.  We were kind of like a supply store.  We also had

Christopher Johnson
October 25, 2016

7

uniforms. We had a uniform closet and a semi-functional uniform inventory operation. So basically when a deputy would leave or resign they would come in to us and turn in all of their gear that they were issued originally.

Q    And the car?

A    And the vehicle would go to the garage and then the garage would notify us that so-and-so turned in their vehicle. They would do the garage things they do, you know, tune it up or whatever the case and we'd try to put it back into rotation.

Q    Is garage a different entity than the sheriff?

A    It is.

Q    Is that DuPage County?

A    It is.

Q    All right. And then after you were the quartermaster where did you go next?

A    I went to the Kane County Sheriff's Office.

Q    And what do you do there?

A    Deputy sheriff.

Q    And are you sworn?

A    I was. Not any more.

County Court Reporters, Inc.
630.653.1622

Christopher Johnson
October 25, 2016

8

Q    Okay.  When were you sworn?

A    **September 21st, 2015.**

Q    Okay.  So let's go a second to your quartermaster role.  Were you responsible for issuing squad cars?

A    **I was.**

Q    Okay.  And how was it decided who would get what squad cars?

A    **I tried to take a clean slate when I came into the program.  So I wanted to start the process -- the only fair process which I thought would be by seniority or need.**

Q    Okay.  So that was the program that you implemented?

A    **Tried to, yes.**

Q    Now, did you have sole say in who got what cars?

A    **I did not, no.**

Q    Okay.  Who else had say on who got cars?

A    **The chief and the sheriff.**

Q    By chief you mean a bunch of chiefs or a particular chief?

A    **I answered to three different chiefs so --**

Q    Okay.  Do you remember who they were?

Christopher Johnson
October 25, 2016

9

A    Chief Kruse, K-r-u-s-e, Chief Angus, A-n-g-u-s, and before him Chief Bilodeau, B I -- I am going to mess that up.

MR. VACI:  B-i-l-o-d-e-a-u.

BY MR. JACOBSON:

Q    Okay.  So, for example, when you worked there did Chief Kruse say this is who I wanted to have a car?

A    No.  I would bring it to Chief Kruse or Chief Angus or Chief Bilodeau and say this was my plan.

Q    Okay.

A    They usually agreed with all my plans but ultimately the sheriff had the final say.

Q    So when you would give something to one of those three would that then go to the sheriff for approval?

A    Yes.

Q    Okay.  So during your period of time as quartermaster was the sheriff --  And we are talking about Sheriff Zaruba?

A    Correct.

Q    Was he the one that had decision-making on every single vehicle?

County Court Reporters, Inc.
630.653.1622

Christopher Johnson
October 25, 2016

10

A       Not every single vehicle.  Some.

Q       Okay.  And how was it determined whether he would or wouldn't?

A       To this day I have no idea.  He would just tell me yes or no.

Q       The sheriff would?

A       Yes.  I would have a plan and my plan would get vetoed.

Q       Okay.  So your plan was to give cars out based on seniority?

A       Based on seniority, based on guys that need.  For instance there was a canine officer who was in a really messed up car but one of the chiefs was willing to give up his car.  And I had this perfect plan, told the sheriff, the sheriff said no.

Q       And was your plan based on any political affiliation of these people?

A       What do you mean?

Q       Like were you favoring one over the other, or were you doing this because you thought it was best for the sheriff's department?

A       Best for the office.

Q       Okay.  Now, you know Mr. Koty.  Correct?

A       I do, yes.

Christopher Johnson
October 25, 2016

11

Q    And when you were quartermaster did you know he had a disability?

A    I did not --

MR. VACI:  Objection to the form of the question.

BY MR. JACOBSON:

Q    You can answer unless your attorney tells you not to.

A    Okay.

Q    She is in charge today.

MS. CLAY:  You can answer.

THE WITNESS:  Repeat the question, please.

BY MR. JACOBSON:

Q    Sure.  When you were quartermaster did you know that Mr. Koty had a disability?

A    I knew he was injured, not a disability.

Q    Okay.  And do you know what his injury was?  Do you remember?

A    I believe it was a back injury.

Q    Do you know if there was any request, if you heard anything that Mr. Koty wanted an SUV?

A    Yes, I did.

Q    Okay.  And how did you hear that if you remember?

Christopher Johnson
October 25, 2016

12

A    It came from officer -- one of the chiefs. I don't know which one.

Q    Okay.  Now, if you wanted to at that time give Mr. Koty an SUV about January, 2014 would you have the ultimate decision-making in doing that?

A    That was probably not the ultimate decision but that was -- I already started preparing one for him.

Q    Okay.  And when you say preparing you were preparing the vehicle for him?

A    Yeah.  Like looking for one, making sure hey, if I get an SUV I want to look to give it to Koty.

Q    Okay.  And what happened with that?

A    I was told no.

Q    Okay.  Do you know who told you that?

A    The sheriff.

Q    Sheriff Zaruba?

A    Yes.

Q    Do you know if there was any documentation the sheriff would have with you concerning how vehicles are assigned?

A    No.

Q    Okay.  Was everything oral or verbal?

Christopher Johnson
October 25, 2016

13

A    Verbal, yes.

Q    The sheriff wouldn't write anything down or text message or e-mail?

A    No.

Q    Okay.  Did the sheriff say why?

A    No.

Q    Okay.  Do you know if the sheriff was aware that Mr. Koty needed a vehicle because of his injury?

MR. VACI:  Objection, form of the question.

BY MR. JACOBSON:

Q    You can answer.  You can answer it.

A    Answer it?  I was not aware.  I would assume.  I would assume.  I wasn't fully aware, no.

Q    And why would you assume?

A    Because upstairs there's kind of like that's the talk, you know, like --

Q    About Mr. Koty?

A    Yes.

Q    And when you say upstairs what does that mean?

A    Hey, I told my plan, hey, I kind of want to give Eric a car.  And I don't know how it got back to the sheriff but the sheriff advised me no,

Christopher Johnson
October 25, 2016

14

not to.

Q    Okay.  So when you explained your plan did you explain you just wanted to give him an SUV or did you explain why you wanted to give him an SUV?

A    I didn't explain why.  I just said I wanted to give him an SUV.

Q    Okay.

A    I figured since I have kind of the same back issue or back pain I kind of figured that it would help somebody's back.  I know it would help me.  And if I am in a position to be able to, quote unquote, have the final say on giving somebody a car, then why not try to help somebody, give them a better car because they're going to be in there for twelve hours a day.

Q    During the period of time you were the quartermaster if somebody were to come to you and say Mr. Koty has a disability, he needs an SUV, would there be anything that prevented you from doing that?

A    The sheriff.

Q    Okay.  But you could --  If the sheriff said hey, do whatever you want or the sheriff said

Christopher Johnson
October 25, 2016

15

do what's right you would be able to assign an SUV to Mr. Koty?

A      Oh, absolutely.

Q      Okay.  The cars --  According to the sheriff's office the cars were preassigned and there was none available for Mr. Koty.  Could cars be swapped between deputies?

A      Sure.  Those cars are on --  They're not --  There's kind of like a misconception.  I am not saying Mr. Koty has the misconception but -- From when I took that position a lot of guys believed that that car is their car.  That was a misconception.  So when I would talk about possibly switching cars I would get talked to by their supervisors because they would have an absolute fit about me having this idea.  I called it musical cars.

Q      Okay.

A      You know, my whole thought process is the car's not used with the county which I am try-ing to make the move of what's gong to be in the best interest of the office.  If you don't like the car it is not yours.  You use it for a 12-hour day and you take it home, but be thankful you have got

Christopher Johnson
October 25, 2016

18

Q    And you would have been the quartermaster -- Were you quartermaster at that time?

A    **No, Joe was.**

Q    Okay.  So did you --  So 9/18/15 you started as a quartermaster?

A    **No, 9/18/15 is when I left the sheriff's office.**

Q    I'm sorry.  And this would be before that.  So were they switching quartermasters or did you have a couple of them?

A    **Unfortunately Joe got sick and he left and then I took over his spot.  So okay, that time would make sense.  I would be in there around 2014 around this time.**

MR. JACOBSON:  Okay.  So excuse me.

(Following an interruption the deposition was continued as follows:)

BY MR. JACOBSON:

Q    So at that time could the quartermaster instead of assigning this SUV to whoever they did assign it to Mr. Koty as far as you know?

A    **As far as I know yes.**

Q    Okay.  Were there any policies on how cars got assigned?

Christopher Johnson
October 25, 2016

19

A    I was never shown one.

Q    Okay.  So as far as you know during the period of time you were there there is nothing in writing on how to assign vehicles?

A    No.

Q    Okay.  How do you think vehicles were assigned?  Because obviously the seniority thing didn't work out.

A    No.  The seniority thing was kind of my idea.  How I believe they were assigned was whoever wants a car if they liked you you would get one.  That's my personal belief.

Q    Okay.  And obviously if they didn't like you you wouldn't get one?

A    Correct.

Q    Okay.  Now I am going to ask you about court services.

A    Okay.

Q    Is it your understanding that when you went from law enforcement to court services that was a punishment?

MS. CLAY:  Objection.

BY MR. JACOBSON:

Q    For DuPage.

Christopher Johnson
October 25, 2016

20

A      I never went to court services.

Q      I understand.

MR. VACI:  You are not saying you.  You mean somebody?

BY MR. JACOBSON:

Q      Right.  If someone got assigned -- they were in law enforcement or the law enforcement bureau and they got transferred to the court system at DuPage, was there a belief that was a punishment there?

A      Yes.

MR. VACI:  I object to the form of the question.

MS. CLAY:  You can answer.

THE WITNESS:  Yes.

BY MR. JACOBSON:

Q      Okay.  And do you know of any deputies that were assigned to the court system that felt it was a punishment?  If you remember.

A      Yes.

Q      Okay.  And who was that?

A      Deputy Koty.

Q      Okay.

A      Because I kind of distinctly remember I

Christopher Johnson
October 25, 2016

21

was asked to take him to get his car or -- I don't know why. I don't know if that was the day, but I remember driving with him -- Mr. Koty to the Naperville Police Department to pick up his personal car, I believe.

Q Oh, because he probably had his duty weapons and the --

A I don't remember why. I just remember we were in the car together and I had to go to the Naperville Police Department with him.

Q So it was your responsibility during that day when he got transferred?

A It wasn't my responsibility. I was tasked with that, yes.

Q Okay.

A But no, that is not something I do or have done before in that quartermaster position.

Q Okay. Anything else you know about Mr. Koty's inability to use an SUV?

MR. VACI: Objection to the form of the question.

MS. CLAY: Oh, I'm sorry. You can answer. If I tell you -- If I don't say anything you can answer.

Christopher Johnson
October 25, 2016

22

THE WITNESS: Okay. Can you repeat the question, please?

BY MR. JACOBSON:

Q    Sure. Is there anything else that you can recall that I might have missed concerning Mr. Koty's use of an SUV?

MR. VACI: Same objection.

THE WITNESS: I don't understand the question.

BY MR. JACOBSON:

Q    Okay. Is there -- You know, for example did you see memos that said Mr. Koty should not be using an SUV or did you hear people talking or the chiefs talking concerning Mr. Koty?

A    **I might have heard them talking concerning him. I don't remember what it was.**

Q    Okay.

A    **I know I was asked why didn't I try to give him a car and I stated that I was.**

Q    Who asked?

A    **Chief Kruse, I believe.**

Q    Chief Kruse wanted Mr. Koty -- When you say car do you mean an SUV?

A    **I'm sorry. Yes, an SUV.**

Q    So Chief Kruse wanted him to have an SUV?