Eric Koty
August 9, 2016

12

Q    Who did you speak to?

A    I spoke with Sergeant Moore and Lieutenant Mendrick.

Q    These were oral conversations?

A    Correct.

Q    And what did you tell them regarding your condition?

A    I told them that I had pain in my back, I had pain in my hip, and that my right leg was partially numb.  I told them that I believe I needed to get the seat moved further back in my current squad car to get more room to try to alleviate the problem.

Q    And what if anything occurred as the result of those conversations?

A    January 3rd of 2012 after I spoke with Sergeant Moore again over the phone, he called me into the office and told me to put in a to/from to Chief Bilodeau explaining what the problem was, and I did that.

Q    Did you do that?

A    Yes, I did that.

Q    And when did you do that?

Eric Koty
August 9, 2016

13

A      January 3rd I believe was the date, of 2012.

Q      At that time in January of 2012 were you unable to drive your vehicle that you were assigned?

A      I could still drive it.  I mean physically, could I still drive it?  Yes.

Q      All right.  And at that time had any physician, any of your doctors indicated that you could not use the vehicle that you were assigned to up until that point?

A      Could not?  No.

I explained to them what the problem was. I told them what I thought would help, and they agreed.

Q      The case that you filed here in Federal Court that you're being deposed on, you're alleging that the Sheriff's Office retaliated against you for taking certain actions; is that correct?

A      That's correct.

Q      What actions, specifically, are you alleging that the Sheriff retaliated against you for doing?

A      For filing a Complaint with the EEOC.

Q      Anything else?

A      In the retaliation, no.

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

14

Q    And the EEOC charge that you filed, do you remember when you filed it?

A    **The first week of April, I believe.**

Q    2014?

A    **Correct.**

Q    And what did you do when you filed that -- strike that.

Did you go to the EEOC offices?

A    **No.  My attorney filed the Complaint for me.**

Q    Okay.  And did you see the document before it was filed?

A    **Yes.**

Q    The EEOC charge that was filed, did you personally give it to anybody in the Sheriff's Office?

A    **I gave a copy of it.  I turned it in April 7th in the morning when I started my shift, along with another doctor's note.**

Q    And that was a doctor's note that was provided to you by your physician; is that correct?

A    **Yes, Dr. Thangamane.**

Q    And you gave that doctor's note and the EEOC charge to whom at the Sheriff's Office?

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

15

A     Sergeant -- I can't remember his name because I don't work for him any more.

Q     Was it Ruff?

A     Yes.  It was Ruff.  Thank you.

Q     And did you hand it to him?

A     I didn't hand it directly to him.  I put it on -- I said I need to give this to Lieutenant Mendrick.  He said go ahead and put it into his in box. So essentially, he was there.  He didn't seem like he wanted to take it from me, so I just said hey, I need to hand this stuff in, and I did so.

Q     What was the next thing you recall occurring after you handed those two documents to where you turned them in?

A     Correct.  I was contacted over the phone by Lieutenant Mendrick.

Q     The same day?

A     Yes, the same day, later on in the morning. He told me that Sergeant Ruff had given the documents to Colonel Sternberg.

Q     And that was Mendrick?

A     Correct.

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

16

Q    Any other conversation between you and Mendrick at that time?

A    **I don't recall exactly what was said.**

Q    What was the next thing that happened with respect to the documents that you turned in?

A    **The next day on the 8th I reported to work. And then at about half an hour to an hour after I started my shift, I received a message to come in to the office.**

Q    Where did you receive that message from?

A    **I believe Sergeant Moore either called me or sent me a message over our MDC terminals.**

Q    And what did you do when you got that message?

A    **Came to the office.**

Q    And what offices are we talking about?

A    **The Sheriff's Office.  We went into a control conference room.**

Q    Whom did you meet with there?

A    **There I met with Lieutenant Mendrick, Sergeant Moore and Chief Kruse.**

Q    And was there a conversation at that time?

Eric Koty
August 9, 2016

20

day?

A    That day, no.

Q    Was it the next day?

A    My next day that they needed to make up days off for payroll to be correct, so I started that Friday.

Q    Other than the transfer to the courthouse, is there anything else that you believe, any other actions taken by the employer, the Sheriff's Office, that you believe were retaliatory for filing the EEOC charge?

A    The removal from special operations.

Q    What are special operations?

A    Special operation unit is what is commonly referred to as SWAT.

Q    And is that a unit that you were in at the time?

A    Yes, it was.

Q    That was in April of 2014?

A    That's correct.

Q    How long had you been in special operations?

A    I had been in special operations since about July of 2008, and then there was a break of about a

Eric Koty
August 9, 2016

21

year, year and-a-half where I was moved from special operations, and then I was put back on the special operations after a ULP hearing, Unfair Labor Practice hearing.

Q    At what point were you removed from the Special Operations Unit?

A    In this incident?

Q    Yes.

A    I received a letter at my home on the 9th, I believe was the date.

Q    Of?

A    April.

Q    2014?

A    Correct.

Q    And what did the letter say, to the best of your recollection?

A    Per the advice of the State's Attorney, I was suspended from the Special Operations Unit.

Q    The Special Operations Unit, is that an assignment that you would do something with every day that you would work?

A    You were basically on call every other month

Eric Koty
August 9, 2016

22

at that point in time.  You were trained once or twice a month.  And if an incident arose where they activated the unit, that you would be called out.

Q    And is there extra compensation for the Special Operations Unit?

A    There's a pager stipend that you get for the months that you are on call.

Q    And what is that?  What's the stipend?

A    I believe it's $25.00 a week for the week you're on call.

Q    And during the time that you were suspended from or on inactive status with the Special Ops, did you receive that $25.00?

A    No.

Q    Were you given a reason why you were placed on inactive status with the Special Ops Unit?

A    No.

Q    What is your understanding of why you were placed on inactive status?

A    My opinion is that it was further retaliation.  It was an opportunity to further retaliate against me.

Eric Koty
August 9, 2016

23

Q    Are there any criteria or requirements in the General Orders that you're aware of that would have prevented you from being taken off of Special Ops for a period of time?

A    No.

Q    Do you recall as you sit there how long you were off of the Special Ops?

A    **From April 9th until I believe the end of September.  I think I got back the end of September or October.**

Q    Of the same year, 2014?

A    **Correct.**

Q    Do you know why you were placed back into active duty in Special Ops in September or October of 2014?

A    **No.**

Q    Were you given a reason why you were placed back inactive status in September or October of 2014?

A    **I received a to/from from Chief Kruse stating that he had a medical clearance.  That's it.**

Q    And did you at that time when you were told that, had you received a medical clearance?

Eric Koty
August 9, 2016

24

A       I received a medical clearance on May 27th.

Q       Of 2014?

A       Correct.

Q       So prior to May 27th of 2014, were you not medically cleared by your doctor to work in Special Ops?

A       No, I was not.  There was no restrictions placed on me from a doctor stating no, you can't do special operations, no, you can't do functions of a police officer.  Administration, Chief Kruse, no one ever asked me for a doctor's note stating that I was cleared to perform the duties of special operations.

Q       Are you aware of who made the decision to transfer you to the Court services?

A       According to the letter that I received from Al Angus, Chief Al Angus, it sounded like the State's Attorney's Office made that decision.

Q       And are you aware of who made the decision to place you on inactive status with Special Ops?

A       Again, according to the letter, the State's Attorney's Office made that decision.

Q       Well, somebody with the Sheriff's Office

Eric Koty
August 9, 2016

25

would have to actually transfer you and take you off of Special Ops, correct?

A    I would assume so.  It's Chief Al Angus who signed the letter.

Q    Would it be correct that you don't specifically know who in the Sheriff's Office made the decision?

A    No, I do not.

Q    You weren't privy to any of those discussions?

A    Conversations, no.

Q    Other than being transferred to court services and being placed on inactive status with Special Ops for approximately five months, five to six months, are there any other acts that were taken by the Sheriff's Office that you believe were retaliatory for filing the EEOC claim?

A    Well, when I was put -- after the letter in August of 2014 when he said he had received the letter from -- or my doctor's note from May 27th, I --

Q    Wait.  Who said that?

A    Chief Kruse.

Eric Koty
August 9, 2016

26

Q    Okay.

A    There was the whole issue of where I would store my SWAT gear and my weapon while I was working at the courthouse, which has never been an issue with anyone else.

Q    Is that while you were on inactive status or --

A    Correct.  Before I could be put back on active status, and I'm sure it's in the document, it was brought up that they would need to know, I would have to have a security plan where I would store my gear and my weapon while I was at the courthouse working.

Q    And how was that resolved?

A    That was resolved after several communications, and a month and-a-half later they put me back on the team.

Q    Was there a plan put in place regarding where you would store your weapons?

A    Yes.

Q    Where was that?

A    They were stored in my vehicle, and I was

Eric Koty
August 9, 2016

27

parking down in the sally port of the courthouse, which was available the whole time I was there.

Q    In your personal vehicle, correct?

A    Correct.

Q    And the plan that you came up with, that was acceptable to the Sheriff's Office?

A    That was acceptable to the Sheriff's Office.

Q    So we're clear, what part of that do you believe was retaliatory?

A    That I had to come up with a security plan of where I would store my gear or my weapon while I was working at the courthouse.  And the reason for that is that numerous other members on SWAT drive unmarked SUV's, and they have all their gear and their weapons stored in the back of their SUV's, and those SUV's have no better security to them than I do, and they are parked out in public places all the time.

Q    How do you know that?

A    Because when I go to SWAT I see them open up the back of their SUV.  I know their stuff is in there. And there is no cages or locked anything to prevent someone from breaking a window or taking them, which

Eric Koty
August 9, 2016

28

was their whole issue as to me storing my gear in my personal vehicle.

Q    And do you have information or knowledge that someone within the Sheriff's Office knows that those deputies store their weapons in that way?

A    They know that those vehicles are not equipped with cages or with the security lockers. Those vehicles are issued to them by the Sheriff's Office, so they know the condition of the vehicles. They know that while the deputies are at work, their vehicles are not always parked in a secure location. In fact, they are not parked anywhere in a secure location ever.

Q    How many deputies are you talking about?

A    The commander of the unit at the time, Sergeant Harris, he has an SUV that has no cages in it. He has weapons and gear in there. All the members that were on SR22 all drive SUV's. They had no cages in them. That's three members right there. So that's at least four right there that all drive SUV's that had no additional security to secure their gear or their weapons, the same condition that I would be in driving

Eric Koty
August 9, 2016

29

my personal vehicle.

Q    And it's your understanding that Chief Kruse was aware that those weapons were stored in those vehicles in the manner you described?

A    Yes.

Q    How do you know that?

A    I think I put that in an email to him.

Q    An email informing him that that was the case?

A    Yes.

Q    Do you remember when you did that?

A    Probably after his request for -- it was after his note about where I was going to store my gear.  And maybe I didn't send it to him; maybe it was sent through Joe Mazzone, who is the Union's attorney, to ASA Bruckner.

Q    Were you copied on this email or message?

A    I think I've seen it, yes, because we were discussing how and why I needed to come up with a security plan to where I was going to store my gear and weapons.

Q    Was it responded to?

Eric Koty
August 9, 2016

30

A    No.

Q    Did you receive a response from Chief Kruse?

A    No.

Q    Was at that time Chief Angus aware, as far as you know, of those four individuals storing their weapons in that manner?

A    **I would hope so.  He was Chief of the Law Enforcement Bureau; he would be responsible.**

Q    Did you ever have any conversations with him about that?

A    **I have not had any conversations with either of them, because they don't accept phone calls.**

Q    Is there anything that you're specifically -- strike that.

So you never had any conversations with Chief Angus regarding Harris and the other three members of that unit storing their weapons in their vehicles?

A    No.

Q    Other than what we already talked about, transfer to court services, Special Ops, being placed on inactive duty, and then having to come up with a

Eric Koty
August 9, 2016

32

was cleared medically, I was put on -- I asked if I was going -- before I came back to work, I asked if I would be going back to patrol since I was cleared medically and that there was no restrictions, and the response was that I would be put on a transfer list.

Q     Do you remember when that was?

A     March, 2015.

Q     So just so I'm clear, March of 2015, you were coming back to work after surgery?

A     Correct.

Q     And your testimony is you were medically cleared to go back on patrol, is that right?

A     I had no restrictions.

Q     No restrictions, including anything with any vehicle, is that right?

A     That's correct.

Q     And where did you get assigned when you came back?

A     Court security.

Q     How long were you on court security then before going back to patrol?

A     A week.

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

33

Q    What reason were you given for that?

A    That I was put on a transfer list.  That was the reason.

Q    That was the extent of the explanation?

A    Well, that was the extent of the explanation that I got initially, and then Tuesday of that week, which probably was the 24th, I went and spoke with Major Romanelli who was then, who was in charge of operations for patrol, and I asked him about the transfer and why I was not being -- why I was not going right back to patrol.  And then we had sort of a heated conversation in his office, and during that conversation the Sheriff walked in, and then the conversation ended.  And that was at 1:00.  And at 3:00 in the afternoon, before I was walking out the door, there was a letter that I was going back to patrol.

Q    And that was a week after you were placed in --

A    It was the same week.  So I came back to work on Monday.  Tuesday, I think it was Tuesday I had that conversation with Major Romanelli in his office with

Eric Koty
August 9, 2016

34

the Sheriff there, and then received the letter.  And then that next Monday, I went back to patrol.

Q    And your belief is that the fact that you were initially placed back at work in court services was in retaliation for the EEOC charge?

A    Well, if I was never in court services to begin with, then I wouldn't have to worry about getting transferred back into patrol.

Q    Okay.  Other than those things that you've already mentioned, is there anything else that you believe, any other actions that you believe were taken in retaliation for filing the EEOC charge?

A    Well, when I was put back into patrol, I was put on midnights.

Q    Where did you want to go?

A    Well, I had already been on the 2015 patrol roster for days, which is what I had been on before I was removed from patrol, was days, because I had enough seniority to be on days.

Q    You had enough seniority to be on days?

A    Correct.

Q    Is it the case that when somebody goes

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

35

back -- strike that.

How often is there a bidding process for shifts?

A    Once a year.  We shift bid once a year.

So I had shift bid for 2015 patrol.  I was put on the 2015 patrol roster on days on the same team that I had been on before.  And then when I returned back to patrol at the end of March, I was put on midnights.

Q    And when were you able to bid for the shift you wanted?

A    I had to file a grievance.  And after I filed a grievance, they put me on days.

Q    Is there an office-wide bidding once a year?

A    Correct.

Q    And were you put back on days before that office-wide bidding?

A    Yes.

Q    Do you know who made the decision to put you on midnights when you came back to patrol?

A    The assignment letter that I got came from Chief Kruse.

Eric Koty
August 9, 2016

36

Q    Do you know if he made the decision?

A    **I don't know.**

Q    So other than now those five things that you've said, are there any other acts that you claim were retaliatory by the employer for filing that EEOC charge?

A    **No.**

Q    When you were transferred to court services after you filed the EEOC charge, what can you point to, or why is it your belief that that transfer was caused by, motivated by retaliation for you filing that EEOC charge?

A    **For one thing, when I discussed getting a vehicle with my Supervisors, Sergeant Moore and Lieutenant Mendrick, I told them that I was concerned that if they didn't give me a different vehicle which I needed, that they would transfer me to the courthouse.**

Q    When did you have that concern?

A    **The whole time leading up to my transfer to the courthouse; the whole time I was asking for a different vehicle.**

Q    Was that prior to your filing the EEOC

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

37

charge?

A     **That's correct.**

Q     And you had that conversation with Lieutenant Mendrick prior to filing the EEOC charge?

A     **Correct.**

Q     You told him that you thought that they would transfer you to the courthouse?

A     **Yes.**

Q     And so when you received that notice or that physician's note saying that it was necessary for you to have a different vehicle or that you could no longer -- strike that.

The physician's note said you could no longer use your assigned vehicle, correct?

A     **That's what it said.**

Q     So when you got that, you knew that the Sheriff's Office could no longer have you in that vehicle because it would have been against your doctor's recommendations, correct?

A     **No.**

Q     What effect did you think the April 4th, 2014 doctor's note saying that you could no longer use your

Eric Koty
August 9, 2016

41

vehicle up to that point, correct?

A    Correct.

Q    After you were told that you were going to be transferred to the courthouse, did you use the vehicle after that?

A    Yes.

Q    For how long?

A    Not at that point in time.

Q    So after they told you you were transferred, then you were done using the vehicle?

A    Yes.

Q    Other than the timing and what you stated, is there any other thing that you could point to that indicates to you that the transfer to the courthouse was motivated by retaliation for the EEOC charge?

A    By handing in that Complaint, that EEOC charge?

Q    Right.

A    No.

Q    I'm going to ask you similar questions regarding your being placed on inactivity for Special Ops.  Other than -- strike that.

Eric Koty
August 9, 2016

42

You said the timing with respect to the transfer to the court services was timing, something you were pointing to to indicate that you believe that your placement on Special Ops or inactive on Special Ops was in retaliation for the EEOC charge?

A     That's correct.

Q     Anything other than timing?

A     That leads me to believe that it's retaliation?

Q     Right.

A     Well, on the day that I was removed, or on the day that -- so on the 8th after my conversation with Kruse, Mendrick and Moore, I spoke with Sergeant Harris over the phone, who was the commander of the SWAT unit at that time. I told him, "Hey, they just took me out of the car and they put me into court security. Is there any reason why I can't still be on SWAT?" He said no. Because the guys, we have a multi-jurisdictional unit, and the members they have from other police departments within the county drive their personal vehicles for driving and to respond to calls the whole time.

Eric Koty
August 9, 2016

43

**So there is no reason; just because I didn't have a vehicle, I couldn't be on SWAT.**

Q    And there's nothing about being in court services that would prevent you from being on SWAT?

A    Yes.

Q    So I don't why I said SWAT in said of Special Ops.  Let me go back to Special Ops.

Is there anything that would prevent you from being on Special Ops related to being in the courthouse as an assignment?

A    **No, because obviously, I was still in the courthouse when they put me back on Special Ops.**

Q    Okay.  With respect to when you had to come up with a security plan for your weapons, why is it you believe that was in retaliation for filing the EEOC charge?

A    **Why would I have to come up with a security plan when four other members store their gear in the exact same way that I would have been and they parked it out in public spaces the same way I would have been doing?  Why would I have to do that?**

Q    So your belief that coming up with a security

Eric Koty
August 9, 2016

44

plan was retaliatory is because you believe that other people did not have security plans?

A    **They did not have a security plan.  They were not required to provide a security plan.**

Q    Is there anything specifically you can point to to indicate or to support your belief that the Sheriff's Office, specifically Chiefs Angus and Kruse, knew that other people had weapons that were not secure?

MR. JACOBSON:  Objection.  Besides what he's already testified to?

MR. VACI:  Right.

BY MR. VACI:

Q    If you've testified to something to indicate that, anything in addition to what you've already testified to?

A    **No.  I don't think I can say anything else on that.**

Q    Any other reasons why you believe -- other than that, any other reasons you believe that coming up with a security plan for your weapons was a retaliatory act for filing the EEOC charge?

Eric Koty
August 9, 2016

45

A     The way I looked at it was okay, we're going to put him back on Special Ops because the EEOC is breathing down our neck, and this doesn't look good because we don't really have a reason, but we're going to come up with this requirement of a security plan so we can drag it out as long as we can.

When Chief Kruse gave me that to/from about the security plan, I responded to it I believe within the 72 hours.  He testified in the EOP hearing that he didn't get a response for nine months.

Q     The letters regarding coming up with a security plan were approximately five months after the EEOC charge?  Would that be accurate?

A     The EEOC charge was April, and he didn't respond to the doctor's note until August.  But obviously it was received in May.  So why was there a lag between May 27th and August?

Q     The transfer back to court services instead of going directly into patrol after your surgery, why is it you believe that was in retaliation for your EEOC charge?

A     Because according to them, the only reason I

Eric Koty
August 9, 2016

51

negative aspect to working midnights?

A    Sure.  There's a whole list of negative aspects that I think have been medically documented.

Q    What are those, as far as you're aware?

A    Loss of sleep, stress, weight gain, probably high blood pressure.

Q    And how long were you on midnights before you got transferred to days?

A    A month.

Q    During that month, did you suffer any of those things that you --

A    Loss of sleep, yes.  When you're not used to working midnights, you can't fall asleep during the day.  It takes a while just to get used to be able to fall asleep during the day.

Q    Would I be correct that you weren't on the midnight shift long enough to get used to those things?  Is that accurate?

A    Correct.

Q    What are the negative aspects to being transferred to court services?

A    For me personally?

Eric Koty
August 9, 2016

52

Q    Yes.

A    For one thing, it's not the job that I wanted to do when I got into law enforcement.  So it wasn't the career path that I wanted to be on.  If I had to remain in court services, I would never get to do law enforcement work any more.  I would never have any chance of advancement into detectives or anything along those lines.

Q    Were you aware that it was a temporary situation, a temporary assignment, as long as you had that restriction regarding driving your assigned vehicle?

A    Initially that's the way it was presented.

Q    Do you have any reason to believe you wouldn't be put back into patrol once you were cleared to do so?

A    When they transferred me in November when I got letters saying that I was now transferred to court security, not temporarily transferred to court security.

Q    How long were you in court security?

A    How long was I assigned there?

Eric Koty
August 9, 2016

53

Q    Right.

A    **It was almost exactly a year.**

Q    And then you did go back to patrol, correct?

A    **Correct.**

Q    So it turned out it was a temporary assignment, correct?

A    **Correct.**

Q    Any other negatives regarding court services, other than what you've testified to?

A    **For me personally, it increased the amount of money I had to spend for child care, since in patrol we work 12-hour shifts, which means that you're only working seven out of 14 days. In court security you're working five Monday through Fridays, so now you're working ten days out of every two weeks. So of course if it's not a weekend and it's a weekday, you would normally be off on the weekday. Now you have to pay more child care.**

**So you're doubling your child care costs, because normally on patrol, you would only work five weekdays, five days of weekdays in that two-week period. Now you're working ten. So if you have young**

Eric Koty
August 9, 2016

54

children that aren't in school yet and you have to provide child care for them, then you have to pay more in child care.

Q    Anything else?

A    I had to put more miles on my personal vehicle to come to work.

Q    Why is that?

A    Well, patrol, I park my assigned unit or my assigned squad at Naperville PD.  I live in Plainfield. So when I go to work, I drive to Naperville from Plainfield, pick up my squad and I start my day.  Now I'm driving from Plainfield to Wheaton five days a week rather than driving to Naperville PD seven days out of 14.

Q    Anything else?

A    In order to get back into patrol, I had to take time off to have the surgery done, which was all my time since County decided to deny my workmen's comp claim.  So in order to get that medical clearance, I went and had a surgery done to try to get back into patrol.

Q    The Workers' Comp claim, the Sheriff's Office

Eric Koty
August 9, 2016

55

made decisions regarding how the Workers' Comp claim is handled, as far as you're aware?

A    Well, the Sheriff's Office denies me ever reporting it to them.

Q    Say it again?

A    The Sheriff's Office denies me ever reporting that I was having a problem driving the car, or I was having pain driving the car.

And the to/from that I put in was 47 days after the initial incident, so they are stating that because it wasn't within the 45 days, that they are denying the fact that I reported it.

Q    You do have a Workers' Compensation claim pending though; is that correct?

A    That's correct.

Q    And it's related to your hip injury, correct?

A    Correct.

Q    Regarding your being placed on inactive status with Special Ops for a period of approximately five to six months, what were the negatives regarding that?

First let me ask you, financially, how did

Eric Koty
August 9, 2016

56

it impact you?

A    I wouldn't consider the $25.00 a week pager stipend a huge financial impact, but it's a loss of income.  Is it the end of the world?  No, it's not.

Q    For non-economic purposes, how did it affect you negatively?

A    Well, since this was the second time I was removed from the team, it's more loss of training, more loss of status on the team, which means that as you spend more time on the team and you have more seniority, you should move up as to your roles and responsibilities of the team.  And usually when you move up, then you go to additional training which is outside your office which is another opportunity which you don't get if you're just doing the same thing over and over again.

First of all, they feel like they can't rely on you because you're getting removed from the team.  And then you also by not going through the training, you are out of practice in the skills that you need to perform.

Q    Anything else with respect to negative

Eric Koty
August 9, 2016

57

aspects of not being on Special Ops?

A    **For me personally, no.**

MR. VACI:  Anybody need a break?  This would be a natural break time.

MR. JACOBSON:  Yes.

(There was a break taken, after which the deposition was resumed as follows:)

MR. VACI:  Mark this, please.

(The document was so marked by the court reporter.)

BY MR. VACI:

Q    I'm going to show you what's been marked as Deposition Exhibit No. 1.  Do you recognize that document?

A    **That's a to/from to Chief Angus from January of 2014.**

Q    And other than what looks to be a line in there, is it in substantially the same condition when you created it?  When I say the line, it looks like certain things were underlined or highlighted?

A    **Something like that, yes, correct.**

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

58

Q    And it states that, "I am requesting to be assigned a vehicle that has more legroom than my current one, Squad 59.  I am experiencing discomfort due to the fact that I can't straighten out my leg while driving.  I have sat in the Ford Pursuit SUV and the vehicle has enough legroom to alleviate this discomfort I am experiencing.  I am fit for full duty and I am not injured.  I am requesting a reaonable accommodation to a vehicle of a similar size to present the current discomfort from turning into a medical condition."  Did I read that correctly?

A    **Yes, you did.**

Q    Now, you specifically stated there that you have discomfort from driving in your current vehicle, your assigned vehicle, and you wanted to prevent it from turning into a medical condition, correct?

A    **That's correct.**

Q    And who did you give this to, Chief Angus via the chain of command?

A    **Correct.**

Q    Anyone else that you're aware of?

A    **That saw it?**

Eric Koty
August 9, 2016

59

Q    Yes.

A    Besides my chain of command which would have been Sergeant Moore and Lieutenant Mendrick who was the one who told me to write this after I spoke with him about getting the vehicle.

MR. VACI:  Mark this, please.

(The document was so marked by the court reporter.)

BY MR. VACI:

Q    Take a look at Exhibit No. 2, please.  Do you recognize that?

A    That's a doctor's note submitted on February 12th.

Q    And that's your doctor --

A    Thangamani.

Q    Thangamani.  And that's signed by him or her?

A    Him, yes.

Q    And this is dated February 12th, 2014?

A    That's correct.

Q    And it states that, "Resume regular work as of today, February 12th, 2014.

"Additional comments:  Patient can drive,

Eric Koty
August 9, 2016

60

discharge a firearm, and otherwise perform all duties

of an active full duty law enforcement official.

However, if available, because of a hip condition, a

squad car with more legroom, like an SUV, would be

preferable."  Correct?

A    Correct.

MR. JACOBSON:  I'll just agree that's what the

document says.

BY MR. VACI:

Q    Yes.  I mean I read that correctly, correct?

A    Yes.

Q    Now, this particular physician's note

doesn't -- it says, would be more preferable to have a

squad car with more legroom, correct?

A    That's the way it's termed.

Q    There was nothing -- would you agree that

there was nothing about this letter that would cause

the employer to not allow you to drive your assigned

vehicle at the time?

MR. JACOBSON:  Object to speculative.  You can go

ahead and answer.

THE WITNESS:  Was there anything --

Eric Koty
August 9, 2016

76

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    Take a look at that, Defendant's No. 6.  Do you recognize that?

**A    That is the letter from Chief Angus from the 8th regarding my assignment to court security.**

Q    And do you recall receiving this on or about April 8th, 2014?

**A    Yes.**

Q    And it states that, "Please be advised that I am in receipt of your paperwork that you hand-delivered to Sergeant Ruff on April 7th, 2014."  And that is the EEOC Charge and the doctor's note?

**A    Those are the two.**

Q    And it states further that, "In that your doctor indicated that because of a hip condition a squad car with more legroom, like an SUV, is necessary.

"This note prevents you from working in the current vehicle supplied by the employer, and we have no vehicles conducive to the recommendation of your doctor."

Eric Koty
August 9, 2016

77

"Subsequently, Chief Kruse met with the State's Attorney's Office and their recommendation is to temporarily transfer your work assignment to the courthouse. The work assignment will be reevaluated after you supply the additional information requested regarding this matter.

"Please meet with Major Romanelli regarding your duties at the courthouse."

Did I read that correctly?

A       That's what it states.

Q       Was it the case that -- I mean you agree with the portion that says, "This note prevents you from working in the current vehicle supplied by the employer?" When I say this note, I'm referring to the doctor's note of April 4th, 2014.

A       That's what it states.

Q       Is that accurate?

A       That's what it states.

Q       In your view, was that accurate that that note was his statement that the note, meaning your doctor's note of April 4th, 2014, prevented you from working in your current vehicle supplied by the

Eric Koty
August 9, 2016

78

employer?

A    That's what it states.

Q    That's what this states, but would you agree with that statement that based on that doctor's note, the Sheriff's Office could no longer have you driving that vehicle?

A    No, because I drove it the whole day before after they had the doctor's note, and I had been driving it for how many years, even though they knew I was having a problem.

Q    But that doctor's note in Exhibit 3 I believe it is, yes, 3.  You can look at it if you need to.

A    I don't need to look at it.

Q    Okay.  It says that, "Because of a hip condition, a squad car with more legroom, like an SUV, is necessary."

Is it your position that the Sheriff's Office -- strike that.  Is it your position that that doctor's note didn't require the Sheriff's Office to prevent you from driving that vehicle any further, your assigned vehicle?

A    It's up to them what they do.  They can

Eric Koty
August 9, 2016

79

either follow the advice of a doctor, they can send me to their own doctor to have an evaluation done, which is part of our General Orders, but they didn't do any of that. They didn't call the doctor for further explanation. They did nothing. They decided to look at this one doctor's note and use it as an opportunity and disregard all the rest.

Q But that doctor's note is different than previous doctors' notes that you got, correct?

A By one word, "necessary."

Q Right. And is it your opinion that the Sheriff's Office could have ignored that physician's note?

A Sure. They could have ignored that note just like they ignored all the rest of them.

Q So you don't believe that that note prevented you from working in your current vehicle? Do you agree with that or disagree with that?

A I'm telling you that they make their decision on what they are going to follow and what they are not going to follow. So it's up to them what they do.

Q But I'm asking you, do you agree with the

Eric Koty
August 9, 2016

80

statement in Chief Angus's April 8th, 2014, --

A    Did he accurately quote the doctor's note? Yes, he did.

Q    No, forget about the quote.  Where he says that this note prevents you from working in the current vehicle supplied by the employer, is that a statement you agree with or disagree with?

A    That's what the doctor's note says.

Q    No, the doctor's note says, "Because of the hip condition, a squad car with more legroom, like an SUV, is necessary," right?  That's what the doctor's note says?

A    Right.

Q    And then Chief Angus says that, "This note prevents you from working in the current vehicle supplied by the employer."  Is that a statement you agree with or not?

A    No.

Q    You disagree with that?

A    Yes.

Q    Okay.  So the employer could have just left you in that vehicle even though the doctor was saying a

Eric Koty
August 9, 2016

85

vehicle, correct?

MR. JACOBSON: Objection. You mean all the time, or at the moment? Because he was assigned back to the vehicle.

MR. VACI: Well, let me strike. I'll rephrase that.

BY MR. VACI:

Q By transferring you to the courthouse temporarily, that complied with your doctor's note, correct, that you could not be in that vehicle, you could not drive in that vehicle?

MR. JACOBSON: Objection. What timeframe?

BY MR. VACI:

Q At this time on April 8th, 2014, when you were transferred? Do you understand the question?

A **Yes, I understand the question. That was one possible solution, sure.**

Q And it wasn't a solution that you preferred, correct?

A **Obviously not.**

Q And you preferred getting a different vehicle and staying in your current assignment of patrol,

Eric Koty
August 9, 2016

86

correct?

A     **That's correct.**

Q     Defendant's 6 also states that, according to Chief Angus, "We have no vehicles conducive to the recommendation of your doctor," correct?

A     **That's correct.**

Q     Transferring you to the courthouse, while not what you preferred, you agree was something that accommodated that doctor's note, correct?

A     **No, I think it was not accommodating the doctor's note, because he said that I didn't need to be on light duty or change my work condition.**

Q     Well, going to the courthouse is not light duty, correct?  That's just another assignment for a deputy, correct?

A     **Correct.**

Q     And as you testified, there are occasions when people are transferred from court services to law enforcement and back.  Would that be accurate?

A     **That they are transferred?**

Q     Are deputies ever transferred from court services to law enforcement for whatever reason?

Eric Koty
August 9, 2016

87

A    Generally, no.  I can't remember the last time, unless it was the only time that they have been transferred from court services to law enforcement is when they were already in law enforcement and got transferred into court services as punishment.

Q    And they request a transfer back to law enforcement, correct?

A    Correct.

Q    And on occasion people are transferred from law enforcement to court services, correct, for whatever reason?

A    Yes.

Q    And there's nothing that prevents the transfer back and forth?

A    I think we've already discussed that, arbitrary and capricious.

Q    So I think the question I asked you was the transfer, when you were transferred on April 28th, 2014, into court services, that satisfied the condition, the restriction placed on you by your physician, correct?

A    According to the employer.

Eric Koty
August 9, 2016

88

Q    It did satisfy it though, correct?

A    **According to the employer, yes.**

Q    When you say according to the employer, what do you mean?

A    **That was the decision they made independently on their own.  That was their decision.  Under ADAA they are required to sit down and talk with the affected individual to see what can be worked out.  How could they provide something that would accommodate them?  They did not do that.  They made this decision --**

Q    They did not speak to you --

A    **No.**

Q    -- about what accommodation you would prefer, correct?

A    **They didn't speak to me about anything; about what the problem was, what they could do to help me with that problem.**

Q    But at the end of the day, transferring you to the court services, while not what you preferred, was still an accommodation that satisfied your restriction that was placed on you by the doctor?

Eric Koty
August 9, 2016

89

**A     So would have been going to Detective.    So would have been going to CRU.    Those are other accommodations that could have been made.**

Q     And they are all in a group of accommodations that would have satisfied the restriction that was placed on you, correct?

**A     Correct.**

Q     So the problem that you have with going to the court services is it wasn't the accommodation that you preferred?

**A     It wasn't an accommodation I even asked for.**

Q     Right.    But that's the problem you have with it?    It's not that it wasn't something that accommodated the restriction, because it clearly did; it's something that you didn't want to do, correct?

**A     Correct.**

Q     Now, this took place, the transfer took place right after you filed, or you turned over the EEOC Charge the day before, correct?

**A     Correct.**

Q     The employer, as a result of the document that you turned in with the EEOC Charge, that doctor's

Eric Koty
August 9, 2016

90

note, it put the employer in a position of having to do something with regard to that doctor's note, right?

A    That's correct.

Q    And what they decided to do was to transfer you to the courthouse instead of some other possible accommodations?

A    Some other possible accommodation, correct.

MR. VACI:  Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    Have you seen that?

A    That is from May 27th, 2014.  That is a doctor's note from Dr. Shahbandar.

Q    Just as an aside, there's no Bates stamp on this document.  This is one of the documents that was provided to me today by you.  It is dated May 27th, 2014?

A    Correct.

Q    And it states, from Dr. Shahbandar "The patient is cleared to work as required for the Special Operations Unit with no restrictions."  And it says,

Eric Koty
August 9, 2016

91

"Please call with questions," correct?

A    **Correct.**

Q    Did I read that correctly?

A    **That's what it states.**

Q    Why was this provided to you so that you could provide it to the Sheriff's Office?

A    **Because Joe Mazzone told me to get it.**

Q    And did he tell you why?

A    **Because he was going to try to get me back on the Special Operations Unit.**

MR. VACI:  Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    This is Exhibit No. 8.  Do you recognize that?

A    **It's from the General Orders LEB 7-47 regarding the Special Operations Unit.**

Q    And is this the General Order, as far as you're aware, that the effective date is 7/1/2011.  Is it still in effect, and was it in effect -- strike that.  Was it in effect in 2014?

Eric Koty
August 9, 2016

92

A    As far as I know, this is the same, unless they've updated.  As far as I know, this is the same thing.

Q    If you look on Bates stamp Page 450 which is Page 2 of this document, it states that under Criteria For Selection to the Unit, it states under C, "Physical condition:  Due to the rigorous nature of the activities and the demanding tasks to be performed, each applicant shall be in excellent physical condition."  Did I read that correctly?

A    Yes.

Q    Is it your understanding that while you're in the Special Ops Unit, you have to be in excellent physical condition?

A    It's my understanding that the selection for the criteria is that you have to be in excellent physical condition.

Q    Is it your position then that if you have a medical issue that would affect your ability to be in Special Ops, that you would still remain as an active member of Special Ops?

A    Yes.

Eric Koty
August 9, 2016

93

Q      What do you base that on?

A      Well, I've been off before because of an injury.  When I came back they didn't retest me to see if I was still in excellent physical condition.

We have members that still operate hurt all the time.  They have to be off because maybe they have an injury, and when they come back, they don't retest them to make sure they are in excellent physical condition.

And in fact, after you make it on the team, after you pass the physical agility test the first time, you're not required to pass it again to stay on the team.

And if they wanted to, they could have tested me and said either you passed the test, or you failed.  If you fail the test right now, then no, you can't be on it.  But they didn't do that.

Q      Is there a tests that's required?

A      Yes.

Q      That's in the General Order?

A      I don't know if it's in the General Order or not.  Yes, it's testing Section I on Page 3.

Eric Koty
August 9, 2016

94

Q    Page 3?

A    **Correct.  Page 3 under I.**

Q    And this is a test to get into the unit?

A    **That's correct.  And I have not taken this test probably for six or seven years now.**

Q    Has anybody been tested after they have been admitted to the unit?

A    **No.**

Q    But it's your position that regardless of what your medical condition was, it would have been no basis to put you on an inactive status?

A    **That's correct.**

MR. VACI:  Mark this, please.

(The document was so marked

by the court reporter.)

BY MR. VACI:

Q    I'll ask you if you recognize what that is?

A    **That would be the to/from that I received from James Kruse.  It's dated August 14th, 2014.**

Q    Okay.  And that relates to specifically the Special Operations Unit, right?

A    **That's correct.**

Eric Koty
August 9, 2016

95

Q    And it refers to a note from your medical care provider.  Is that the note that was Defendant's Exhibit 7, as far as you're aware?

A    **As far as I'm aware, yes.**

Q    Were there ever any other notes other than that one?

A    **No.**

Q    It states, "Please be advised that I am in receipt of note from your medical care provider, indicating you are able to perform the duties necessary with the Office Special Operations Unit.  While you have been medically cleared by your medical care provider, there are some logistical issues which need to be addressed, specifically regarding the security of your SOU weapons and equipment, and your ability to respond to a call-out while temporarily assigned to the courthouse.  Accordingly, please submit to me, in writing, a proposal as to how you will provide for the safe keeping of your SOU weapons and equipment while at the courthouse, and how you will be able to respond to a call-out if needed.  Once I receive your plan, it will be reviewed for appropriateness."

Eric Koty
August 9, 2016

96

Did I read that correctly?

A    Yes, you did.

Q    When you received this memo from Chief Kruse, what did you do?

A    I responded to it.  Well, that was the 14th is the date that it's dated.  I don't think I got it until like the 17th, so I think I responded to it either that night or the next day.

Q    And what was your response, generally?

A    My response was that I would be restoring the weapons and gear in my personal vehicle, and when I got a call-out, I would be responding in my personal vehicle.

Q    And you provided that to Chief Kruse in writing?

A    Yes.

Q    Directly or through the chain of command, if you recall?

A    I can't remember.  I don't recall if I did a to/from to him, or if I sent him an email, but I know I responded to him directly.  I don't recall sending it through the chain of command.  I could have, though.

County Court Reporters, Inc.
630.653.1622

Eric Koty
August 9, 2016

111

there any other negative issues relating to that

transfer, other than what's in that paragraph?

　　　MR. JACOBSON:　And what he testified to?

BY MR. VACI:

　　Q　　And what you've already testified to?

　　**A　　And what I testified to.**

　　Q　　How did the transfer to the courthouse cause

you to lose your holiday pay?

　　**A　　So deputies that work in court security don't**

**work, they don't get holiday pay because they are**

**already off the holidays.　When you're on patrol you**

**get 56 hours of holiday pay every six months.　So it's**

**split up half the year and half the year.**

**　　　　　So basically when I was transferred over**

**there, I didn't get holiday pay for those holidays that**

**I was in the courthouse for.**

　　Q　　Do you actually have to work those holidays

then?

　　**A　　No.**

　　Q　　If you're in patrol, just so I have an

understanding of this, if you're in patrol, you're

getting holiday pay and you're working the holiday, or

Eric Koty
August 9, 2016

112

you're not working the holiday?

A     Correct.  It's not like you would get double time because you worked the holiday; you just get 56 hours of holiday pay twice a year.

Q     And if you're working in the courthouse, you get the holiday off, correct?

A     Correct.

Q     And you're being paid for that day, correct?

A     You're being paid your regular salary.

Q     Right.  So you're saying that the 56 hours is over and above your regular salary?

A     Yes.  It's up and above your regular salary.

Q     Did you have the ability to work overtime in the courthouse?

A     No.

Q     You didn't have the ability, or you never got any?

A     I didn't have the ability.

Q     Why is that?

A     Well, when I got there originally, they gave me one day of training.  And I wasn't trained or certified to use the screening machines, the X-ray

Eric Koty
August 9, 2016

113

machines, and in order to work overtime, you had to be able to do that function. Or to work in a courtroom you had to have been trained in a courtroom, and I wasn't trained in a courtroom either.

Q    And what was the reason you weren't getting the training; do you know?

A    Because it was supposed to be a temporary assignment.

Q    You did air quotes there. But it turned out it was a temporary assignment, correct?

A    That's correct, a year later.

Q    Now, you also said it caused you to lose the ability to find other patrolman positions. Are you talking about in other agencies?

A    If I would have stayed in the courthouse, court security officers are different than patrol.

Q    Okay. But how would that have affected you in the sense that you would not have the ability to find other patrolman positions?

A    If you stay there long enough, you lose your certification.

Q    How long would you have to stay to lose your

Eric Koty
August 9, 2016

114

certification?

A    I don't know what the State Statutes are.

Q    Did you lose your certification?

A    I wasn't there that long.  This was back in --

Q    So this may have been an issue again, but it turned out it wasn't an issue?

A    Correct.

Q    Is that correct, what I just said?

A    Yes.

Q    Did you miss training related to patrolman positions?

A    If there was any training that occurred during those nine months, or actually a year, then I would not have attended it.

Q    As you sit here today, do you know if you missed any of that patrolman-related training?

A    I don't know.

Q    Now, you state, "Has worse work hours in the courthouse."  In what sense do you mean that?

A    I think I explained that when I talked about my child care.

Eric Koty
August 9, 2016

115

Q     Okay.  So that was specifically, when you say worse work hours, you mean for you personally?

**A     For me personally, yes.**

Q     Taking the child care issue out of it, are there worse work hours in the courthouse?

**A     I think that's a very individual question. Everybody would answer that question differently; some people yes, some people no.  Obviously the people that want to work there like the hours.**

Q     But the hours are, generally speaking, what being at the courthouse?

**A     Generally speaking?**

Q     If you're working at the courthouse, generally speaking, are they 8:00 to 5:00, that kind of thing?

**A     8:00 to 5:00, 7:00 to 3:00.  There are a couple of different starting times.**

Q     Are there any other shifts other than the day shift?

**A     There's afternoons.  I think they start at 10:00 or 11:00.**

Q     And they go to when?

Eric Koty
August 9, 2016

120

A       I would say that's an individual thing.

MR. VACI:   Mark this, please.

(The document was so marked

by the court reporter.)

MR. VACI:   For the record, I received this today as well from counsel.

BY MR. VACI:

Q       Have you seen this document before or not?

A       Yes.

Q       If you can go to the second page under the heading of Damages, lost benefits?

A       Yes.

Q       And it says 321 hours, correct?

A       Correct.

Q       How was that calculated, if you know?

A       That would be sick time I had burned.

Q       At what time?

A       I had to burn all my sick time when I was off on FMLA to have the surgery done.  And then I also had to use some sick time when I first reported that there was -- when I first gave him the note, he sent me home back in January of 2012.  He sent me home and I burned

Eric Koty
August 9, 2016

121

sick time then.

Q    Is this sick time that would have been in your A bank or your B bank?

A    **We don't have separate banks.**

Q    So all of your sick time would be paid for, correct?

A    **Yes.**

Q    And just so I'm clear, you have sick time that you burned while you were having the surgery?

A    **Yes.**

Q    And what's the other sick time that went into that calculation?

A    **The other sick time, like I said, was when I was sent home to get a doctor's note, I used sick time to do that.**

Q    For one day?

A    **I think it was 19 hours.**

Q    And so then the remainder of the 321 hours is sick time you used for getting the surgery, if you know?

A    **The other --**

Q    If mean if you don't know, that's all right.

Eric Koty
August 9, 2016

122

A    Is that both?  I don't recall.

MR. JACOBSON:  That's some detail stuff.

BY MR. VACI:

Q    Forget about the number of hours.

You were going to have to have the surgery -- why is it that you believe that the sick time you used in getting the surgery is related to this case?

A    If I wasn't transferred into the courthouse, I wouldn't have --

Q    You wouldn't have had the surgery?

A    I wouldn't have had to have the surgery.

Q    And it's your position you would have never had that surgery?

A    I don't know if I would have ever had it.  I don't know.  But I know that in order to get me out of the courthouse, I had to have that surgery.

Q    But in order to have that surgery, let's say if you had that surgery at some other time, you would have still used sick time, correct?  It would have required you to use sick time?

A    No, not if the workmen's comp would have

Eric Koty
August 9, 2016

123

**covered it.  If I was not being fought by the County on workmen's comp, I would have been covered under workmen's comp.**

Q    But is the factor or the issue of whether you were being fought by the County on Workers' Comp, that would have been occurring regardless of where you were assigned, correct?

MR. JACOBSON:  Object as speculation.  If you know.

THE WITNESS:  That issue, you mean wherever I was assigned?  I guess.

BY MR. VACI:

Q    I mean if you were assigned to patrol and you had the surgery, the same thing would have been occurring within the Workers' Comp case?

MR. JACOBSON:  Objection to speculation.

THE WITNESS:  Maybe it would have already been resolved then.  I don't know.  All I know is that in order to get out of the courthouse, I had to do something to get that medical restriction lifted.

BY MR. VACI:

Q    Now, you have lost wages 60.  I assume that's

Eric Koty
August 9, 2016

124

60 hours, if you know?

A    Yes.

Q    And how was that calculated?

A    I'm not sure.  I'm not sure what that --

Q    Regardless of the number, where is it that you think wages were lost?

A    Well, I know that I lost wages when I was off and I wasn't getting paid anything.

Q    And that's the period of time between February and March of 2015?

A    Right.

Q    Is that the period that you are referring to?

A    Correct.

Q    And that's when there was no light duty available, correct?

A    Correct.

Q    So is that what that refers to?

A    Yes.

Q    But you did get -- you were getting, I think your testimony was, 50 percent of your salary during that time?

A    From my IMRF.

Eric Koty
August 9, 2016

127

until today that you have a disability?

A    Yes.

Q    And did you believe from the first time you told them about a disability, that they had accommodated your disability until today?

A    **At one point in time in 2012 they made an accommodation for me.**

Q    Okay.  Other than that, how many other accommodations -- by accommodations I mean that accommodate your disability, not like your statement that you were moved to court services.

A    **Correct.**

Q    You don't believe that's an accommodation, do you?

A    **No.**

Q    They have actually worked on your vehicle at points from 2011 until you got the SUV, right?

A    **That's correct.**

Q    And is that because you told them you had a disability?

A    **Yes.**

Q    And that's also because they believed you had

Eric Koty
August 9, 2016

128

a disability and the vehicle needed to be accommodated, correct?

A    **Correct.**

Q    Is there any time where you thought that your vehicle had gone past its use full life pursuant to the Sheriff's policy and should have been sent to the junk yard?

A    **It has a lot of miles, or it had a lot of miles on it, and it still has a lot of miles on it, but I couldn't say it went past what the Sheriff's policy is.**

Q    Okay.  Did it appear to you that -- let me ask you this.  Did it appear to you that there was a point before you actually got the SUV that the car, the Crown Victoria, should have been taken out of service and you should have been put in the SUV?

A    **I personally believe that once the vehicle starts breaking down while you're using it for police work, that it should be taken out of service.**

Q    Was that happening with your vehicle?

A    **Yes, it was.**

Q    And when was that happening?

Eric Koty
August 9, 2016

129

**A      I believe that the vehicle broke down probably four or five times prior to me being transferred to the courthouse that I had to actually have it towed in.**

Q      And what period of time are we talking about? Was it a year before, a few months?

**A      Probably two years before.**

Q      And instead of swapping it out with an SUV, they were repairing it, jimmy-rigging it?  What would you say?

**A      They were repairing it.**

Q      And do you know if there were any SUVs available for that period of time?

**A      There was SUV's.  I believe we first started getting SUV's in 2012 or 2013.  I believe the first model year was 2013, so they probably would have come out some time in 2012.**

Q      Okay.  And when those first SUVs came out, could you have driven in those without pain?

**A      Yes.**

Q      And how did you know that?

**A      Because I have actually sat in one.**

Eric Koty
August 9, 2016

130

Q    And I might have asked you this.  Prior to you giving them the Complaint filled out -- let me step back.

So when you gave the employer a copy of the EEOC Complaint, it wasn't stamped by the EEOC at that time, correct?

A    **That's correct.**

Q    And had there been any time prior where you said I'm being disabled and they took a position that was not accommodating to your disability?

A    **Yes.**

Q    Is there any point prior to moving to the court services that you thought they were retaliating against you for complaining about your disability?  Not formal, but a formal Complaint that you had complained about your disability and you thought they were taking action that wasn't accommodating in retaliation?

A    **Yes.**

Q    And when was that?

A    **That was in January of 2014.**

Q    And what happened?

A    **I had submitted the to/from to Chief Angus**

Eric Koty
August 9, 2016

131

asking for a different vehicle, and then I also at the same time or about two weeks later I reported the work-related injury, tried to file a workmen's comp Complaint. And then after that the Sheriff's Office called in the County's risk manager, Patrick Genovese to do a vehicle assessment on my vehicle and one of the forward SUVs.

Q    Okay. And why do you think that's retaliation?

A    To the best of my knowledge, they had never done that before when someone asked for an accommodation for a different vehicle.

Q    Did they ever talk to you about what an appropriate accommodation would be?

A    No.

Q    Did they ever ask you to talk to your doctor about what an appropriate accommodation would be?

A    No. Well, strike that. They gave me paperwork to have filled out after I was transferred to the courthouse.

Q    But prior to transferring to the courthouse, was there any discussion -- does the Sheriff's Office