James Kruse
September 29, 2016

18

officer?

A.        No.    We have a few vehicles that we have set aside as spares.

Q.        All the time?

A.        Yes.

Q.        Okay.   So if Mr. Koty's car were to break down, and in fact it had at times, needed to go into the shop for repair, does Mr. Koty get an alternate vehicle?

A.        Yes.

Q.        And if you had spare SUV's at the time his vehicle broke down, he could have gotten a spare SUV; correct?

A.        We did not have a spare SUV.

Q.        Okay.   So on the date that you and -- was it Lieutenant Angus?

A.        Chief.

Q.        Chief Angus, sorry about that.   At the time you and Chief Angus and ASA Bruckner met, there were no spare SUV's?

A.        Correct.

Q.        And why was that?

A.        The SUV's that were upfitted, meaning the lights and siren and everything like that, they were already assigned to other deputies, and they were -- each deputy is

James Kruse
September 29, 2016

19

assigned a vehicle, and that's their vehicle they are responsible for.

Q.    So, I'm just trying to find out so there were no -- as far as you know, there were no spare SUV's on the day that you had this meeting?

A.    Correct.

Q.    And what did you do to determine that?

A.    We have a motor pool officer that is in charge of the vehicles.  Also it was the Quarter Master at that time.

Q.    Would that be the same title for the person?

A.    Yeah.

Q.    Who was that person at that time?

A.    At that time it was Chris Johnson.

Q.    And he's no longer with the Sheriff's Office?

A.    Correct.

Q.    And who contacted him?

A.    I don't remember.

Q.    Do you know if he was emailed or phone call?

A.    I don't remember.

Q.    Do you remember what his -- what he was asked and what his response was?

A.    No.

Q.    Were you involved in the communication with

James Kruse
September 29, 2016

20

Mr. Johnson?

A.      No.

Q.      Do you know who was?

A.      No.

Q.      Who said they talked to Chris Johnson and there was no SUV's available in your meeting with Mr. Bruckner and Mr. Angus?

A.      **Mr. Angus was the one that indicated that there were no vehicles available.**

Q.      Okay.  So is it fair to say you don't really know why they weren't available, or did Mr. Angus say why?

A.      **Well, as I said, all the vehicles that were upfitted were out working.**

Q.      And so I understand you say that, but I asked you how you knew that.

A.      **Because Chief Angus indicated there were no vehicles available.**

Q.      Okay.  Now, how hard is it if someone has an SUV -- and I'm guessing some law enforcement officers, deputies, had SUV's at that time; correct?

A.      **Yes.**

Q.      How hard is it for you to say, "You're going to be taking a Crown Victoria from Deputy Koty, and Deputy Koty is going to be taking your SUV"?

James Kruse
September 29, 2016

21

A.      I believe that would cause, at a minimum, some discord within the office.

Q.      Okay.   And why is that?

A.      Well, because the vehicles are assigned, and when you get that vehicle, that's your vehicle that you're responsible for.

Q.      But isn't -- doesn't a deputy or anyone that works for the sheriff have to understand that the sheriff can do whatever they want, and it's really the County's property?

A.      Yes.

Q.      But people, I'm guessing, come to believe that that's their property, and if you take it away, they're being punished?

A.      Yes.   Our vehicles are take-home.

Q.      If they live in the County, otherwise they have to leave them --

A.      Correct.

Q.      -- at the police department.

So, were you weighing upsetting one deputy versus accommodating Mr. Koty?

MR. VACI:   Objection to the form of the question.

BY MR. JACOBSON:

Q.      When you made this decision that he would have

James Kruse
September 29, 2016

22

to take an SUV from a deputy for Mr. Koty, is it fair to say you were weighing whether you were going to upset one deputy over accommodating Mr. Koty?

A.    **We had the thought of that occurring, but we acknowledged that it would be detrimental for us to take a vehicle away from someone that has an assigned car.**

Q.    Do you know did anyone put in a request at that meeting for one of the SUV's that hasn't been assigned yet to be assigned to Mr. Koty?

A.    **At that time all the SUV's had been assigned.**

Q.    But there's more SUV's that came in; right?

A.    **Yes, but those are not police cars.**

Q.    What's the difference between the SUV's that came in and the police cars?

A.    **Because the vehicles that are not upfitted, meaning we did have some SUV's, but they did not have lights, they didn't have sirens, they didn't have radios, they were just cars.**

Q.    And eventually those SUV's that came in got fitted and went on the street?

A.    **Eventually, yes.**

Q.    Did anyone request that to happen for Deputy Koty, that when an SUV comes in and gets fitted for law enforcement, that it be assigned to Mr. Koty?

James Kruse
September 29, 2016

23

A. Eventually he was assigned one.

Q. At that meeting, did anyone do that?

A. No.

(Whereupon, a recess was

taken.)

BY MR. JACOBSON:

Q. In transferring from one bureau to another bureau, is the sheriff the one that makes that decision?

A. As I indicated before, that the bureau chiefs make that decision also.

Q. Do you know if you've ever heard anyone say that transferring from law enforcement to court security is a punishment?

A. No.

Q. Do you believe that moving to the courthouse is a punishment from law enforcement?

A. No.

Q. In court security, what is their jobs?

A. Their jobs are the same as a deputy sheriff on the road, with the exception of they don't drive.

Q. How many killings have there been in the courthouse in the last five years?

A. Killings?

Q. Killings.

James Kruse
September 29, 2016

24

A.      None.

Q.      What, in the last 12 months, was the number one crime in the courthouse?

A.      Aggravated battery.

Q.      And how often did that happen in the courthouse in the last 12 months?

A.      I would have to check.  I couldn't give you a definitive number.

Q.      In law enforcement, do you know -- well, is the training the same for the officers in the courthouses as law enforcement?

A.      It could be.

Q.      And I apologize, I keep referring to them as officers, but I mean deputies.

When you say could be, why do you say could be?

A.      There are people with more and less training with regard to the deputies at the courthouse, but they all receive -- at a minimum, they all receive the basic correctional officer academy.

Q.      Law enforcement, though, after the basic academy, they get further training; correct?

A.      They go into field training.

Q.      And is there routine training that the law

James Kruse
September 29, 2016

58

Q.    He was subsequently transferred to a different shift; correct?

A.    **I don't know about a different shift.**

Q.    He's not working midnights any more; correct? Do you know what shift he's working?

A.    **I don't.**

Q.    So, what was your involvement then in him being transferred from court security to law enforcement?

A.    **There was a need in the law enforcement bureau for patrol deputies, and the three chiefs; myself, Chief Davis and Chief Angus, there's a list that's called intent to transfer that deputies can put their names on it. And because there was an urgent need for people, we looked for deputies that already had had the law enforcement training academy, and since Deputy Koty had that training, that's why he was transferred back to the law enforcement bureau.**

Q.    Was this transfer back related to your needs, or because it was determined by the doctor that he can sit in a Crown Victoria?

A.    **Well, both are correct. There was a need, and we had also received a doctor's note saying -- indicating that he was clear to return to work without restrictions.**

Q.    Okay. Do you know if there was any positions open at the shift he was working on before he went to court

James Kruse
September 29, 2016

59

security?

A.     No.

Q.     So the three of you met.  Did you decide -- were you meeting just over Deputy Koty, or all the transfers?

**A.     It was more than just Deputy Koty.  I believe we transferred -- I believe we transferred three or four deputies.**

Q.     From?

**A.     From, well, Deputy Koty, and there were deputies from the jail that had law enforcement training.**

Q.     Would Deputy Koty be the only one that was transferred from court security to law enforcement?

**A.     I believe it was.**

Q.     Was Deputy Koty, when he was able to go back in the Crown Victoria, was there any policy, procedures or union contract that required him to go back to the same shift?

**A.     No.**

Q.     If, under the policies, procedures and the contract, when Deputy Koty was transferred to court security under those policies, procedures and union contract, could you have moved Deputy Koty from one shift to another without him bidding on it?

James Kruse
September 29, 2016

60

A.      While at the courthouse?

Q.      No.   When he was law enforcement.   On April 4th, 2014, before he was moved, did the union contract allow you to move him from one shift to another as you see fit?

A.      **I believe by the contract they bid for those now.**

Q.      So once they bid for it, he's locked into that shift for a year?

A.      **For a year.**

Q.      Okay.   So do you know why he -- I understand the needs of the sheriff, but shouldn't he have been moved back to the same shift he was at before being sent to court security?

A.      **No.   All the transfers into patrol are to where the vacancy is, and then at the next bid cycle is when they can put in for their preference.   I believe it's by seniority.**

Q.      So you were accommodating Mr. Koty by moving him to court security; right?

A.      **Yes.**

Q.      Did you feel the need to keep his position available?

MR. VACI:   Objection, form of the question.

County Court Reporters, Inc.
630.653.1622

James Kruse
September 29, 2016

61

BY MR. JACOBSON:

Q.     When you transferred him to court security -- let me give you some -- if a deputy in law enforcement goes on pregnancy leave, is the policy, union contract, procedures to keep that position open for them at that shift when they return?

A.     **During the FMLA period, yes.**

Q.     When Deputy Koty was transferred over to the court security, who replaced his position on the shift he was in?

A.     **I don't know.**

Q.     Who would know?

A.     **Chief Angus.**

Q.     Is there a log or records of who replaced him?

A.     **There may be.**

Q.     Well, you're one of the chiefs; right?

A.     **Yes.**

Q.     So, is there or isn't there a log of who replaced Mr. Koty?

A.     **The reason I say there may be is because there's different bureaus, so there may be a record from Chief Angus assigning someone to that shift. I wouldn't necessarily have to have that.**

Q.     Are you aware of any policies, procedures,

James Kruse
September 29, 2016

62

rules that say there has to be a record?

A. No.

Q. Okay. Do you know if -- well, how did you know then when he got transferred from court security to law enforcement there was a need for midnights?

A. **I knew that there was a need for people. I didn't know specifically which shift was in need.**

Q. Okay. And what policy or procedure says that Mr. Koty had to go to midnight shifts versus the shift he had been on?

A. **We had historically placed people where the vacancies are, so we were following the same practice.**

Q. Is that -- when you say historically, is that when someone is on disability?

MR. VACI: Objection to the form of the question.

THE WITNESS: Even with someone that may be on long-term disability, that doesn't necessarily mean they are going to come back to their exact position.

BY MR. JACOBSON:

Q. Okay. During the period of time that there is a union contract, if someone goes on short-term -- well, did you consider Mr. Koty, would he have been on long-term disability or short-term disability, or something else?

A. **I never considered him as a disability.**

James Kruse
September 29, 2016

64

Koty and I had a very brief conversation in the lobby of the Sheriff's Office, and he said I'm clear to return to work. And I said good, put your intent to transfer letter in.

Q.     Why did he need an intent to transfer letter?

A.     Because he was assigned over at the courthouse at that time.

Q.     He was only, if I understand correctly, temporarily to the courthouse; right?

A.     For a period of, I believe, ten months.

Q.     So what would have happened at the end of ten months?  Did he need to fill out an intent to transfer form?

A.     Well, there was one letter that I did submit to Mr. Koty where he was, for a very short period, transferred to the courthouse, and the reason that we had to do that was because of shift bidding.

Q.     What does shift pay mean?

A.     Shift bidding.

Q.     Shift bidding, what does that mean?

A.     That, because of the union contract, they can bid for their shifts.  And since Deputy Koty had been at the courthouse for so long, that we had him transferred there because it would have been disruptive on the bids.

Q.     Do you know how SUV's were assigned in 2014 and 2015 to deputies?

James Kruse
September 29, 2016

65

A. That was, again, a conversation that occurred between the Quarter Master and Department of Transportation.

Q. Did the sheriff have any policy on how SUV's are assigned to deputies?

A. Not that I can recall. It's by need. It's when the vehicles come out of service.

Q. Well, how does someone decide which sheriff gets it? Is it by seniority?

A. No. Again, it's by need of the conditions of the vehicles.

Q. So it's just solely the vehicle?

A. And mechanic's assessment of those vehicles.

Q. Which would be the condition of the vehicle?

A. Yes.

Q. Were you involved in why Mr. Koty couldn't go back to law enforcement until he explained what he was going to do with his duty weapons?

A. Yes.

Q. What was your involvement in that?

MR. VACI: Wait, object to that form of that question.

BY MR. JACOBSON:

Q. What was your --

A. He was returned to the Special Operations

James Kruse
September 29, 2016

66

Unit.

Q.      And when was that?

A.      **I don't remember the specific date.**

Q.      Why was he taken off the Special Operations Unit?

A.      **He was not taken off.**

Q.      He wasn't -- he wouldn't have been paged or contacted if there was a special operations?

A.      **He was placed inactive.**

Q.      Why was he placed inactive?

A.      **Chief Angus placed him on the inactive status because of the medical letter.**

Q.      And what is it of the letter that made him inactive?

A.      **I believe you would have to ask him, but I believe it was because of the indication of the hip condition.**

Q.      So what was the delay in putting him on special operations related to his vehicle?  What happened?

A.      **Well, he was driving his personal vehicle because he was assigned to court security, and being on special operations, you have specialized weapons, and we needed to ascertain how he was going to secure those weapons in his private vehicle.**

James Kruse
September 29, 2016

67

Q.     Wasn't it the employer's policies and procedures or in the union contract on how these weapons are to be secured in a private vehicle?

A.     **No.**

Q.     There's no policy or procedure?

A.     **Not that I can think of it.**

Q.     So, is it fair to say this was just created for Mr. Koty?

A.     **It was --**

MR. VACI:  Objection to the form of the question.

THE WITNESS:  It was requested because we had never had a deputy at court security on special operations.

BY MR. JACOBSON:

Q.     What is the difference, though, between a court security deputy and any other deputy?  I think we already testified there's no difference between court security deputy and a law enforcement deputy; correct?

A.     **Correct.**

Q.     And why is it you've never had a court security deputy on special operations?

MR. VACI:  Objection, form of the question, calls for speculation.

THE WITNESS:  I don't know.  Well, actually we did.

James Kruse
September 29, 2016

68

BY MR. JACOBSON:

Q. Well, no, he was put on inactive; correct?

A. **But when he was returned to special operations, he was still at the courthouse.**

Q. Okay.

A. **So he was the first one.**

Q. And the only one as far as you know?

A. **As far as I know. I think we have a negotiator, but not an operator.**

Q. So why is it the employer didn't come up with a policy and procedure, but instead ordered Mr. Koty to come up with a procedure?

A. **Because those weapons were going to be stored in his personal vehicle while parked at the County Complex, and people break into vehicles at the County Complex, so we requested how are you going to store these weapons.**

Q. You actually get communication of police officer vehicles being broken into and guns stolen; correct?

A. **I would find out, but that would be investigated by Wheaton.**

Q. I'm not saying in DuPage, but you get memos of weapons being stored in the trunks of police cars?

A. **Yes.**

Q. And they're broken into and stolen; correct?

James Kruse
September 29, 2016

69

A.      I've heard of it, yes.

Q.      So, what is it your belief that improves the security -- what were you wanting on that memo from Mr. Koty on securing his vehicle?

A.      Well, typically the vehicles, in the marked cars, they're either secured in a gun rack or in the trunk. And it was my understanding that Mr. Koty drove a vehicle that has an open back, so the weapons would have been visible.

Q.      And did you examine his vehicle?

A.      It's parked outside.

Q.      On the time for him to return from -- or to get back on special operations, did you examine his vehicle?

A.      No.  I actually was dealing with Major Romanelli who was the special operations commander at the time.

Q.      Do you know who made the decision on whether it was okay on how Mr. Koty's weapons could be stored?

A.      Major Romanelli had a discussion.  He came to my office and said that they were going to give Deputy Koty access to the secured area for the parking so that he could park his vehicle in the secured area instead of the parking garage, and I said that's okay.

Q.      So you were the one that made the final