**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| ERIC KOTY, | ) | No. 15 C 2600 |
| | ) | |
| Plaintiff, | ) | Judge Virginia M. Kendall |
| | ) | |
| v. | ) | |
| | ) | |
| SHERIFF JOHN ZARUBA, in his official | ) | |
| capacity as Sheriff of DuPage County, and | ) | |
| DUPAGE COUNTY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Eric Koty, a DuPage County Sheriff's deputy, sued his employer, DuPage County, alleging that the County retaliated against him in violation of the Americans with Disability Act ("ADA").[1] Defendant moves for summary judgment, arguing that Plaintiff experienced no adverse employment actions and, even if he did, he cannot prove a causal connection between his protected activity and the adverse actions. For the reasons discussed herein, the County's Motion for Summary Judgment is granted.

## FACTS

The following facts, which are taken from the parties' Local Rule 56.1 Statements, are undisputed unless otherwise noted.[2] Eric Koty, a deputy employed by the DuPage County

---

[1]Koty's suit originally included claims for discrimination and failure to accommodate under the ADA in addition to claims against DuPage County Sheriff John Zaruba. On July 28, 2015, the Court dismissed Koty's discrimination and failure to accommodate claims. (Dkt. 14.) Zaruba was dismissed by agreement of the parties on the same day. (*Id.*)

[2] In its reply, Defendant challenges the consideration of a number of Plaintiff's additional facts on a variety of evidentiary grounds. Those challenges have been carefully considered and the facts described below take those challenges into account.

Sheriff's Office,[3] suffers from a genetic hip condition. (Def. 56.1 ¶¶ 3, 6.) As a result of his hip condition, Koty experiences pain when he drives a vehicle that does not allow him to stretch out his legs. (Pl. SOAF ¶ 17.) Beginning in 2011, Koty informed the Sheriff's Office of the hip pain he experienced but never provided documentation indicating that he needed a different vehicle. (Dkt. 58-3 11:15-13:12.)

In January 2014, DuPage County Sheriff Chief James Kruse[4] asked Patrick Genovese, the Sheriff's Office's risk manager, to measure the Sheriff's Office's vehicles. (Def. 56.1 ¶ 27.) Genovese measured a Ford Crown Victoria (a sedan) and a Ford Interceptor (an SUV), both owned by the Sheriff's Office, to determine which vehicle had more legroom. (Def. 56.1 ¶ 28.) Genovese is not a certified ergonomist and had no training relating to Koty's alleged disability. (Pl. SOAF ¶ 20.) Genovese gave Kruse the following relevant measurements:

| Measurement | Crown Victoria | Interceptor |
|---|---|---|
| 1. Length of seat pan | 21" | 19.25" |
| 2. Front edge of seat to pedals | 21.5" | 23" |

(Def. 56.1 ¶ 28; Dkt. 58-14.)

On February 12, 2014, Koty submitted a doctor's note to the Sheriff's Office that stated he could "perform all duties of an active, fully duty law enforcement official" but suggested that "if available, because of a hip condition, a squad car with more legroom, like an SUV, would be preferable." (Def. 56.1 ¶ 11; Dkt. 58-7.) Nothing in the letter suggested that Koty could not drive his assigned vehicle, a Crown Victoria. (Def. 56.1 ¶ 12.)

On April 7, 2014, Koty submitted a doctor's note and an unfiled EEOC complaint to the Sheriff's Office. (Def. 56.1 ¶¶ 7, 13.) The doctor's note stated that while Koty could still

---

[3] Koty was hired in 2001. (Def. 56.1 ¶ 4.) He worked in Corrections before transferring to the Law Enforcement Bureau in 2005. (Def. 56.1 ¶ 4.)

[4] Chief Kruse was the Chief of the Administrative Bureau at the time. (Dkt. 58-5 38:2-12.)

perform the full duties of a law enforcement officer, he must, due to his hip condition, drive a vehicle with more legroom than his Sheriff's Office-issued Crown Victoria.  (Def. 56.1 ¶ 15.) The unfiled EEOC complaint alleged discrimination in violation of the ADA.  (Def. 56.1 ¶¶ 9, 13.)  Koty filed the EEOC complaint on April 9, 2014, (Def. 56.1 ¶ 9), and an amended EEOC complaint alleging retaliation on April 28, 2014. (Def. 56.1 ¶ 8.)

### A. Koty's Transfer from Law Enforcement to Court Security

On April 8, 2014, the day after Koty submitted his doctor's note and unfiled EEOC complaint to the Sheriff's Office, Chief Alan Angus[5] notified Koty that the restriction in his doctor's note required a temporary reassignment to the Court Security Bureau.  (Def. 56.1 ¶¶ 20-21; Dkt. 58-9.)

Prior to submitting the letter and complaint, Koty understood that the doctor's note prevented him from using his Crown Victoria.  (Def. 56.1 ¶ 19.)  Further, he knew that a transfer to court security was one of several possible accommodations that the Sheriff's Office could make, even though it was not the accommodation that he preferred.  (Def. 56.1 ¶¶ 14, 22.)

The decision to transfer Koty occurred on either April 7 or April 8, 2014, and started with a meeting between Chief James Kruse of the Sheriff's Office and Assistant State's Attorney Paul Bruckner.[6]  (Def. 56.1 ¶¶ 23-24.)  No one contacted Koty to discuss any accommodation.  (Pl. SOAF ¶ 13.)   By adding Genovese's measurements of the seat length and the distance between the front of the seat and the pedals, Kruse determined that Koty's Crown Victoria had one quarter inch more legroom than the Interceptor. (Def. 56.1 ¶ 28.)   Kruse thus believed assigning Koty an Interceptor would not accommodate his hip condition.  (Def. 56.1 ¶ 29.)

---

[5] Chief Angus was the Chief of Law Enforcement at the time.  (Dkt. 58-5 38:2-12.)

[6] Defendants argue that Chief Angus was also present at the meeting (Def. 56.1 ¶ 23), but Plaintiff disputes that Chief Angus was at the meeting, (Pl. Response ¶ 23).

Koty does not dispute the measurements, but disputes Kruse's conclusion that the Crown Victoria has more legroom than the Interceptor. (Pl. SOAF ¶ 24.) Koty argues that only the first measurement, from the front edge of the seat to the pedals, should be used to determine legroom. (*Id.*) Using those measurements, the Interceptor has 1.5 inches more legroom than the Crown Victoria. (*Id.*) Christopher Johnson was the Sheriff's Office's Quartermaster at the time (Def. 56.1 ¶ 54), and was responsible for assigning vehicles. (Pl. SOAF ¶¶ 6, 41.) At some point, Johnson was preparing to assign Koty an Interceptor, but Sheriff Zaruba, without explanation, told him not to assign Koty an Interceptor. (Pl. SOAF ¶ 8.) Johnson does not remember when this conversation took place. (Def. 56.1 ¶ 55.)

During their April 7 or 8 meeting, Kruse and Bruckner determined that their only options to accommodate Koty's hip condition were to transfer him to the Court Security Bureau, where he would not be required to drive, or to send him home. (Def. 56.1 ¶¶ 25, 30.) Bruckner suggested the courthouse transfer because there Koty would do the work of a deputy but would not need to operate a vehicle. (Def. 56.1 ¶ 26.) Further, Koty's union contract allowed transfers from law enforcement to court security if the transfer was not "arbitrary and capricious." (Def. 56.1 ¶ 5.) Knowing that Koty needed more legroom, Chief Angus agreed with the transfer decision. (Def. 56.1 ¶¶ 32, 34.) Sheriff Zaruba approved the transfer. (Def. 56.1 ¶¶ 35, 36.) Chief Angus then sent Koty a letter notifying him of his temporary assignment to courthouse duty, pending receipt of additional requested information.[7] (Def. 56.1 ¶¶ 21-22.)

Koty presents some testimony emphasizing the differences between court services and the law enforcement assignments. Deputy David Bilodeau, for example, noted that law enforcement requires driving a squad car and responding to calls, whereas courthouse duty involves monitoring hallways and courtrooms. (Pl. SOAF ¶ 5.) Koty also presents his own

---

[7] There is not sufficient information in the record to determine what the additional requested information is.

testimony, along with the testimony of Deputy Bilodeau and Quartermaster Johnson, that involuntary transfers to court security were generally considered punishment. (Pl. SOAF ¶¶ 3, 11, 12.)

On November 10, 2014, after seven months of the temporary courthouse assignment, Koty was officially assigned to the Court Security Bureau. (Dkt. 63-3.) While assigned to court security, Koty did not lose his certification as a patrol officer and did not miss any patrol officer training. (Def. 56.1 ¶ 52.) Koty's base compensation was unaffected by the reassignment. However, because he no longer worked on holidays, he did not receive holiday pay. (Dkt. 63-10 111:7-113:4.) He also was ineligible for overtime hours in court security because he was not trained to use the court's X-ray machines or to work in a courtroom. (*Id.*) He also claims that his childcare expenses increased due to the different work schedule. (Pl. SOAF ¶ 19.)

### B. Koty's Removal from Active Status in the Special Operations Unit

On April 9, 2014, the same day Koty was transferred to courthouse duty and two days after he submitted his doctor's note and unfiled EEOC complaint to the Sheriff's Office, Koty received a letter suspending him from the Special Operations Unit ("SWAT"). (Def. 56.1 ¶ 38; Dkt. 58-3 21:5-18.) The short letter stated: "Please be advised that since your work assignment has been temporarily transferred to the Courthouse you will be temporarily placed as inactive on the Special Operations Team (deployment & training). This decision was based on the advice of the State's Attorney's Office. This collateral assignment will be reevaluated after you supply the additional information requested regarding this matter." (Dkt. 63-5.) Koty does not know who made the decision to place him on inactive status. (Def. 56.1 ¶ 39.) The doctor's note that he submitted regarding his request for a new vehicle did not indicate that he was physically restricted from being on SWAT. (Pl. SOAF ¶ 29.) Koty argues that being removed from

SWAT caused him to miss training and affected his ability to take on more responsibility. (Dkt. 63-10 56:5-21.)

### C. Koty's Reactivation in the Special Operations Unit

On August 14, 2014, Kruse notified Koty via letter that he could rejoin SWAT if he submitted an approved security plan for storing his SWAT weapons and equipment in his personal vehicle. (Def. 56.1 ¶ 41.) The letter stated: "While you have been medically cleared by your medical care provider,[8] there are some logistical issues which need to be addressed, specifically regarding the security of your SOU weapons and equipment, and your ability to respond to a call out while temporarily assigned to the courthouse." (Dkt. 62-16.) Koty submitted a plan but received no response. (Dkt. 62-7 at 237:9-20.) He then sent an email approximately one month later. (*Id.*) On September 22, 2014, Kruse approved one of the options presented by Koty. (Def. 56.1 ¶ 44.) The plan required Koty to park his vehicle in a secure area at the courthouse and store his equipment in the trunk of his personal vehicle or in a locked case. (*Id.*) The Sheriff's Office reactivated Koty's status on SWAT in September or October 2014. (Def. 56.1 ¶ 38.)

The Sheriff's Office does not have policies or procedures detailing how SWAT members must secure their weapons and equipment. (Pl. SOAF ¶ 35.) It also has no policy that prevents members from using personal vehicles, with or without modifications to the vehicle. (*Id.*) Koty is not aware of any other SWAT members who were required to submit plans to store their equipment and weapons and was aware of several SWAT members who stored their weapons and equipment in unmarked Sheriff's Office SUVs. (Pl. SOAF ¶ 30.)

---

[8] Koty received medical clearance to work on SWAT on May 27, 2014. (Dkt. 63-10 23:21-24:12.)

### D. Koty's Assignment to Court Security after Medical Leave

Koty was still assigned to court security when he had hip surgery in February 2015. (*See* Dkt. 63-3; Def. 56.1 ¶ 45.) Following his surgery, Koty went on medical leave. (Def. 56.1 ¶ 45.) While on leave, Koty asked the Sheriff's Office if he would be reassigned to law enforcement upon his return, anticipating that the surgery would likely obviate his doctor's requirement for a vehicle with more legroom. (Dkt. 63-10 32:1-4.) The Sheriff's Office told Koty that he needed to submit a transfer request because employees who return from medical leave are returned to their pre-leave assignment. (Pl. SOAF ¶ 36; Def. 56.1 ¶ 48.) Koty did so. (Def. 56.1 ¶ 48.) On March 23, 2015, Koty's doctor released him to full duty and removed the legroom restriction. (Dkt. 58-3 105:9-11.) Koty returned to work in court security the same day. (Def. 56.1 ¶ 46.)

On March 24, 2015, one week after submitting the transfer request and shortly after restarting in court security, Koty asked Major Romanelli about his request to transfer to patrol. (Def. 56.1 ¶ 48; Pl. SOAF ¶ 36; Dkt. 63-10 33:5-11.) The same day, Chief Kruse notified Koty in a letter that Koty was being transferred back to law enforcement effective March 30, 2015. (Def. 56.1 ¶¶ 47-48; Dkt. 58-12.)

### E. Koty's Assignment to the Midnight Shift after Transferring to Law Enforcement

Following the March 30, 2015 transfer to law enforcement, Koty was initially assigned to the midnight shift. (Def. 56.1 ¶ 49.) Employees who return from medical leave generally may not bid on a shift and are placed in any open slots.[9] (Def. 56.1 ¶ 50.) Koty filed a grievance approximately two weeks after his reassignment. (Dkt. 58-3 108:2-3.) In the grievance, Koty claimed that he should be moved to the day shift because the Sheriff's Office had open day shift

---

[9] As a union member, Koty bid on and received the day shift during 2015. (Pl. SOAF ¶ 39.)

positions. (*Id.*; Dkt. 62-6 50:4-11.) He was subsequently transferred to the day shift, effective in two weeks—one month after his reassignment to law enforcement. (Def. 56.1 ¶ 49.) Koty suffered no loss of pay while working the midnight shift. (Def. 56.1 ¶ 51.) He experienced a loss of sleep as he attempted to adjust to the new schedule. (Dkt. 63-10 51:10-19.)

## LEGAL STANDARD

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Thayer v. Chiczewski*, 705 F.3d 237, 246 (7th Cir. 2012). A genuine dispute of material fact exists if, based on the evidence, a reasonable jury could find in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of establishing that there is no genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party meets its burden, then the nonmoving party must set forth facts that show that there is a genuine issue for trial. *Anderson*, 477 U.S. at 255. Where there are genuine disputes as to material facts, courts view those facts in the light most favorable to the nonmoving party when deciding motions for summary judgment. *Scott v. Harris*, 550 U.S. 372, 380 (2007). And when deciding motions for summary judgment, courts do not weigh evidence or make credibility determinations because such considerations are for the jury. *Omnicare, Inc. v. UnitedHealth Group, Inc.*, 629 F.3d 697, 704-05 (7th Cir. 2011).

## DISCUSSION

Koty alleges that, in response to his submission of his doctor's note and his unfiled EEOC complaint in April 2014, the Sheriff's Office carried out five distinct acts of retaliation against him: (1) his transfer from the Law Enforcement Bureau to the Court Security Bureau; (2) his conversion to inactive status in SWAT; (3) the requirement that he devise a plan to store his

weapons in order to return to active status in SWAT; (4) his reassignment to the Court Security Bureau upon returning to work after medical leave; and (5) his assignment to the midnight shift upon transferring back to the Law Enforcement Bureau. Defendant argues that none of these actions constitute an adverse employment action and, even if the actions were adverse, Koty cannot establish causation because he can only point to the timing of the actions. Further, Defendant provides non-retaliatory explanations for some of the actions. (Dkt. 57 at 13-14.)

The ADA prevents retaliation, interference, coercion, or intimidation against any individual who opposed a practice illegal under the Act. 42 U.S.C. § 12203 (2012). To survive summary judgment on his retaliation claim under the ADA,[10] Plaintiff must offer evidence of "'(1) a statutorily protected activity; (2) a materially adverse action taken by the employer; and (3) a causal connection between the two.'" *Baines v. Walgreen Co.*, No. 16-3335, 2017 WL 2962887, at  *3 (7th Cir. July 12, 2017) (quoting *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 403–04 (7th Cir. 2007), aff'd, 553 U.S. 442 (2008). Defendant does not dispute that Plaintiff engaged in a statutorily protected activity when he requested an accommodation and submitted his doctor's note and unfiled EEOC complaint.

A plaintiff suffers an adverse action if the action is "materially adverse." *Roney v. Ill. Dept. of Transp.*, 474 F.3d 455, 461 (7th Cir. 2007). An action is "materially adverse" if it injures or harms the employee to such a degree that the employee might stop his or her protected activity. *Poullard v. McDonald*, 829 F.3d 844, 857 (7th Cir. 2016). The test to determine whether an act is materially adverse is objective and depends on the circumstances of each case. *Stephens v. Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (citing *Burlington N. & Santa Fe Ry.*

---

[10] Cases cited in the discussion below are both ADA and Title VII retaliation cases. The language in the anti-retaliation provision in the ADA is similar to the language in the anti-retaliation provision in Title VII. *Casna v. City of Loves Park*, 574 F.3d 420, 427 (7th Cir. 2009). Thus, courts may consider Title VII cases when reviewing ADA claims. *Id.*

*Co. v. White*, 548 U.S. 53, 68-69 (2006)).  Examples of actions that rise to the level of an adverse action include "termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation."  *Barton v. Zimmer, Inc.*, 662 F.3d 448, 456 (7th Cir. 2011).  An employee's dissatisfaction with an employer's action does not make it adverse.  *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001).

A causal connection between the protected act and the adverse action exists when the evidence as a whole is sufficient "to permit a reasonable fact finder to conclude that retaliatory motive caused the [action]."  *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 563 (7th Cir. 2016).  As both parties acknowledge, demonstrating a causal connection through either "direct" or "indirect" evidence is no longer required.  *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016).  After Ortiz, the critical question is: "Does the record contain sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge?"  *Lord*, 839 F.3d at 563.  Evidence that retaliatory motive exists includes "suspicious timing, ambiguous statements, . . . other bits and pieces from which an inference of [retaliatory] intent might be drawn, [and] evidence, but not necessarily rigorous statistical evidence, that similarly situated employees were treated differently."  *Lambert v. Peri Formworks Sys., Inc.*, 723 F.3d 863, 869 (7th Cir. 2013) (internal quotations and citations omitted).

Even if a plaintiff successfully shows he suffered adverse actions and proves causation, a defendant can escape liability if he provides non-retaliatory explanations for the adverse actions.  *See Lord*, 839 F.3d at 564; *Argyropoulos v. City of Alton*, 539 F.3d 724, 736 (7th Cir. 2008).  A plaintiff then must show that the explanations are pretext for retaliation.  *Id.*  "Pretext means a

dishonest explanation, a lie rather than an oddity or an error." *Bodenstab v. County of Cook,* 569 F.3d 651, 657 (7th Cir. 2009). The explanation may be "mistaken, ill considered, or foolish," but it is not pretext if the defendant honestly believes the explanation. *Id.* at 657 (quoting *Hague v. Thompson Distrib. Co.*, 436 F.3d 816, 823 (7th Cir. 2006)). To suggest pretext, the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in the explanation "that a reasonable person could find [it] unworthy of credence." *Coleman v. Donahoe*, 667 F.3d 835, 853 (7th Cir. 2012) (citation and internal quotation marks omitted). "Summary judgment is appropriate only if a reasonable fact finder would be compelled to believe [the defendant's] explanation." *Culver v. Gorman & Co.*, 416 F.3d 540, 547 (7th Cir. 2005).

When a plaintiff alleges multiple retaliatory actions, each action is analyzed separately and not in the aggregate. *See Boss v. Castro*, 816 F.3d 910, 918 (7th Cir. 2016) (stating that "totality of the circumstances" only applies to hostile work environment claims); *Elue v. City of Chicago*, No. 16 CV 09564, 2017 WL 2653082, at *5 (N.D. Ill. June 20, 2017) (stating that retaliatory acts must be considered separately and not in the aggregate).

### A. Plaintiff's Transfer from Law Enforcement to Court Security

Koty first contends that his transfer from law enforcement to court security the day after he submitted a doctor's note and an unfiled EEOC complaint was retaliatory and done to punish him for requesting an accommodation for his hip condition. Defendant argues that Koty's transfer was not materially adverse and even if it were adverse, there is no causal link tying his transfer to the submission of the doctor's note and EEOC complaint.

Generally, job transfers or reassignments are not materially adverse unless the differences in job duties are "significant," as marked by a change in "work hours, compensation, or career

prospects." *Stephens*, 569 F.3d at 791. Additionally, "[b]y and large a reassignment that does not affect pay or promotion opportunities lacks th[e] potential to dissuade and thus is not actionable." *Washington v. Ill. Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005). Reassignments can be adverse, however, when they involve a transfer to a less prestigious position, are objectively inferior, include more arduous tasks, involve a significant diminishment in material responsibilities, or otherwise exploit a specific plaintiff's vulnerabilities. *Id.*; *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 71; *Atanus v. Perry*, 520 F.3d 662, 677 (7th Cir. 2008).

Although a lateral job transfer can constitute a materially adverse action in narrow circumstances, those circumstances do not exist here. Koty submitted a letter from his doctor informing the Sheriff's Office that he could no longer drive the car assigned to him and that he needed a car with more legroom, preferably an SUV. Instead of assigning him an SUV, the Sheriff's Office transferred him to a department where he would not need to drive. Although Koty preferred a different outcome or an interactive process with the Sheriff's Office, his subsequent transfer to court security was a reasonable attempt to accommodate his self-reported physical work restriction, one that he admitted he knew was possible.

In addition to his retaliation claim, in his original complaint, Koty claimed that the Sheriff's Office's actions in failing to adequately accommodate his alleged disability violated the ADA. That claim alleged that the Sheriff's Office failed to properly accommodate Koty's alleged disability by failing to engage in an interactive process with him regarding his request for an accommodation and by transferring him to court security instead of providing him with his preferred accommodation, an SUV. That claim has been dismissed. (*See* Dkt. 14.) Koty's retaliation claim regarding his initial transfer to court security, however, attempts to recast his

failed failure to accommodate claim, again taking umbrage with the fact that he was not consulted before he was transferred to court security and arguing that he should have been given his preferred accommodation of an SUV instead of being transferred to a position that did not require a vehicle.

Courts, however, do not recognize ADA retaliation claims that are simply repackaged failure to accommodate claims. If they did, "almost every failure to accommodate claim would be simultaneously a retaliation claim" and "it was unlikely Congress' intent to provide plaintiffs redundant relief for the same conduct when it established the anti-retaliation provisions of the ADA." *Moore-Fotso v. Bd. of Educ. of the City of Chicago*, 211 F. Supp. 3d 1012, 1038 (N.D. Ill. 2016), *reconsideration denied sub nom. Moore-Fotso v. Bd. of Educ. of City of Chicago*, No. 12-CV-10419, 2017 WL 1833152 (N.D. Ill. May 8, 2017). Indeed, the Seventh Circuit and many district courts within this District consistently reject these types of claims. *See, e.g.*, *Serino v. Potter*, 178 Fed. Appx. 552, 556 (7th Cir. 2006) (finding that even if plaintiff's transfer to a different unit in Postal Service constituted an adverse employment action, the transfer "was an attempt to satisfy *her* demand for accommodation of her medical conditions" and therefore "was not a sanction motivated by her disability"); *Edwards v. Ill. Dep't of Fin. & Prof'l Regulation*, No. 12 C 00371, 2017 WL 2224878, at *3 (N.D. Ill. May 22, 2017) (precluding plaintiff from introducing evidence of defendant's alleged failure to accommodate as a separate and distinct adverse action for purposes of her ADA retaliation claim); *Santos-Means v. Sheriff's Office of Cook Cty., Ill.*, No. 12 CV 8804, 2016 WL 6092600, at *8 (N.D. Ill. Oct. 19, 2016), appeal dismissed sub nom. *Dionne Santos-Means v. Cook Cty. Sheriff's Office* (Nov. 15, 2016) (rejecting plaintiff's retaliation claim predicated on same alleged failure to accommodate that comprised her ADA discrimination claim, noting that "[a] retaliation claim based entirely on a

failure to accommodate is redundant in a manner not likely intended by Congress); *Avet v. Dart*, No. 14 C 4555, 2016 WL 757961, at *6 (N.D. Ill. Feb. 26, 2016) (granting summary judgment on ADA retaliation claim because employer's non-accommodation "cannot do 'double duty' as evidence of an adverse employment action"); *Sheahan v. Dart*, No. 13-cv-9134, 2015 WL 1915246, at *6 (N.D. Ill. Apr. 23, 2015) ("[b]ecause the protected activity Plaintiff alleges he engaged in was requesting accommodations, the denial of such requests can hardly be considered unlawful retaliation for the act of requesting them."); *Pack v. Ill. Dep't of Healthcare & Family Servs.*, No. 13-cv-8930, 2014 WL 3704917, at *4 (N.D. Ill. July 25, 2014) (dismissing plaintiff's ADA retaliation claim based on denials of accommodations as "duplicative").

Similarly, when an employee institutes a physical work limitation or requests a reprieve from certain types of work, reasonable actions taken to accommodate such a limitation or request cannot be considered adverse, because it "is the employer's prerogative to choose a reasonable accommodation; an employer is not required to provide the particular accommodation that an employee requests." *Jay v. Intermet Wagner Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). *See Malekpour v. Chao*, 682 Fed. Appx. 471, 474 (7th Cir. 2017) (finding that plaintiff's removal as project manager, which was done at plaintiff's request, was not adverse); *Hancock v. Potter*, 531 F.3d 474, 478–79 (7th Cir. 2008) (concluding that the Postal Service's efforts to accommodate a plaintiff's self-reported physical work restrictions, including fitness-for-duty examinations and reduced hours, could not be considered adverse); *see also Langreder v. Freeman Expositions, Inc.*, No. 13-cv-0371, 2016 WL 537953, at *5 (N.D. Ill. Feb. 11, 2016), *aff'd sub nom. Langreder v. Freeman Expositions, Inc.*, 679 F. App'x 500 (7th Cir. 2017) ("When a plaintiff requests certain work restrictions that reduce the availability of work hours, it does not qualify as an adverse employment action."); *Latham v. Donahue*, 40 F. Supp. 3d 1023, 1032 (N.D. Ill

2014) ("A refusal to provide Plaintiff's preferred accommodation is not an adverse employment action, even for purposes of retaliation claims."). For these reasons, the Sheriff's Office's actions to transfer Koty to court security cannot be considered adverse.

Even if Koty were able to make out a prima facie case of retaliation, however, he would be unable to demonstrate that Defendant's non-retaliatory explanation for the transfer—the need to quickly accommodate Koty's physical restriction—was pretextual. There is undisputed evidence that based on the legroom measurements performed by the Sheriff's Office risk manager in January, Chief Kruse believed that Koty's Crown Victoria had one quarter inch more legroom than the Interceptor. (Def. 56.1 ¶ 28.) Kruse made that determination by adding the measurement of the seat length to the distance between the front of the seat and the pedals. (*Id.*) As a result, Kruse believed that assigning Koty an Interceptor would not accommodate his hip condition, even if Interceptors were available. (Def. 56.1 ¶ 29.)

Without challenging the measurements themselves, Koty argues that Defendant used the incorrect legroom calculations and that the Sheriff's Office should have only considered the length of the seat as measured from the front of the seat to the pedals, rather than, as in Kruse's calculations, from the back of the seat to the pedals. Koty points to the testimony of Genovese, who measured the vehicles and who agrees with Koty's method of determining the amount of legroom.

But Koty fails to acknowledge, however, that "merely disagreeing with an employer's reasons does not meet" the standard for demonstrating pretext. *Tibbs v. Admin. Office of the Illinois Courts*, 860 F.3d 502, 506 (7th Cir. 2017). "A plaintiff must point to 'evidence tending to prove that the employer's proffered reasons are factually baseless, were not the actual motivation for the discharge in question, or were insufficient to motivate'" the adverse action. *Id.* (quoting

*Carter v. Chicago State Univ.*, 778 F.3d 651, 659 (7th Cir. 2015)). Koty has failed to identify evidence that undermines the Sheriff's Office's facially valid decision behind the transfer, and a different interpretation of the legroom measurements does not show pretext. First, there is no evidence to undercut Chief Kruse's belief that the SUV had less room than Koty's assigned cruiser. Additionally, there is no evidence in the record to support the conclusion that Genovese told Chief Kruse that he believed that the Interceptor had more legroom, nor that Genovese asserted which measurements should be used to determine total legroom. Furthermore, as Koty himself points out, Genovese was not certified in ergonomics, had no idea what he was measuring for, and did not see Koty's doctor's note. (Pl. SOAF ¶¶ 19, 20, 24, 25.) Therefore, whether Kruse had shared Genovese's position regarding the measurements is immaterial.

As noted above, even if Kruse mistakenly relied upon the wrong legroom measurements, that alone is insufficient to demonstrate pretext. *Tibbs*, 860 F.3d at 506 ("Pretext 'involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is [a] lie, specifically a phony reason for some action.'") (quoting *Burton v. Bd. of Regents of the Univ. of Wis. Sys.*, 851 F.3d 690, 698 (7th Cir. 2017)); *Grayson v. O'Neill*, 308 F.3d 808, 820 (7th Cir. 2002) ("[I]n determining whether an employer's proffered reason for an employment action was pretextual, we are not concerned with the correctness or desirability of reasons offered for employment decisions, but rather the issue of whether the employer honestly believes in the reasons it offers."). Koty provides no support for the conclusion that Kruse's interpretation of the measurements was incorrect, let alone any evidence that the Sheriff's Office transferred Koty due to a retaliatory motive.

Koty also points to the fact that at some unidentified point, Chief Zaruba, without explanation, instructed the Sheriff's Office's Quartermaster not to assign Koty an SUV. He has

failed, however, to elicit any evidence that would allow a reasonable trier of fact to conclude that this statement happened after Koty submitted his doctor's note or that Zaruba was motivated by a wish to retaliate against Koty for requesting an accommodation for his hip issue. The fact that the Sheriff's Office decided not to issue Koty an SUV is not in dispute, and the fact that Zaruba declined to issue Koty an SUV does nothing to show a retaliatory motive. In fact, even if Zaruba's statement took place after Koty's request for an accommodation, such a determination is entirely consistent with the Sherriff's Office's proffered legitimate reason for transferring Koty—it did not believe that an SUV sufficiently accommodated Koty's hip condition.

### B. Plaintiff's Removal from Active Status in the Special Operations Unit

Two days after Koty submitted his doctor's note and unfiled EEOC complaint to the Sheriff's Office, Defendant informed Koty that he was being temporarily placed on inactive status in SWAT due to his transfer to court security and that the decision would be reevaluated after he submitted additional information. (Dkt. 63-5.) Koty maintains that this action was retaliation for requesting a different vehicle. Again, Defendant argues that the transfer was not adverse and that Koty cannot prove causation.

"A decrease in job responsibilities can constitute an adverse employment action, but the decrease must result in *significantly different job responsibilities*." *Hobson v. Potter*, 100 Fed. Appx. 556, 559 (7th Cir. 2004) (emphasis added); *see also Twisdale v. Snow*, 325 F.3d 950, 953 (7th Cir. 2003) (finding that removal of duties is actionable only if it impedes an employee's career). In other words, Koty must show that his temporary placement on inactive status for SWAT constituted "significantly diminished responsibilities or working conditions" in order to demonstrate an adverse job action. *Mercer v. Cook Cty., Ill.*, 527 Fed. Appx. 515, 522 (7th Cir. 2013) (finding that plaintiff's reassignment was not adverse because there was no loss salary

benefits, or substantially changed working conditions); *James v. Hyatt Regency Chicago*, 707 F.3d 775, 782 (7th Cir. 2013) (noting that a materially adverse action could include "a material loss of benefits, *significantly diminished material responsibilities*, or other indices that might be unique to a particular situation.") (quoting *Crady v. Liberty Nat'l Bank & Trust Co.*, 993 F.2d 132, 136 (7th Cir. 1993) (emphasis added)).

Although Koty nominally claims that his placement on SWAT inactive status was adverse, he has failed to develop the factual record necessary to enable a reasonable jury to make that conclusion, thereby waiving his claim. *Bauers v. Bd. of Regents of Univ. of Wisconsin*, 33 Fed. Appx. 812, 817–18 (7th Cir. 2002) ("This court is not obligated to construct arguments for the parties, or comb the record to find factual support for their assertions. When a party fails to develop the factual and legal basis for a claim, as [Koty] has done, the arguments are deemed waived.").

Indeed, Plaintiff has not presented any evidence that being placed on inactive SWAT status resulted in significantly diminished material responsibilities, let alone material loss of income,[11] a limitation on career prospects, or a material loss of benefits. Instead, the only admissible facts that Koty submits in his L.R. 56.1 statement of additional facts relating to this issue go to causation or pretext.[12] Even if the Court were to perform an independent review of the record, that review would indicate that when active, Koty was only on call for SWAT every other month and would only engage in SWAT missions on an ad hoc basis when he was on call.

---

[11] Koty's 56.1 statement of additional facts fails to present any evidence that his placement on inactive status resulted in any material loss of income. A review of the record indicates that Koty testified that he received $25 per week in "pager" stipend when he was on call for SWAT but that he was only on call every other month. Additionally, there is no evidence that Koty incurred pager expenses when he was on inactive status that would warrant receipt of the stipend or that the stipend covered more than his out of pocket expenses. (*See* Dkt. 63-10 at 21-22.)

[12] Koty spends the vast majority of his Response addressing his initial transfer to court services, focusing little attention on his placement on inactive SWAT status. The only relevant admissible facts that he submits relate to the steps Koty was forced to take to ensure that his gear and weapons were stored properly. (*See, e.g.*, Pl. SOAF ¶¶ 30, 35.)

During his time on inactive status Koty missed a handful of SWAT trainings but there is no evidence that he missed any SWAT missions, that his skills atrophied, or that his career was impacted in any way. In fact, there is no evidence that being on inactive SWAT status had any adverse effect on Koty whatsoever, let alone one that was materially adverse. Plaintiff was clearly unhappy with the action, but "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that an . . . employee did not like would form the basis of a" retaliation claim. *Coffey-Sears v. Lyons Twp. High Sch. Dist. 204*, No. 15-cv-08642, 2017 WL 1208439, at *10 (N.D. Ill. Mar. 31, 2017) (quoting *Kersting v. Wal-Mart Stores, Inc.*, 250 F.3d 1109, 1115 (7th Cir. 2001).

Instead of pointing to facts that would lead a jury to conclude that being placed on inactive SWAT status was adverse, Plaintiff cites *Hoppe v. Lewis University*, 692 F.3d 833 (7th Cir. 2012), which does not aid his argument. In *Hoppe*, a philosophy professor filed a series of accommodation requests over a two-year period and was eventually removed from teaching an aviation ethics course, which had become her sub-specialty. *Id.* at 835-36. The professor alleged that the removal and numerous other acts were retaliation for her accommodation requests. *Id.* The court determined that, with the exception of her removal from teaching aviation ethics, the numerous acts could not be adverse because they produced no injury and were simply snubs and slights. *Id.* at 842.

Koty's citation to *Hoppe*, however, is unhelpful to his conclusory argument that his temporary removal from SWAT active status was adverse. Although the court noted in dicta that Hoppe's removal from teaching aviation ethics could be considered adverse, aviation ethics had become Hoppe's sub-specialty, so the removal of such a critical responsibility is the type of diminished material responsibility that courts within this district consistently find can constitute

an adverse action. As discussed above, Koty has failed to proffer admissible evidence that would allow a reasonable trier of fact to come to the same conclusion.

### C. Plaintiff's Reactivation in the Special Operations Unit

After Koty received medical clearance to return to SWAT, Defendant required Plaintiff to submit a plan to securely store his SWAT weapons and gear in his personal vehicle in order to be reactivated to SWAT, ostensibly because he no longer was assigned an official vehicle where weapons could be securely stored. Defendant again argues that the action was not adverse and that Koty cannot show causation. Koty asserts that the action was punitive because there were no official policies regarding weapon storage and that police officers from other jurisdictions who were on SWAT could use their personal vehicles to carry their SWAT gear and weapons. (Dkt. 63 at 10.)

Adverse actions do not include trivial harms because "normally petty slights, minor annoyances, and simple lack of good manners do not deter employees from reporting discrimination. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. Koty provides no evidence that this action rises above a minor annoyance. There is no evidence that formulating a safety plan to safely store weapons would prevent a reasonable actor from engaging in protected activity. A reasonable fact finder could find Defendant's requirement frustrating, but no reasonable fact finder could determine that requiring Koty to submit a plan to safely store his weapons in his personal car was materially adverse. In fact, the Seventh Circuit regularly finds that requiring employees to participate in performance improvement plans, which are typically much more onerous than the safety plan Koty was required to submit, are not materially adverse. *See Langenbach v. Wal-Mart Stores, Inc.*, 761 F.3d 792, 799 (7th Cir. 2014) (finding in retaliation suit that placing employee on performance improvement plan was not materially

adverse); *Cole v. Illinois*, 562 F.3d 812, 816 (7th Cir. 2009) (finding that onerous improvement plan in retaliation suit did not constitute an adverse action because "[t]he mere act of submitting a daily plan to one's superiors is not an additional burden of great concern").

Furthermore, Koty has entirely failed to respond to Defendant's argument regarding causation. Koty was asked to come up with the safety plan several months after he requested the accommodation, so he cannot point to any suspicious timing to establish a causal link. Instead, the gap between the protected activity and the alleged retaliatory act undermines any inference of causation. *Carlson v. CSX Transp., Inc.*, 758 F.3d 819, 828 (7th Cir. 2014) (noting that an inference of retaliation can be weakened by "a lengthy time period between the protected activity and the alleged retaliation"); *see also E.E.O.C. v. Yellow Freight Sys., Inc.*, 253 F.3d 943, 952-53 (7th Cir. 2001) (affirming summary judgment, *inter alia*, because six-week gap between protected activity and termination was insufficient to establish retaliation); *Jasmantas v. Subaru-Isuzu Auto., Inc.*, 139 F.3d 1155, 1158 (7th Cir. 1998) (affirming summary judgment when there was a three-month gap between protected activity and employee's termination). Koty has otherwise failed to point to any other evidence that could establish causation, conceding that point to Defendant. *See Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 600 (7th Cir. 2014) ("The non-moving party waives any arguments that were not raised in its response to the moving party's motion for summary judgment.").

### D. Plaintiff's Assignment to Court Security after Medical Leave

Defendant assigned Koty to court security when he returned from medical leave and required him to file paperwork before transferring him back to law enforcement. Again, Defendant argues that the action was not adverse because Plaintiff did not experience reduced pay, diminished career prospects, or a negatively altered workplace. Plaintiff suggests that the

action was evidence of continued punishment but again fails to make any arguments—factually or legally—that the action was adverse or that there was a causal link between the retaliatory act and Koty's protected activity.

Again, Defendant's action was not adverse and therefore not retaliatory. Plaintiff argues that after being assigned back to court security he "had to go through additional hoops to get back to his job. He was required to file other forms to get back to his job, [sic] or remain in Court Services." (Dkt. 63 at 11.) Those "hoops" included only two actions: filing a transfer form and asking a superior about the status of his transfer. Plaintiff has failed to show that those actions signify more than a minor annoyance, and minor annoyances do not rise to the level of adverse actions. *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 68. Further, it is undisputed that the Sheriff's Office had a policy that required employees who return from medical leave to be returned to their pre-leave assignment. (Pl. SOAF ¶ 36.; Def. 56.1 ¶ 48.) The application of a uniform employment policy does not support a finding of retaliation. *See Silk v. City of Chicago,* 194 F.3d 788, 800 (7th Cir. 1999) (finding that application of police department policy to plaintiff, which required plaintiff to stop working his second job, did not evidence retaliation); *Moore-Fotso v. Bd. of Educ. of the City of Chicago*, 211 F. Supp. 3d 1012, 1040 (N.D. Ill. 2016), *reconsideration denied sub nom. Moore-Fotso v. Bd. of Educ. of City of Chicago*, No. 12-cv-10419, 2017 WL 1833152 (N.D. Ill. May 8, 2017) (finding that employer's compliance with workplace policy could not sustain retaliation claim).

Even if Koty's reassignment to court security after his hip surgery was adverse, Koty has again failed to address the issue of causation and thus cannot establish a prima facie case of retaliation. Furthermore, there is no suspicious timing connecting his reassignment to court security to Koty's protected activity—which took place approximately one year earlier—which

could lead to an inference of causation. Furthermore, Koty fails to identify who made the decision to return him to court security after his hip surgery, let alone establish that the decision maker knew of his original request for an accommodation, providing another reason to grant summary judgment for the Defendant on this count. *See, e.g., Wackett v. City of Beaver Dam, Wis.*, 642 F.3d 578, 583 (7th Cir. 2011) (affirming summary judgment for employer because where plaintiff could not "show that any of the defendants knew of his purportedly protected [activity], he cannot establish causation.").

### E. Plaintiff's Assignment to the Midnight Shift after Transferring to Law Enforcement

Finally, Koty argues that his assignment to the midnight shift after transferring back to law enforcement was retaliatory. Defendant continues to argue that this action was not adverse and that Koty has failed to demonstrate causation.

When an employee's pay and responsibilities remain the same, schedule changes alone are only adverse when an employer attempts to exploit an employee's known vulnerability. *See Burlington N. & Santa Fe Ry. Co.,* 548 U.S. at 69 ("A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children."); *Washington*, 420 F.3d at 662-63 (holding that a schedule change could be adverse because the employer knew an employee needed flex time to care for an ill child but changed her schedule, causing significant losses when the employee drained her vacation and sick leave to care for her child). Plaintiff makes no argument that Defendant exploited any known vulnerability or that he experienced any adverse effect from a short stint on the midnight shift. Instead, he simply argues that he lost sleep while adjusting to the new schedule. While losing sleep is certainly an annoyance, the schedule change does not rise to the level of an adverse action. *See Langenbach*, 761 F.3d at 799 (finding that transferring employee

to night shift was not materially adverse because there was no evidence that employer made transfer to exploit a known vulnerability).

Furthermore, Koty has failed to present any argument or evidence linking his request for an accommodation in April 2014 to his placement on the midnight shift many months later. The long gap between the protected activity and the alleged retaliatory act undercuts an inference of causation and Koty has failed to present evidence to allow a reasonable trier of fact to come to a different conclusion. Again, he does not point to any evidence identifying the decision makers behind his transfer to the midnight shift, nor whether those individuals were even aware of his original request for an accommodation. *See Wackett*, 642 F.3d at 583.

## CONCLUSION

For the reasons stated herein, Defendant's motion for summary judgment is granted.


Hon. Virginia M. Kendall
United States District Judge

Date: September 19, 2017